**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

ANTHONY GALLEGOS; OLEN C. PRIDDY;
SHEILA CAVITT-OLGUIN; TYLER KEMP;
DEBORAH LEYBA; ROSE ANNA
MARQUEZ; DANIEL JOSLIN; GREGORY
LUNGSTRUM; JUANTIA MAESTAS;
CANDACE SEAVERNS on behalf of the
Seaverns Family Living Trust; RICHARD
OGOREK; JUANTIA HERRERA-ROMERO,

        Plaintiffs,

vs.                                                                  No. CIV 24-0170 JB/JFR

FEDERAL EMERGENCY MANAGEMENT
AGENCY, DOES 1-20, inclusive,

        Defendant.

<u>**MEMORANDUM OPINION AND ORDER**</u>

**THIS MATTER** comes before the Court on the: (i) Plaintiffs Review Hearing Brief, filed April 29, 2025 (Doc. 52)("Plaintiffs' Hearing Brief"); (ii) Plaintiffs Request for Judicial Notice, filed April 29, 2025 (Doc. 53)("Plaintiffs' Judicial Notice Request"); (iii) Federal Respondent's Motion *In Limine* to Exclude Extra-Record Testimony and Evidence, filed May 1, 2025 (Doc. 56)("FEMA's Motion in Limine"); and (iv) Defendant/Respondent Federal Emergency Management Agency's Pre-Judicial Review Hearing Brief, filed May 3, 2025 (Doc. 62)("FEMA's Hearing Brief"). The Court held hearings on May 5, 2025, and May 6, 2025. See Clerk's Minutes at 1, filed May 5, 2025 (Doc. 66)("May 5-6, 2025, Minutes"). The primary issues are: (i) whether the Court may evaluate the Plaintiffs' requests for judicial review, where the Plaintiffs file the Complaint, filed February 20, 2024 (Doc. 1)("Complaint"), more than 60 days after FEMA provides a judicially reviewable decision on the Plaintiffs' Hermit's Peak Act claims, but within

60 days of FEMA issuing the Plaintiffs' Letters of Determination; (ii) whether the Court should take judicial notice of several State court documents in other wildfire cases, where those documents are publicly available but do not relate to the underlying claims at issue in this case; (iii) whether the Court should limit its review of the Defendant Federal Emergency Management Agency's determinations of the Plaintiffs' claims under the Hermit's Peak Fire Assistance Act, Pub. L. No. 117-180, § 104, 136 Stat. 2114, 2168 (2022)("Hermit's Peak Act"), to the record developed before the date that the Defendant Federal Emergency Management Agency ("FEMA") provides a judicially reviewable decision on the Plaintiffs' Hermit's Peak Act claims; and (iv) how much compensation FEMA must provide each individual Plaintiff, where the Plaintiffs provide different levels of substantiation for their damages claims.  The Court concludes: (i) the Court may evaluate the Plaintiffs' judicial review requests, because, although the Plaintiffs filed the Complaint more than 60 days after getting a judicially reviewable decision, each Plaintiff's 60-day filing deadline has been tolled equitably, their 60-day clocks start ticking when FEMA issues their respective Letters of Determination, and the Plaintiffs file the Complaint within 60 days of each Letter of Determination; (ii) the Court will not take judicial notice of the Plaintiffs' identified State court documents, because those documents are not part of the record made before the FEMA Administrator; (iii) the Court will limit its judicial review to materials presented to FEMA before FEMA issued the decisions which the Court is reviewing -- which, in the Plaintiffs' cases, are the Letters of Determination -- because the Hermit's Peak Act provides that a district court "shall" review a challenged decision "on the record made before the Administrator," Hermit's Peak Act § 104(i)(1)-(2); and (iv) FEMA shall pay: (a) $11,118.58 to Plaintiff Anthony Gallegos, which includes $9,000.00 in noneconomic nuisance damages; (b) $206,991.36 to Plaintiff Olen C. Priddy, which includes $150,000.00 in noneconomic nuisance damages; (c) $314,198.68 to

Plaintiff Sheila Cavitt-Olguin, which includes $215,000.00 in noneconomic nuisance damages; (d) $31,146.35 to Plaintiff Tyler Kemp, which includes $24,000.00 in noneconomic nuisance damages; (e) $269,782.43 to Plaintiff Deborah Leyba, which includes $100,000.00 in noneconomic nuisance damages and $169,782.43 in reforestation damages; (f) $15,112.35 to Plaintiff Rose Anna Marquez, which includes $12,000.00 in noneconomic nuisance damages; (g) $330,000.00 in noneconomic nuisance damages to Plaintiff Daniel Joslin; (h) $1,661,794.88 to Plaintiff Gregory Lungstrum, which includes $300,000 in noneconomic nuisance damages, $1,035,608.83 in reforestation damages, and $326,186.05 in road regrading and erosion damages; (i) $86,490.24 to Plaintiff Juanita Maestas, which includes $35,000.00 in noneconomic nuisance damages; (j) $1,203,921.32 to Plaintiff Candace Seaverns, which includes $250,000.00 in noneconomic nuisance damages and $953,921.32 in road regrading and erosion damages; (k) $353,986.11 to Plaintiff Richard Ogorek, which includes $270,000.00 in noneconomic nuisance damages; and (l) $266,460.24 to Plaintiff Juanita Herrera-Romero, which includes $180.000.00 in noneconomic nuisance damages.

## FACTUAL BACKGROUND

The Court first summarizes the history of the Hermit's Peak/Calf Canyon Fire. The Court then describes the Hermit's Peak Act and FEMA's promulgated regulations. Finally, the Court describes the Plaintiffs and their attempts to obtain Hermit's Peak Act compensation.

**1.    The Hermit's Peak/Calf Canyon Fire.**

In April, 2022, a wildfire scorched over 340,000 acres of land in northeastern New Mexico, destroying over 900 structures and forcing the evacuation of over 15,000 households throughout Mora, San Miguel, and Taos Counties. See Patrick Lohmann, Were You Affected by the Massive Wildfire in Northern New Mexico?  We Want to Hear From You, (March 2, 2023), https://www.propublica.org/getinvolved/new-mexico-wildfires-hermits-peak-calf-canyon    (last

accessed December 6, 2024). It is the largest wildfire in New Mexico State history. See Bryan Pietsch and Jason Samenow, New Mexico blaze is now largest wildfire in state history, The Washington Post (May 17, 2022), https:(ww.washingtonpost.com/nation/2022/05/17/calf-canyon-hermits-peak-fire-new-mexico/ (last accessed December 5, 2024). The first wildfire began on April 6, 2022, in Hermit's Peak, New Mexico, when the United States Forest Service ("Forest Service") initiated a prescribed burn in the Santa Fe National Forest in San Miguel County that quickly spread beyond federal land and turned into a wildfire. See Hermit's Peak Act § 102(a) Findings and Purposes, 136 Stat. 2144, 2168 ("Hermit's Peak Act § 102(a)"). A second wildfire began on April 19, 2022, in Calf Canyon, New Mexico, when a dormant pile burn[1] from the prior winter re-emerged. See Hermit's Peak Act § 102(a). Within the same month, on April 27, 2022, the wildfires at Hermit's Peak and Calf Canyon merged, and formed the Hermit's Peak/Calf Canyon Fire. See Hermit's Peak Act § 102(a). By May, 2022, the Hermit's Peak/Calf Canyon Fire caused evacuations in multiple villages and communities, including the San Miguel county jail, the State's psychiatric hospital, the United World College, and New Mexico Highlands University. See Hermit's Peak Act § 102(a). At the request of New Mexico Governor Michelle Lujan Grisham, President Joseph R. Biden issued a major disaster declaration for the counties of Colfax, Mora, and San Miguel. See Hermit's Peak Act § 102(a); Hermit's Peak/Calf Canyon Fire Assistance, 88 Fed. Reg. 33808 (August 29, 2023)(codified at 44 C.F.R. 296). The Forest Service fully contained the Hermit's Peak/Calf Canyon Fire four months later, in August 2022. See The New Mexican, Hermits Peak/Calf Canyon Fire 100 percent contained, fire officials say (August

---

[1]A pile burn "is a type of prescribed fire where firefighters pile and burn forest debris to reduce an area's wildfire risk." Pile Burning, United States Forest Service, https://www.fs.usda.gov/detail/arp/landmanagement/resourcemanagement/?cid=fsm91_058291 (last accessed Dec. 6, 2024).

21, 2022), https://www.santafenewmexican.com/news/local_news/hermits-peak-calf-canyon-fire-100-percent-contained-fire-officials-say/article_5ac054fc-21a1-11ed-9401-134e852ee0a8.html (last visited December 6, 2024).  The Forest Service assumes responsibility for the Hermit's Peak/Calf Canyon Fire.  See Hermit's Peak Act § 102(a).

### 2.    The Hermit's Peak Act.

In September, 2022, Congress establishes a dedicated relief fund to compensate victims of the Hermit's Peak/Calf Canyon Fire by enacting the Hermit's Peak Act.  See Hermit's Peak Act § 102(b), 136 Stat. at 2169.  The Hermit's Peak Act has two stated purposes: "(1) to compensate the victims of the Hermit's Peak/Calf Canyon Fire, for injuries resulting from the fire; and (2) to provide for the expeditious consideration and settlement of claims for those injuries."  Hermit's Peak Act § 102(b).  The Hermit's Peak Act provides: "Not later than 180 days after the date on which a claim is submitted under this Act, the Administrator shall determine and fix the amount, if any, to be paid for the claim."  Hermit's Peak Act § 104(d)(1)(A)(i) ("180-Day Determination Deadline").  Under Hermit's Peak Act § 104(i) ("Section 104(i)"), claimants "aggrieved by a final decision" may seek "not later than 60 days after the date on which the decision is issued," judicial review in the United States District Court for the District of New Mexico "to modify or set aside the decision, in whole or in part."  Hermit's Peak Act § 104(i)(1) ("Section 104(i)(1)").  A reviewing court "shall": (i) review FEMA's final decision "on the record made before the Administrator," Hermit's Peak Act § 104(i)(2); and (ii) uphold FEMA's final decision, "if the decision is supported by substantial evidence on the record considered as a whole," Hermit's Peak Act § 104(i)(3).  Claimants also may seek judicial review of partial payments of a Hermit's Peak Act claim.  See Hermit's Peak Act § 102(d)(2).

### 3.    **The FEMA Regulations.**

The Hermit's Peak Act authorizes FEMA to promulgate "regulations for the processing and payment of claims under this Act." Hermit's Peak Act § 104(f)(1). FEMA published its final regulations on August 29, 2023. See 44 C.F.R. § 296 ("Hermit's Peak Regulations"). The Hermit's Peak Regulations state that the purpose of the Hermit's Peak Act is to "receive, evaluate, process, and pay actual compensatory damages for injuries resulting from the Hermit's Peak/Calf Canyon Fire." 44 C.F.R § 296.1. To receive compensation, a claimant "must be an Injured Person who suffered injury as a result of the Hermit's Peak/Calf Canyon Fire and sustained damages." 44 C.F.R. § 296.20. A claimant first must file with the FEMA Claims Office a Notice of Loss form that briefly describes each injury. See 44 C.F.R. §§ 296.5(b), 296.10(a). Second, the claimant and a Claims Reviewer[2] discuss the claim "to help the claimant formulate a strategy for obtaining any necessary documentation or other support," and the Claims Reviewer submits a report to the Authorized Official[3] for review. 44 C.F.R. § 296.5(c). Third, "[a]fter the claimant has had an opportunity to discuss the claim with the Claims Reviewer, a Proof of Loss will be presented to the claimant for signature." 44 C.F.R. §§ 296.5(c). FEMA's regulations state that FEMA evaluates the claim and provides an initial claim determination only after the Claims Reviewer submits the Proof of Loss, which is a "statement attesting to the nature and extent of the claimant's injuries." 44 C.F.R. § 296.4. See 44 C.F.R. §§ 296.5(c), (a). FEMA's regulations state that claimants may

---

[2]The Hermit's Peak Regulations define Claims Reviewer as "an employee of the United States or a Claims Office contractor or subcontractor who is authorized by the Director of the Claims Office to review and evaluate claims submitted under the Act." 44 C.F.R. § 296.4.

[3]The Hermit's Peak Regulations define Authorized Official as "an employee of the United States who is delegated with authority by the Director of the Claims Office to render binding determinations on claims and to determine compensation due to claimants under the Act." 44 C.F.R. § 296.4.

file their Proof of Loss up to 150 days -- or later, if the claimant shows good cause -- after filing their Notice of Loss.  See 44 C.F.R. § 296.30(b).  Fourth, the Authorized Official evaluates the claim and issues a compensation determination.  See 44 C.F.R. §§ 296.5(d), 296.32(a).  FEMA's regulations provide that, within 120 days of the compensation determination, the claimant either may accept the determination or may submit a written request for review, i.e., an administrative appeal, to the Director[4] of the Claims Office that explains why the Authorized Official's determination was incorrect.  See 44 C.F.R. §§ 296.32(b), 296.41.  During the administrative appeal, the claimant may submit supplemental evidence to support his or her appeal, the claimant and the Director of the Claims Office may schedule a conference to explore settlement, and the Director of the Claims Office may convene an informal hearing to receive oral testimony from witnesses or experts.  See 44 C.F.R. § 296.41(c)-(g).  The Director of the Claims Office then will issue a written decision on the administrative appeal, which, according to FEMA, "will constitute the final decision" under the Hermit's Peak Act, §§ 104(d)(2), 104(i)(1).  44 C.F.R. § 296.41(h).  Per FEMA's regulations, the claimant then either may initiate arbitration or may seek judicial review of the administrative appeal decision.  See 44 C.F.R. §§ 296.41(i), 296.43.

The Hermit's Peak Regulations contain an overview of the Hermit's Peak Act damages provisions, addressing allowable damages and then exclusions:

> (a)    Allowable damages.    The Act provides for the payment of actual compensatory damages for injury or loss of property, business loss, and financial loss.  The laws of the State of New Mexico will apply to the calculation of damages. Damages must be reasonable in amount.

---

[4]The Hermit's Peak Regulations define Director as "an Independent Claims Manager appointed by the [FEMA] Administrator who will serve as the Director of the Claims Office." 44 C.F.R. § 269.4.

(b)    Exclusions.  Punitive damages, statutory damages under section 30-32-4 of the New Mexico Statutes Annotated (2019), interest on claims, attorney's fees and agents' fees incurred in prosecuting a claim under the Act or an insurance policy, and adjusting costs incurred by an insurer or other third party with the rights of a subrogee that may be owed by a claimant as a consequence of receiving an award are not recoverable from FEMA [. . . . ]

44 C.F.R. § 296.21(a)-(b).  According to FEMA's commentary on the interim final rule, see 88 Fed. Reg. at 59767, the allowable damages of "property, business loss, and financial loss" exclude noneconomic damages.  44 C.F.R. § 296.21(a).

Initially, FEMA required that individuals submit a Notice of Loss by November 14, 2024.  See 44 C.F.R. § 296.43.  Congress extended the deadline, however, to December 20, 2024.  See Hermit's Peak/Calf Canyon Claims Office, FEMA.gov, https://www.fema.gov/hermits-peak (last updated December 6, 2024); Patrick Lohmann, Deadline for Hermits Peak-Calf Canyon Fire victims extended a month through federal spending bill, Source NM (September 25, 2024).  Congress later extends the deadline again to March 14, 2025, and allocates an additional $1.5 billion to compensate Hermit's Peak/Calf Canyon Fire victims.  See American Relief Act, 2025, H.R. 10545 § 101(1) (2025); Further Continuing Appropriations Act, 2025, H.R. 10545, Title VI.

4.    **The Plaintiffs' Attempts to Obtain Hermit's Peak Act Compensation.**

The Plaintiffs assert that they are victims of the Hermit's Peak/Calf Canyon Fire.  See Complaint ¶ 1, at 2.  The Court hereinafter refers to the Plaintiffs' alleged losses which include pain and suffering, annoyance, discomfort, and inconvenience as "noneconomic damages."  The Plaintiffs submitted Notices of Loss for their Hermit's Peak Claims between January 5, 2023, and March 29, 2023.  See FEMA Hearing Brief at 2 n.1.  FEMA gave the Plaintiffs compensation determinations which exclude noneconomic damages between December 19, 2023, and February, 3, 2024.  See Complaint ¶¶ 10-21, at 4-9.

## PROCEDURAL BACKGROUND

The Court describes this case's procedural background in five sections. First, the Court describes the Complaint. Second, the Court describes its relevant holdings in a related FEMA case regarding the availability of noneconomic damages under the Hermit's Peak Act. Third, the Court describes its relevant holdings in the Memorandum Opinion and Order, filed March 31, 2025 (Doc. 40)("MTD MOO"), where the Court denies FEMA's Motion to Dismiss for Failure to Exhaust Administrative Remedies, filed April 29, 2024 (Doc. 12)("MTD"). Fourth, the Court summarizes a status conference it holds in related cases, during which the Court sets a hearing in this case to conduct judicial review of the Plaintiffs' Hermit's Peak Act claims. Fifth, the Court describes the parties' judicial review hearing briefing. Sixth, the Court summarizes the two judicial review hearings on May 5, 2025, and May 6, 2025, during which the Court provides specific rulings on each Plaintiff's noneconomic damages claims.

### 1.    The Complaint.

Three-hundred-twenty-eight days after the last Plaintiff files her Notice of Loss, the Plaintiffs file the Complaint. See Complaint at 16; FEMA Hearing Brief at 3 n.1. The Plaintiffs allege one cause of action, pursuant to Section 104(i), seeking judicial review of FEMA's compensation determinations which exclude noneconomic damages. See Complaint ¶¶ 37-42, at 14-16. The Complaint alleges that the Plaintiffs received "final determination[s]" of their claims between December 19, 2023, and February 3, 2023. Complaint ¶¶ 10-21, at 4-9. The Plaintiffs do not explain, however, what a "final determination" is or to what event the Plaintiffs refer when they use that term. Complaint ¶¶ 10-21, at 4-9.

### 2.    The Lands and Dolan MOO.

On December 17, 2024, the Court issues a Memorandum Opinion and Order in two related FEMA cases: Lands v. FEMA, No. CIV 23-0869 JB/JFR (D.N.M.)("Lands"), and Dolan v. FEMA,

No. CIV 23-0908 JB/JFR (D.N.M.)("Dolan").  See Dolan v. FEMA, 760 F. Supp. 3d 1200, 1200 (D.N.M. 2024)(Browning, J.)("Lands and Dolan").  In Lands and Dolan, the Court holds that: (i) the Hermit's Peak Act allows victims to recover noneconomic damages; and (ii) FEMA's refusal to award noneconomic damages violates the APA.  See Lands and Dolan, 760 F. Supp. 3d at 1208.  To support these conclusions, the Court determines that: (i) the provision which limits damages to "actual compensatory damages," Hermit's Peak Act § 104(c)(3)(A), includes noneconomic damages; and (ii) the provision which lists "allowable damages," Hermit's Peak Act § 104(d)(4), is a non-exhaustive list of recoverable losses.  See Lands and Dolan, 760 F. Supp. 3d at 1252-65.  As a remedy, the Court: (i) holds unlawful and sets aside FEMA's regulations that preclude recovery of noneconomic damages; and (ii) compels FEMA to award noneconomic damages for the Plaintiffs' Hermit's Peak Act claims.  See Lands and Dolan, 760 F. Supp. 3d at 1265-66.

### 3.    **The MTD MOO.**

On March 31, 2025, the Court denies FEMA's MTD.  See MTD MOO at 6-9.  FEMA premises its MTD on a jurisdictional defect: FEMA insists that the Court does not have subject-matter jurisdiction, because the Plaintiffs have not exhausted their administrative remedies, as FEMA argues the Hermit's Peak Act's limited sovereign immunity waiver requires.  See MTD at 2, 16.  FEMA argues that, because the Hermit's Peak Act limits judicial review to claimants who have received a "final decision," Judicial Review Provision, and FEMA's regulations define a "final decision" as an administrative appeal decision, 44 C.F.R. § 296.41(h), FEMA has not waived sovereign immunity for claimants, like the Plaintiffs, who have not received administrative appeal decisions.  MTD at 6-8.

In the MTD MOO, the Court explains why it disagrees with FEMA's interpretation of the sovereign immunity waiver of the Hermit's Peak Act.  See MTD MOO at 6-9.  First, the Court

holds that, if there is no administrative appeal decision, whatever FEMA has offered a claimant at day 180 -- starting from the day a claimant files his Notice of Loss -- is the judicially reviewable final decision, because the 180-Day Determination Deadline requires FEMA to issue judicially reviewable determinations within 180 days. See MTD MOO at 86-95. Next, the Court holds that the Plaintiffs -- along with many other plaintiffs in related cases -- satisfy the exhaustion requirement in the sovereign immunity waiver of the Hermit's Peak Act, because each Plaintiff had waited at least 180 days from filing his Notice of Loss before coming to court, and "no party has alleged that any Plaintiffs missed the sixty-day deadline" which requires claimants to seek judicial review within 60 days of receiving a final decision. MTD MOO at 103. In a footnote, the Court states that, although a claimant can miss his judicial review window if he waits more than 60 days after his day 180, this situation "is unlikely, [] because the Plaintiffs' counsel, who represents the vast majority of fire victims seeking to file suit in federal court, has said that they have been careful to file claims in federal court, under the Judicial Review Provision, within sixty days of each client's day 180." MTD MOO at 108 n.19 (citing Arrellin v. FEMA, No. CIV 24-0979 JB/JFR (D.N.M.), Draft Transcript of February 6, 2025, Hearing at 40:23-41:13 (taken February 6, 2025)(Lothyan)("February 6, 2025, Tr.")[5](explaining that some plaintiffs came to federal court based on "when their 180 days had come," because the Hermit's Peak Act "has the 60-day jurisdictional deadline to seek judicial review" and "the plaintiffs don't want to [waive] their right to seek judicial review")). In sum, the Court holds that: (i) a claimant does not need an administrative appeal decision before coming to court; and (ii) a claimant can come to court 180

---

[5]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version; any final transcript may contain slightly different page and/or line numbers

days after filing his Notice of Loss, as long as he files a complaint within 60 days of day 180.  See MTD MOO at 6-9, 102-03.

4.    **The Lands, Dolan and Leonard Hearing.**

On April 11, 2025, the Court holds a status conference in three related FEMA cases: Lands, Dolan, and Leonard v. FEMA, No. CIV 24-0311 JB/JFR (D.N.M.)("Leonard").  See Lands, Clerk's Minutes at 1, filed April 11, 2025 (23-0869 Doc. 73)("April 11, 2025, Hearing Minutes"). Now that the Court has interpreted the Hermit's Peak Act's damages provisions and jurisdictional scope, the Court asks the parties' counsel -- who also represent the Plaintiffs in this case and many other related FEMA cases -- "how we're going to move forward" in these cases.  Lands, Draft Transcript of April 11, 2025, Hearing at 4:20 (taken April 11 2025)(Court)("April 11, 2025, Tr."). After the parties represent that they need rulings on the claimants' noneconomic damages claims, the Court sets a hearing for May 5, 2025, to review FEMA's claim determinations, as Section 104(i) contemplates, in this case, which is the earliest case where the claimants request a Section 104(i) review.  See April 11, 2025, Tr. at 33:20-34:2 (Court); id. at 60:17-61: (Court, Siminou, Sydow); Notice of Hearing pursuant to Hermit's Peak Act § 104(i), filed April 22, 2025 (Doc. 45). The Court tells the parties to prepare a record for the May 5, 2025 hearing ("Section 104(i) Hearing") that summarizes the evidence that each Plaintiff presented to FEMA during the Hermit's Peak Act claims process.  See April 11, 2025, Tr. at 63:5-66:5 (Court, Sydow).

5.    **The Section 104(i) Hearing Briefing.**

Ahead of the Section 104(i) Hearing in this case, the parties submit briefs outlining each Plaintiff's Hermit's Peak Act claim and disputing the § 104(i) Hearing's evidentiary scope.  These briefs include the Plaintiffs' Hearing Brief, the Plaintiffs' Judicial Notice Request, FEMA's Motion in Limine, the Federal Respondents' Response in Opposition to Petitioners' Request for Judicial Notice, filed May 2, 2025 (Doc. 61)("FEMA's Judicial Notice Request Response"), the

Plaintiffs' Response to Respondent Federal Emergency Management Agency's Motion in Limine to Exclude "Extra-Record" Testimony and Evidence, filed May 2, 2025 (Doc. 60)("Plaintiffs' Motion in Limine Response"), FEMA's Hearing Brief, and the Federal Respondent's Reply in Support of Motion in Limine, filed May 4, 2025 ("FEMA's Motion in Limine Reply"). The Court discusses each document in chronological order.

### a.    The Plaintiffs' Hearing Brief.

On April 29, 2025, the Plaintiffs file the Plaintiffs' Hearing Brief, which describes FEMA's compensation determinations for each Plaintiff and prefaces the Plaintiffs' arguments for why the Court should modify those determinations. See Plaintiffs' Hearing Brief at 1-2. First, the Plaintiffs ask the Court to award all twelve Plaintiffs "appropriate noneconomic damages," which FEMA "categorically denied." Plaintiffs' Hearing Brief at 2. The Plaintiffs argue that the Plaintiffs' noneconomic damages requests "were informed by, and are consistent with, awards of noneconomic damages for similar injuries in other wildfire cases." Plaintiffs' Hearing Brief at 15. As exemplars, the Plaintiffs point to: (i) jury verdicts arising out of the Echo Fire in Oregon; and (ii) awards made pursuant to a settlement process related to several recent California wildfires. See Plaintiffs' Hearing Brief at 15-16.

Second, Leyba, Lungstrum, and Seaverns seek review of FEMA's erosion damage awards. See Plaintiffs' Hearing Brief at 2. The Plaintiffs assert that they hired an expert -- Kristina Cydzik -- who assessed the Plaintiffs' properties and "determined the scope of work and costs for erosion control to prevent further damage." Plaintiffs' Hearing Brief at 20-21. The Plaintiffs insist that FEMA's erosion damage awards are too small, because those awards are "consistently" between five and eleven percent of Cydzik's estimated damages. Plaintiffs' Hearing Brief at 21. Moreover, the Plaintiffs assert that (i) FEMA's erosion awards are based on "reports with an unknown and

unidentified author"; and (ii) FEMA's reports dispute Cydzik's estimates without providing an explanation for why Cydzik's estimates are unreasonable.  Plaintiffs' Hearing Brief at 21.

Third, Leyba and Lungstrum seek review of FEMA's reforestation damages awards. <u>See</u> Plaintiffs' Hearing Brief at 3.  The Plaintiffs' arguments here are similar to their erosion arguments: FEMA "offers a fraction of the damages" that the Plaintiffs' experts estimate, "again based on reports with an unknown and unidentified author."  Plaintiffs' Hearing Brief at 21.    Fourth, Lungstrum and Kemp seek judicial review of FEMA's denial of economic damages for business-income losses and lost wages.  <u>See</u> Plaintiffs' Hearing Brief at 3.  Fifth, Ogorek seeks judicial review of FEMA's denial of economic damages for property value diminution.  <u>See</u> Plaintiffs' Hearing Brief at 3.  The Plaintiffs also provide a summary of evidence they anticipate  presenting at the for the § 104(i) Hearing: (i) oral testimony from nine plaintiffs and three experts; and (ii) documentary evidence, including the Plaintiffs' Notices of Loss, Proofs of Loss, and expert reports, which the Plaintiffs provided to FEMA during the claims process.  <u>See</u> Plaintiffs' Hearing Brief at 22-23.

### b.    The Plaintiffs' Judicial Notice Request.

On April 29, 2025, the Plaintiffs ask the Court to take judicial notice of five documents: (i) three final verdicts in <u>James v. Pacificorp</u>, No. CIV 20-33885 (County of Multnomah, Circuit Court, State of Oregon)(together, the "Oregon State Court Verdicts"); and (ii) the Fire Victims Claims Resolution Procedures Preamble and the Fire Victims Trust Eligibility Criteria (together, the "California Wildfire Documents"), which were both created as part of a bankruptcy proceeding related to several California wildfires.  <u>See</u> Plaintiffs' Request for Judicial Notice at 3-5.  The Plaintiffs argue that the Court should take judicial notice of the Oregon State Court Verdicts, because they are publicly filed, not subject to reasonable dispute, and contain information that is "central to Plaintiffs' claims for noneconomic damages because they show what noneconomic

damages have been awarded in a wildfire case." Plaintiffs' Request for Judicial Notice at 4. The Plaintiffs argue that the Court should take judicial notice of the California Wildfire Documents, because they are publicly available, not subject to reasonable dispute, and "show how noneconomic damages are calculated in a bankruptcy proceeding following several California wildfires." Plaintiffs' Judicial Notice Request at 5.

      **c.    FEMA's Motion in Limine.**

      On May 1, 2025, FEMA asks the Court to: (i) limit its judicial review to the administrative record as it existed when FEMA issued final decisions for each Plaintiffs; and (ii) exclude the Plaintiffs' supplemental documents and live testimony from the § 104(i) Hearing. See FEMA's Motion in Limine at 2. Specifically, the Plaintiffs argue that § 104(i)'s three subparts limit FEMA's sovereign immunity waiver to a judicial review of the administrative record before FEMA when the agency issues its final decision. See FEMA's Motion in Limine at 7-9. First, § 104(i)(1) provides that an aggrieved claimant may seek judicial review of a "final decision of the Administrator," and that a reviewing court may "modify or set aside the decision." Hermit's Peak Act § 104(i)(1). See FEMA's Motion in Limine at 8. Second, Section 104(i)(2) provides that a reviewing court "shall" review FEMA's final decision "on the record made before the Administrator." Hermit's Peak Act § 104(i)(2). See FEMA's Motion in Limine at 8. Third, § 104(i)(3) provides that a reviewing court "shall" uphold FEMA's final decision if it is "supported by substantial evidence on the record considered as a whole." Hermit's Peak Act § 104(i)(3). See FEMA's Motion in Limine at 8. Thus, FEMA argues that "any review of non-final decisions, any review outside of the record made before the Administrator, and any review not for substantial evidence in the record fall outside the scope of that which is permitted by Section 104(i) of the HPCC Act and its waiver of sovereign immunity." FEMA's Motion in Limine at 8. See Motion in Limine at 15-17. FEMA also argues that the Court should exclude the Plaintiffs' supplemental

materials and live witness testimony, because the Plaintiffs have not "offered any explanation of whether these documents were ever submitted to FEMA in connection with their claims." FEMA's Motion in Limine at 19.

####    d.    FEMA's Judicial Notice Request Response.

On May 2, 2025, FEMA opposes the Plaintiffs' Judicial Notice Request. See FEMA's Judicial Notice Request Response at 1. FEMA argues that the Court should not consider the Plaintiffs' materials -- final verdicts in Oregon State court cases and materials from bankruptcy proceedings related to several California wildfires -- for three reasons. See FEMA's Judicial Notice Request Response at 1. First, FEMA argues that the Court should not take judicial notice of the Plaintiffs' materials, because the Plaintiffs offer those materials for the truth of the matter asserted. See FEMA's Judicial Notice Request Response at 2-3. Second, FEMA argues that the Court should not take judicial notice of the Plaintiffs' materials, because those materials -- which describe damage awards and procedures related to different fires in different states  --  are not relevant here, where the Court reviews whether FEMA fairly compensates the Plaintiffs for their Hermit's Peak/Calf Canyon Fire damages. See FEMA's Judicial Notice Request Response at 3. Third, FEMA argues that the Court should not consider the Plaintiffs' materials, because those materials are not in the administrative record. See FEMA's Judicial Notice Request Response at 5.

####    e.    The Plaintiffs' Motion in Limine Response.

On May 2, 2025, the Plaintiffs oppose FEMA's Motion in Limine. See Plaintiffs' Motion in Limine Response at 1. First, the Plaintiffs argue that the Plaintiffs' supplemental documents are "fairly part of the administrative record," because "[m]ost of those documents were submitted to FEMA before it made its initial claim determination," and "any documents submitted after FEMA's initial determination were submitted pursuant to FEMA's policy guide, which permitted

claims to submit additional materials within 60 days of the initial determination." Plaintiffs'
Motion in Limine Response at 2. The Plaintiffs do not define what an "initial determination" is or
when that event occurs for each Plaintiff. Plaintiffs' Motion in Limine Response at 2-3. Second,
the Plaintiffs argue that the planned witness testimony -- by some Plaintiffs and hired experts --
"are also part of the record for purposes of this judicial review proceeding," because "[t]he contents
of that testimony will fairly trace the contents of the materials Plaintiffs previously submitted to
FEMA" and "to the extent it might exceed what is strictly in the administrative record . . . it is only
because FEMA failed to avail itself of the opportunity under its own regulations to conduct an
'informal hearing to receive oral testimony from witnesses or experts.'" Plaintiffs' Motion in
Limine Response at 3 (quoting 44 C.F.R. § 296.41(g)). FEMA thus argues that, "just as an agency
cannot stifle judicial review by unilaterally choosing the contents of the record, so too FEMA
cannot truncate the record here by declining to avail itself of opportunities to take testimony from
claimants and experts." Plaintiffs' Motion in Limine Response at 3

f.    **FEMA's Hearing Brief.**

On May 3, 2025, FEMA files FEMA's hearing brief, which discusses: (i) the Court's
jurisdiction over the Plaintiffs' Section 104(i) claims; (ii) the scope and standard of the Court's
record review; (iii) the allowable relief that the Plaintiffs may obtain under Section 104(i); and
(iv) law relevant to the Plaintiffs' challenges to specific damages awards. See FEMA's Hearing
Brief at 2-3. Regarding (i), FEMA argues that the Court does not have jurisdiction over the
Plaintiffs' Section 104(i) claims, because the Plaintiffs missed the 60-day filing deadline. See
FEMA's Hearing Brief at 3-5. FEMA notes that, in the MTD MOO, the Court holds that the
Hermit's Peak Act's sovereign immunity waiver requires claimants seeking judicial review to
come to court within 60 days of receiving FEMA's final decision, and that a final decision is either
"'an administrative appeal decision provided within 180 days or . . . whatever pre-appeal claim

determination [a claimant] had at the 180-day mark.'"  FEMA's Hearing Brief at 5-6 (quoting MTD MOO at 103).  FEMA argues that the Plaintiffs missed the 60-day deadline, because the Complaint was filed more than 240 days after the Plaintiffs filed their Notices of Loss.  See FEMA's Hearing Brief at 3-5.  FEMA also observes that the Complaint challenges the Plaintiff's Letters of Determination, which FEMA issued more than 180 days after the Notices of Loss.  See FEMA's Hearing Brief at 6-7.  Thus, FEMA argues, if a final decision is whatever on the table at day 180, and Section 104(i) permits a claimant to seek review only of a final decision, then the Plaintiffs cannot challenge their Letters of Determination, because they were issued after day 180.  See FEMA's Hearing Brief at 6-7.  In sum, FEMA argues that the Plaintiffs' Section 104(i) claims are untimely, and the Court may not review FEMA's Letters of Determination, which FEMA issued after day 180.  See FEMA's Hearing Brief at 6-7.

Regarding (ii) -- the scope and standard of the Court's record review -- FEMA argues that the Court can review only FEMA's final decisions, on the record made before the Administrator, based on a substantial evidence standard.  See FEMA's Hearing Brief at 10-18.  According to FEMA, a court engaging in a substantial evidence review does not reweigh the evidence or substitute its own discretion for that of the agency.  See FEMA's Hearing Brief at 16.  FEMA argues that, instead, a reviewing court asks whether the record contains sufficient evidence to support the agency's factual determination and upholds an agency's determination if there is enough evidence that a "'reasonable mind might accept as adequate to support a conclusion.'"  FEMA's Hearing Brief at 16 (quoting Biestek v. Berryhill, 587 U.S. 97, 103 (2019)).  Regarding (iii) -- the relief available under the Hermit's Peak Act -- FEMA notes that the Hermit's Peak Act allows a reviewing court only "'to modify or set aside'" FEMA's decision "'in whole or in part.'"  FEMA's Hearing Brief at 19 (quoting Hermit's Peak Act § 104(i)(1)).  Accordingly, FEMA argues

that the Court can adjust FEMA's compensation determinations only incrementally or remand a Plaintiff's claim back to FEMA for further consideration.  See FEMA's Hearing Brief at 19-20.

Regarding (iv) -- law relevant to the Plaintiffs' challenges to specific damages awards -- FEMA discusses two legal issues: noneconomic damages limitations and the role of expert testimony in administrative claims processes.  See FEMA's Hearing Brief at 21-26.  First FEMA insists that the Court can award noneconomic nuisance[6] damages only: (i) to Plaintiffs who are occupants of homes; and (ii) for property value diminution if a Plaintiff's property is damaged permanently.  See FEMA's Hearing Brief at 22-23.  Second, FEMA argues that, contrary to the Plaintiffs' arguments, FEMA's expert reports are valid, even if those reports do not comport with the Federal Rules of Evidence, because, according to FEMA, the Federal Rules of Evidence do not apply to agency proceedings.  See FEMA's Hearing Brief at 24-25.  Accordingly, FEMA argues that, under the substantial evidence standard, an agency may rely on its own expert's reports and that an agency does not need to disclose its experts' underlying data.  See FEMA's Hearing Brief at 25-26.

> ### g.    FEMA's Motion in Limine Reply.

On May 4, 2025, FEMA files FEMA's Motion in Limine Reply.  See FEMA's Motion in Limine Reply at 1.  First, FEMA argues that the Plaintiffs' supplemental documents are not a part of the record, because the Plaintiffs do not show that their supplemental documents were presented to FEMA before FEMA issued final decisions.  See FEMA's Motion in Limine Reply at 2-3.

---

[6]Although FEMA acknowledges that the Court holds, in Lands and Dolan, that the Hermit's Peak Act permits noneconomic damages under nuisance, trespass, and personal injury claims, FEMA asserts that only the nuisance claims are relevant here, because the Plaintiffs ask only for "'noneconomic nuisance damages,' [Complaint] ¶¶ 10-21, [at 4-9] consisting of 'noneconomic damages for annoyance, discomfort, and inconvenience, associated with damage to and/or the loss of use of their property.'"  FEMA Hearing Brief at 21 n.8 (first quoting Complaint ¶¶ 10-21, at 4-9; then quoting Plaintiffs' Hearing Brief at 15).

Second, FEMA argues that the Plaintiffs' supplemental documents do not fit into a narrow exception for admitting extra-record documents when those documents: (i) did not exist at the time of the challenged agency decision; and (ii) show that the agency's decision is wrong.  See FEMA's Motion in Limine Reply at 3-4.  Third, FEMA argues that the Plaintiffs' proposed witness testimony is not part of the record for two reasons: (i) the Plaintiffs do not provide any authority for their proposition that witness testimony that reflects record information is also a part of the record, see FEMA's Motion in Limine Reply at 5-6; and (ii) admitting evidence that an agency "could have, but did not" solicit during administrative agency would convert the judicial review hearing to a de novo trial, which is not permitted under the Hermit's Peak Act, FEMA's Motion in Limine Reply at 6.  Fourth, FEMA argues that the Plaintiffs' proposed witness testimony also does not meet the limited exception for extra-record evidence in administrative review cases, because the Plaintiffs do not demonstrate that the proposed witness testimony includes information that was not available when FEMA rendered its final decision or that the proposed witness testimony shows that FEMA's final decisions are wrong.  See FEMA's Motion in Limine Reply at 6-7.

### 6.    __The Section 104(i) Hearings__.

On May 5, 2025, and May 6, 2025, the Court holds a hearing to decide the Plaintiffs' Section 104(i) claims.  See May 5-6, 2025, Hearing Minutes at 1.  First, the Court denies the Plaintiffs' Judicial Notice Request and rules that, although the Plaintiffs may use the State court materials to support their arguments about noneconomic damages, the Court will not take judicial notice of those documents.  See Draft Transcript of May 5, 2025, Hearing at 5:1-6:2 (taken May 5, 2025)(Court)("May 5, 2025, Tr.").  Next, the Court grants in part and denies in part FEMA's Motion in Limine, ruling that the Court may only consider materials presented to FEMA before each Plaintiff's day 180.  See May 5, 2025, Tr. at 6:3-7:2 (Court).  Next, FEMA makes

"preliminary remarks regarding the scope of this proceeding and our pending motions." May 5, 2025, Tr. at 10:8-11 (Sydow). First, FEMA argues that, if the final decision for judicial review is "what's at 180 days," then the Court should not consider most of the parties' submitted evidence, because most of that evidence did not exist at day 180. May 5, 2025, Tr. at 11:10-15 (Sydow). Next, FEMA argues that the Court does not have jurisdiction over the Plaintiffs' 104(i) claims, because the Plaintiffs did not file those claims in federal court within the Hermit's Peak Act's 60-day deadline. See May 5, 2025, Tr. at 11:15-19 (Sydow). Third, FEMA asserts that, because the Plaintiffs request judicial review of line items which were not identified in the Complaint, it is difficult for FEMA to respond to the Plaintiffs' arguments, which were presented in detail for the first time in the Plaintiffs' Hearing Brief. See May 5, 2025, Tr. at 11:22-12:7 (Sydow).

Responding first to the jurisdictional argument, the Plaintiffs argue that the 60-day deadline is waivable and subject to equitable tolling. See May 5, 2025, Tr. at 12:14-21 (Siminou). Citing Sebelius v. Auburn Regional Medical Center, 568 U.S. 145, 158 (2013)(Ginsburg, J.)("Sebelius"), the Plaintiffs argue that they "have equitable tolling in spades," because FEMA: (i) initially took the position that the 180-day clock starts when FEMA acknowledges a claim, rather than when a claimant files his Notice of Loss; and (ii) "sought numerous extension requests, and asked us to give them abundant time in order for them to adjudicate the claims, which, for a time, we were happy to do." May 5, 2025, Tr. at 12:22-13:5 (Siminou). The Plaintiffs assert that "it's undisputed we brought these actions within 60 days of when they gave us the determination." May 5, 2025, Tr. at 13:17-19 (Siminou). In sum, the Plaintiffs agree that, going forward, "we can work with" filing within 60 days of day 180, but the Plaintiffs insist that the Court has jurisdiction over past claims that were filed outside of the 60-day window, because the 60-day deadline is equitably tolled. May 5, 2025, Tr. at 13:20-25 (Siminou). Replying to the Plaintiffs' arguments, FEMA

asserts that the Court holds, in the MTD MOO, that the 60-day deadline is "jurisdictional, and not waivable because it's part of statutory sovereign immunity waiver."  May 5, 2025, Tr. at 18:5-21:11 (Sydow)(citing MTD MOO at 103).

        **a.**        **Gallegos**.

After the parties finish making their preliminary legal arguments, the Court begins evaluating the Plaintiffs' § 104(i) claims, beginning with Gallegos.  See May 5, 2025, Tr. at 22:1-3 (Court).  The parties agree that the "only issue for the Court's judicial review today is FEMA's denial of nuisance damages" for Gallegos.  May 5, 2025, Tr. at 25:19-23 (Ritchey).  See May 5, 2025, Tr. at 27:5 (Siminou).   The parties also agree that FEMA gave Gallegos $2,118.58 in economic damages and that Gallegos requests $60,000.00 in noneconomic damages.  See May 5, 2025, Tr. at 27:5 (Siminou); id. at 27:15-27:22 (Court, Siminou).  id. at 33:15-16 (Ritchey).  The Court denies the Plaintiffs' request to have Gallegos testify about his noneconomic damages, reasoning that, unless Gallegos testifies about something he told FEMA officials, Gallegos' testimony is outside the scope of the record the Court may review under Section 104(i).  See May 5, 2025, Tr. at 28:22-29:4 (Court).  Although FEMA maintains that the agency should not award any noneconomic damages, FEMA argues that "no more than $1,000 is warranted in this case for nuisance damages."  May 5, 2025, Tr. at 33:21-24 (Ritchey).  The Plaintiffs' stand by Gallegos' $60,000.00 request for nuisance damages.  See May 5, 2025, Tr. at 34:7-25 (Siminou).  The Court modifies FEMA's final decision and awards Gallegos $9,000.00 in noneconomic nuisance damages, bringing Gallegos' total compensation to $11,118.58.  See May 5, 2025, Tr. at 35:1-6 (Court).

        **b.**        **Priddy**.

The Court next turns to Priddy's § 104(i) claim.  See May 5, 2025, Tr. at 35:7-9 (Court).  The parties agree that FEMA's final economic damages offer for Priddy is $56,991.36 and that

Priddy challenges only FEMA's denial of his noneconomic nuisance damages. <u>See</u> May 5, 2025, Tr. at 35:7-36:25 (Court, Siminou, Ritchey, Yang). Priddy requests $150,000.00 in noneconomic nuisance damages. <u>See</u> May 5, 2025, Tr. at 37:4-13 (Court, Siminou); <u>id.</u> at 42:11-22 (Siminou)("[W]e're not seeking emotional distress. We're here to seek noneconomic damages for annoyance, discomfort, and inconvenience, what I think my friends are referring to as nuisance damages."). At the hearing, FEMA opposes any award of noneconomic damages, but suggests that, if the Court is going to award Priddy any noneconomic damages, the Court should give Priddy $1,000.00 in noneconomic nuisance damages. <u>See</u> May 5, 2025, Tr. at 44:6-9 (Yang). Conducting a substantial evidence review, the Court concludes that Priddy presents a reasonable amount for his nuisance damages, and the Court modifies FEMA's final decision to give Priddy his $150,000.00 in noneconomic nuisance damages, bringing Priddy's total compensation to $206,991.36. <u>See</u> May 5, 2025, Tr. at 45:5-17 (Court).

### c. **<u>Cavitt-Olguin</u>.**

The Court next turns to Cavitt-Olguin's § 104(i) claim. <u>See</u> May 5, 2025, Tr. at 45:18-19 (Court). The parties agree that Cavitt-Olguin accepted FEMA's economic damages offer of $99,198.68 and that Cavitt-Olguin challenges only FEMA's denial of her $215,000.00 noneconomic nuisance damages request. <u>See</u> May 5, 2025, Tr. at 46:3-47:3 (Ritchey, Court Siminou). FEMA argues that "it's important for the Court to really clearly dissect which facts would go to emotional distress, and which would go to nuisance," because, according to FEMA, a large part of Cavitt-Olguin's noneconomic damages request is based on emotional distress, and, according to FEMA: (i) emotional distress damages are not available under New Mexico law "when there is neither a personal injury to Ms. Cavitt-Olguin nor reckless and wanton conduct that is alleged or has been proven by the plaintiff"; and (ii) the Plaintiffs' counsel "has already represented to the Court that they are not seeking emotional distress damages in this case." May

5, 2025, Tr. at 50:16-51:10 (Ritchey).    Accordingly, while FEMA resists all noneconomic damages, FEMA suggests that, if the Court is going to modify the Administrator's decision then the Court should give Cavitt-Olguin $40,000.00 in noneconomic damages.  See May 5, 2025, Tr. at 51:16-23 (Ritchey).  In response, the Plaintiffs' counsel confirms that they are seeking only nuisance damages for "annoyance, discomfort, and inconvenience."  May 5, 2025, Tr. at 52:24-53:16 (Siminou).  Conducting a substantial evidence review, the Court concludes that Cavitt-Olguin presents a reasonable figure of her nuisance damages, and the Court modifies FEMA's final decision to give Cavitt-Olguin her requested $215,000.00 in noneconomic nuisance damages, bringing Cavitt-Olguin's total compensation to $314,198.68.  See May 5, 2025, Tr. at 53:17-54:2 (Court).

       **d.**    **<u>Kemp</u>.**

The Court next turns to Kemp's § 104(i) claim.  See May 5, 2025, Tr. at 54:3-4 (Court). The parties agree that FEMA's final economic damages offer is $7,146.35 and that Kemp challenges only FEMA's denial of his $35,000.00 noneconomic nuisance damages request.  See May 5, 2025, Tr. at 60:2-18 (Berkstresser, Court, Go); <u>id.</u> at 64:4-8 (Court, Berkstresser).  At the hearing, FEMA suggests that, if the Court thinks Kemp should receive noneconomic damages, then the Court should modify the amount to give Kemp $4,000.00 in noneconomic nuisance damages.  See May 5, 2025, Tr. at 62:4-63:19 (Go).  The Court thinks that Kemps' request is a little rich for his nuisance damages, but thinks they were more than $4,000.00.  See May 5, 2025, Tr. at 64:23-65:8 (Court).  Conducting a substantial evidence review, the Court modifies FEMA's final decision to give Kemp $24,000.00 in noneconomic nuisance damages, bringing Kemp's total compensation to $31,146.35.  See May 5, 2025, Tr. at 64:23-65:8 (Court).

e.    **Leyba.**

The Court next turns to Leyba's § 104(i) claim.  See May 5, 2025, Tr. at 65:9-10 (Court).

The parties agree that FEMA's final economic damages offer is $116,673.67.  See May 5, 2025,

Tr. at 65:14-67:10 (Court, Berkstresser, Go).   In addition to contesting FEMA's denial of her

$100,000.00 noneconomic nuisance damages request, Leyba challenges FEMA's partial denial of

two economic damages requests: (i) $226,538.00 for reforestation and taxes associated with the

reforestation;[7] and (ii) $280,280.42 for road regrading and erosion control.  See May 5, 2025, Tr.

at 67:13-24 (Berkstresser, Go).

First, the Court takes up the $226,538.00 reforestation request.  See May 5, 2025, Tr. at

69:8-10 (Court, Berkstresser).  In FEMA's May 14, 2024, Letter of Determination, FEMA offers

Leyba $107,865.43 for reforestation.  See May 5, 2025, Tr. at 69:16-19 (Go).  FEMA argues that

Leyba's $226,538.00 reforestation request, which is based on Leyba's expert report listing items

for repair, is inflated, because it has unreasonably high unit costs and includes compensation for

aesthetic damages and a ten percent contingency fee, which, according to FEMA, is a fee that

"build[s] in additional cost for unforeseen events."  May 5, 2025, Tr. at 70:12-71:25 (Go, Court).

FEMA argues that the Hermit's Peak Act does not provide compensation for aesthetic damage or

contingency fees.  See May 5, 2025, Tr.at 72:1-23 (Court, Go, Sydow).  In response, the Plaintiffs

assert that aesthetic damages -- which compensate for lost mature trees that will not regrow in time

for the claimant to enjoy their aesthetic value -- and contingency fees -- which cover normal

fluctuations in the labor and materials market -- are available under the Hermit's Peak Act.  See

---

[7]FEMA asserts that the Plaintiffs do not include the associated taxes request in the Plaintiffs' Hearing Brief.  See May 5, 2025, Tr. at 67:19-24 (Go).  In response, the Plaintiffs argue: "The tax line item cannot be offered without the reforestation line item.  They are offered together, and in conjunction, and are dependent on one another, so they cannot be separated out."  May 5, 2025, Tr. at 67:25-68:4 (Berkstresser).

May 5, 2025, Tr. at 91:4-93:12 (Berkstresser, Court).  The Plaintiffs also argue that their expert report more accurate and reliable than FEMA's, because FEMA has not disclosed its experts' identities or qualifications.  See May 5, 2025, Tr. at 88:20-91:1 (Berkstresser, Court)).  Conducting a substantial-evidence review, the Court determines that the record before FEMA does not support FEMA's calculation, and, accordingly, the Court modifies FEMA's reforestation award to match Leyba's $226,538.00 request.  See May 5, 2025, Tr. at 72:25-101:7 (Go, Court, Sydow, Berkstresser).

The Court then turns to Leyba's $280,280.42 road regrading and erosion control request. See May 5, 2025, Tr. at 101:8-9 (Court).  After determining that the roads for which Leyba requests regrading and erosion control compensation were not damaged, FEMA denied Leyba's request entirely.  See May 5, 2025, Tr. at 103:10-25 (Go, Court).  The Plaintiffs argue that road regrading and erosion control damages provide compensation for future damages that are "necessarily certain" going to happen, because the property will "sustain increased water flow and erosion" after a large fire destroys nearby vegetation.  May 5, 2025, Tr. at 105:19-106:15 (Berkstresser). Conducting a substantial-evidence review, the Court determines that the record before FEMA supports FEMA's calculation, and, accordingly, the Court upholds FEMA's denial of Leyba's regrading and erosion control damages request.  See May 5, 2025, Tr. at 101:10-110:24 (Go, Court, Berkstresser).

Next, the Court turns to Leyba's $100,000.00 noneconomic nuisance damages request.  See May 5, 2025, Tr. at 112:22-23(Court).  FEMA offers $0.00 in noneconomic nuisance damages, arguing that, because Leyba did not occupy the property in question during the fire, she is not entitled to noneconomic nuisance damages.  See May 5, 2025, Tr. at 113:23-115:10 (Go).  The Court says:

> It's clear that she bought [the property] for both use for her cattle, as well as for its beauty. And the fact that it's been burned and destroyed, I think, goes to the nuisance damages. And a lot of the plans she had for it are not attainable anytime soon. So I think she has proposed a reasonable amount for nuisance damages.

May 5, 2025, Tr. at 115:24-116:5 (Court). Conducting a substantial evidence review, the Court modifies FEMA's final decision to give Leyba her requested $100,000.00 in noneconomic nuisance damages, bringing Leyba's total compensation to $326,538.00. See May 5, 2025, Tr. at 115:22-116:9 (Court).

### f.    Marquez.

The Court next turns to Marquez' § 104(i) claim. See May 5, 2025, Tr. at 116:10-11 (Court). The parties agree that Marquez accepted FEMA's final economic damages offer of $3,112.35 and that Marquez challenges only FEMA's denial of her $80,000.00 noneconomic nuisance damages request. See May 5, 2025, Tr. at 117:7-119:25 (Court, Starita, Ritchey). Asserting that Marquez' noneconomic damages requests sound more in emotional distress than in nuisance, FEMA argues that "there is substantial evidence for FEMA's denial of this entire noneconomic damages award request" and suggests that, "at most, one or two thousand" dollars in noneconomic nuisance damages is appropriate. May 5, 2025, Tr. at 120:8-123:25 (Ritchey). The Court sees Marquez' proposed damages as rich but worth more than FEMA's suggested value. See May 5, 2025, Tr. at 123:23-124:13 (Court). Conducting a substantial evidence review, the Court modifies FEMA's final decision to give Marquez $12,000.00 in noneconomic nuisance damages, bringing Marquez' total compensation to $15,112.35. See May 5, 2025, Tr. at 123:23-124:13 (Court).

### g.    Joslin.

The Court next turns to Joslin's § 104(i) claim. See May 5, 2025, Tr. at 124:14-15 (Court). The parties agree that Joslin challenges only FEMA's denial of his $330,000.00 noneconomic

nuisance damages request.[8]  See May 5, 2025, Tr. at 124:18-127:10 (Court, Starita, Go).  In addition to arguing that the Hermit's Peak Act does not allow for noneconomic damages, FEMA argues that Joslin should not get any noneconomic damages award, because both FEMA and Joslin's insurance company provided adequate economic compensation.  See May 5, 2025, Tr. at 127:16-129:8 (Go). The Court deems Joslin's proposed valuation reasonable.  See May 5, 2025, Tr. at 129:23-130:7 (Court).  Conducting a substantial evidence review, the Court modifies FEMA's final decision to give Joslin his requested $330,000.00 in noneconomic nuisance damages.  See May 5, 2025, Tr. at 129:23-130:7 (Court).

> **h.     Lungstrum.**

Next, the Court turns to Lungstrum's § 104(i) claim.  See May 5, 2025, Tr. at 131:21-24 (Court).  The parties agree that FEMA's final economic damages offer is $890,820.73.  See May 5, 2025, Tr. at 132:6-21 (Court, Berkstresser, Sydow).  Lungstrum challenges three economic damages awards: (i) Lungstrum requests $1,263,451.00 for reforestation, and FEMA awards only $744,558.83, see May 5, 2025, Tr. at 133:5-134:17 (Berkstresser, Court); (ii) Lungstrum requests $1,200,957.00 for road regrading and erosion control, and FEMA awards only $49,008.00, see May 5, 2025, Tr. at 147:15-148:6 (Court, Berkstresser, Sydow); and (iii) Lungstrum requests $175,000.00 for loss of hunting revenue, and FEMA awards $0.00, see May 5, 2025, Tr. at 164:23-165:8 (Court, Berkstresser).  Lungstrum also contests FEMA's denial of his $300,000.00 noneconomic nuisance damages request.  See May 5, 2025, Tr. at 174:14-15 (Court, Berkstreser),

---

[8]At the hearing, the parties do not agree on what FEMA's final economic damages offer is.  See May 5, 2025, Tr. at 130:9-25 (Court, Starita, Go).  The Plaintiffs throw out a figure of $1,362,337.70, and, although FEMA says that their calculations do not match that number, FEMA does not allege that the Plaintiffs' figure is far off.  See May 5, 2025, Tr. at 130:9-25 (Court, Starita, Go).  The parties agree, however, that, because Joslin challenges only FEMA's noneconomic damages denial, they do not need to "get our math right here today," and the parties agree to tell the Court, at a later date, what the final economic damages offer is.  May 5, 2025, Tr. at 131:10-20 (Sydow, Court, Colon).

First, the Court takes up the $1,263,451.00 reforestation request. See May 5, 2025, Tr. at 133:15-17 (Court). In Lungstrum's Letter of Determination, FEMA offers $744,558.83 for reforestation. See May 5, 2025, Tr. at 134:14-17 (Court, Berkstresser). To support Lungstrum's $1,263,451.00 reforestation request, the Plaintiffs point to their expert report, which, like the expert report in Leyba's case, estimates the cost of reforesting Lungstrum's property. See May 5, 2025, Tr. at 134:21-135:2 (Berkstresser). In response, FEMA first asserts that the reforestation challenge "is not properly raised in this action at all," because "reforestation in not in the complaint." May 5, 2025, Tr. at 135:21-136:4 (Sydow). Next, FEMA argues that its own expert report is more detailed than Lungstrum's expert report. See May 5, 2025, Tr. at 136:11-140:6 (Sydow, Court). Replying to FEMA, the Plaintiffs identify three differences between the report's calculations: (i) the reports have different unit costs for some line items, like debris removal; (ii) FEMA's report does not include a contingency fee; (iii) FEMA's report does not include aesthetic damages; and (iv) FEMA's report does not include lost resources. See May 5, 2025, Tr. at 142:10-143:8 (Court, Berkstresser). FEMA then argues that compensation for lost resources and replacement costs -- for which FEMA has compensated -- would be double counting. See May 5, 2025, Tr. at 143:13-144:2 (Sydow)(arguing that lost resources compensation amounts to "[r]eplacing a tree and paying for the value of the lost tree"). FEMA also argues that the Court should not compensate Lungstrum for the contingency fee, because "the Court is conducting a record review . . . whether FEMA's determination of this amount of damages at the time it made its letter of determination  and was assessing the proof of loss that was initially submitted was reasonable," and, thus, the contingency fee's accounting for "any increase in costs" in the future "is not properly part of the damages." May 5, 2025, Tr. at 144:18-145:6 (Sydow). Conducting a substantial-evidence review, the Court: (i) agrees with FEMA that contingency fee compensation is not available; (ii) concludes that

FEMA "has made a substantial showing not to include the aesthetics"; and (iii) determines that the record before FEMA does not support FEMA's calculation outside of the contingency fee and aesthetics issue, and, accordingly, the Court modifies FEMA's reforestation award to $1,153,586.00.  May 5, 2025, Tr. at 146:20-147:14 (Court, Sydow).

The Court next takes up Lungstrum's $1,200.957.00 road regrading and erosion control request.  See May 5, 2025, Tr. at 147:15-17 (Court, Berkstresser).  In Lungstrum's Letter of Determination, FEMA offers $49,008.00 for erosion control.  See May 5, 2025, Tr. at 147:24-148:6 (Court, Berkstresser, Sydow).  Conducting a substantial-evidence review, the Court determines that the record before FEMA: (i) supports FEMA's conclusion that the roads need to be regraded only once; (ii) does not support FEMA's conclusion regarding the number of trails and roads; and (iii) supports FEMA's denial of a thirty-five percent contingency fee.  See May 5, 2025, Tr. at 148:7-164:18 (Court, Berkstresser, Sydow).  Accordingly, the Court modifies FEMA's erosion award to $257,888.95.  See May 5, 2025, Tr. at 164:14-15 (Court).

Next, the Court takes up Lungstrum's $175,000.00 request for loss of hunting revenue, based on Lungstrum's fledgling hunting business.  See May 5, 2025, Tr. at 164:23-25 (Court).  In Lungstrum's Letter of Determination, FEMA offers $0.00 for loss of hunting revenue.  See May 5, 2025, Tr. at 165:6-8 (Court, Berkstresser).  Conducting a substantial-evidence review, the Court determines that the record before FEMA supports FEMA's denial, because Lungstrum's hunting business was not active and his losses are "very speculative."  May 5, 2025, Tr. at 165:9-173:22 (Court, Berkstresser, Sydow).  Accordingly, the Court upholds FEMA's denial of Lungstrum's request for loss of hunting revenue.  See May 5, 2025, Tr. at 173:22-174:4 (Court).  Putting the three disputed economic damages requests together, the Court modifies Lungstrum's economic damages award to $1,411,474.96.  See May 5, 2025, Tr. at 174:5-8 (Court).

Finally, the Court turns to Lungstrum's $300,000.00 noneconomic nuisance damages request. See May 5, 2025, Tr. at 174:9-15 (Court, Berkstresser). In addition to arguing that the Court should remand this case back to FEMA for further determination on the noneconomic damages award, FEMA argues that, because Lungstrum was not an occupant of the damaged property during the fire, Lungstrum's noneconomic damages compensation should be "closer to [that of] the petitioners" who were "temporarily displaced and had less [] fundamental disruptions to their immediate life and home." May 5, 2025, Tr. at 175:13-178:6 (Sydow). Conducting a substantial evidence review and noting "the size of [Lungstrum's] property," the Court modifies FEMA's final decision and enters Lungstrum's requested $300,000.00 in noneconomic nuisance damages, bringing his total award to $1,711,474.96. See May 5, 2025, Tr. at 178:20-179:4 (Court). After the Court provides its ruling, FEMA "object[s] to a calculation of nuisance damages in this case that looks to be based on the valuation of the property that the petitioner has," because, according to FEMA, that position "is contrary to law, and is not supported by the facts in the record in terms of the way in which someone's discomfort should be valued." May 5, 2025, Tr. at 179:8-18 (Sydow).

### i.  **Maestas.**

The Court next turns to Maestas' § 104(i) claim. See May 5, 2025, Tr. at 180:1 (Court). The parties agree that FEMA's final economic damages offer is $51,490.34 and that Maestas challenges only FEMA's denial of her $35,000.00 noneconomic nuisance damages request. See May 5, 2025, Tr. at 180:2-182:3 (Ritchey, Court, Starita). In addition to arguing that the Court should remand this case back to FEMA for further determination, FEMA argues that Maestas' situation is similar to Gallegos' and Marquez' situations, and, accordingly, FEMA should compensate Maestas similarly, i.e., between $9,000.00 and $12,000.00. See May 5, 2025, Tr. at 185:12-186:9 (Ritchey). Conducting a substantial-evidence review, the Court modifies FEMA's

final decision and awards Maestas her requested $35,000.00 in noneconomic nuisance damages, bringing Maestas' total compensation to $86,490.24.  See May 5, 2025, Tr. at 187:12-188:1 (Court).

      **j.**     **Seaverns.**

The Court next turns to Seaverns' § 104(i) claim.  See May 5, 2025, Tr. at 188:2-3 (Court). The parties agree that FEMA's final economic damages offer is $932,860.87.  See May 5, 2025, Tr. at 188:13-22 (Court, Berkstresser, Yang).  Seaverns challenges FEMA's partial denial of her $1,417,395.80 road regrading and erosion control damages request.  See May 5, 2025, Tr. at 189:1-190:14 (Berkstresser, Court, Yang).  In addition, Seaverns contests FEMA's denial of her $250,000.00 noneconomic nuisance damages request.  See Draft Transcript of May 6, 2025, Hearing at 23:22-24:15 (taken May 6, 2025)(Berkstresser)("May 6, 2025, Tr.").

In Seaverns' Letter of Determination, FEMA offers Seaverns $120,770.77 for road regrading and erosion control.  See May 5, 2025, Tr. at 189:6-7 (Berkstresser).  In defense of its award, FEMA asserts that Seaverns "is in this action on behalf of the Seaverns Living Trust, and not in her or her husband's individual capacities."  May 5, 2025, Tr. at 195:16-18 (Yang). According to FEMA, this distinction is relevant, because it is not clear which damaged plots of land the trust, rather than the individuals, owns.  See May 5, 2025, Tr. at 195:19-196:9 (Yang). Conducting a substantial evidence review, the Court modifies FEMA's calculation and enters $710,767.78 in road regrading and erosion control damages.  See May 5, 2025, Tr. at 190:15-213:23 (Court, Berkstresser, Yang, Sydow); May 6, 2025, Tr. at 13:25-16:17 (Court).  In addition to arguing that the Court should remand this case back to FEMA for further determination of the noneconomic damages award, FEMA argues that Seaverns, on a living trust's behalf, cannot get noneconomic damages in this action, because: (i) "a trust as a non-living, non-corporal entity cannot suffer annoyance itself, nor discomfort"; and (ii) the trust is not an occupant of the damaged

land.  May 6, 2025, Tr. at 24:23-25:9 (Yang).  See id. at 28:14-29:1 (Sydow)(arguing that, although "the nuisance claims here brought in the proof of loss and notice of loss by the individuals," those same nuisance damages "just aren't properly before the Court for judicial review, because all the Court has here is the trust's review of damages, and would be awarding or modifying the trust's award, which wouldn't include the individual's claims for nuisance damages").  In response, the Plaintiffs assert that: (i) the trust is a "grantor trust"; (ii) the individuals "are considered the owners for income tax purposes and estate tax purposes"; (iii) the trust is "indistinguishable from them"; and (iv) "[w]e are required to put the claim under the trust's name."  May 6, 2025, Tr. at 29:13-23 (Gallegos).  Conducting a substantial evidence review, the Court modifies FEMA's final decision and enters Seaverns' requested $250,000.00 in noneconomic nuisance damages.  See May 6, 2025, Tr. at 30:1-14 (Court).

### k.    **Ogorek.**

The Court turns to Ogorek's § 104(i) claim.  See May 6, 2025, Tr. at 31:8 (Court).  The parties agree that FEMA's final economic damages offer is $83,936.11 and that Ogorek challenges only FEMA's denial of his $300,000.00 noneconomic nuisance damages request.  See May 6, 2025, Tr. at 31:13-32:23 (Court, Berkstresser, Sydow).  In addition to arguing that the Court should remand this case back to FEMA for further determination, FEMA argues that Ogorek's situation is similar to other Plaintiffs "who had short-term evacuations from their home," and, accordingly, the Court should compensate Ogorek similarly, i.e., between $9,000.00 and $24,000.00.  May 6, 2025, Tr. at 37:18-24 (Sydow).  Conducting a substantial evidence review, the Court modifies FEMA's final decision and enters $270,000.00 in noneconomic nuisance damages, bringing Ogorek's total compensation to $353,986.11.  See May 6, 2025, Tr. at 39:13-Court).

### l.    **Herrera-Romero.**

The Court turns to Herrera-Romero's § 104(i) claim.  See May 6, 2025, Tr. at 41:8-9 (Court).  The parties agree that FEMA's final economic damages offer is $58,773.11 and that Herrera-Romero challenges only FEMA's denial of her $200,000.00 noneconomic nuisance damages request.  See May 6, 2025, Tr. at 41:8-43:12 (Court, Berkstresser, Go).  In addition to arguing that the Court should remand this case to FEMA for further determination, FEMA argues that Herrera-Romero's situation is similar to other Plaintiffs "who had short-term evacuations from their home," and, accordingly, FEMA should compensate Herrera-Romero proportionally, given that she incurred lower economic damages than the other evacuated Plaintiffs did.  See May 6, 2025, Tr. at 43:25-46:5 (Go).  Conducting a substantial evidence review, the Court modifies FEMA's final decision and enters $180,000.00 in noneconomic nuisance damages.  See May 6, 2025, Tr. at 46:22-48:9 (Court).

### 7.    **FEMA's Equitable Tolling Brief.**

On July 15, 2025, FEMA submits a "brief to address issues regarding jurisdiction and the scope of the Court's judicial review arising out of the hearing held May 5-6, 2025."  Federal Emergency Management Agency's Post-Hearing Brief Regarding Jurisdiction at 1, filed July 15, 2024 (Doc. 71)("FEMA's Equitable Tolling Brief").  First, FEMA argues that the Court does not have subject-matter jurisdiction over the Plaintiffs' § 104(i) claims, because the Plaintiffs do not come to federal court within 60 days of receiving FEMA's final decision.  See FEMA's Equitable Tolling Brief at 9-15.  FEMA acknowledges that, according to the MTD MOO, whatever is on the table at day 180 is a judicially reviewable final decision.  See  FEMA's Equitable Tolling Brief at 9-12.  FEMA then argues that Congress does not waive FEMA's sovereign immunity for the Plaintiffs' claims, because the Plaintiffs file those claims more than 60 days after each Plaintiff's day 180.  See FEMA's Equitable Tolling Brief at 12-15.

Second, FEMA argues that equitable tolling does not excuse the allegedly late filing, because the Plaintiffs have not been diligent in enforcing their rights, and there are no extraordinary circumstances.[9]  See FEMA's Equitable Tolling Brief at 15-23.  Regarding diligence, FEMA asserts that the Plaintiffs did not "pursue their judicial-review rights in accordance with the 180-day deadline nor did they attempt to seek judicial review within 60 days of this 180-day deadline."  FEMA's Equitable Tolling Brief at 17.  FEMA notes, for example, that ten Plaintiffs do not submit their Proofs of Loss until after 180 days, and, thus, FEMA asserts that FEMA "could not have made claim determinations by the 180-day deadline."  FEMA's Equitable Tolling Brief at 17-18.  FEMA also argues that the Plaintiffs' continued participation in the administrative process after day 180 -- and even after filing this lawsuit -- shows that the Plaintiffs have not been enforcing diligently their judicial review rights in accordance with the 60-day deadline.  FEMA's Equitable Tolling Brief at 18.  FEMA maintains that the Plaintiffs' decision to wait until receiving Letters of Determination to come to federal court[10] evinces a lack of diligence, because that decision "directly contradicts their stance that the administrative determination of claims should stop at day 180."  FEMA's Equitable Tolling Brief at 19.  Regarding extraordinary circumstances, FEMA argues that equitable tolling is appropriate only when circumstances outside of the Plaintiffs' control prevent them from filing on time.  See FEMA's Equitable Tolling Brief at 20 (citing Menominee Indian Tribe of Wisconsin v. United States, 577 U.S. 250, 255 (2016)).  FEMA insists that it "did

---

[9]On this issue, FEMA also argues that, if the Court determines that the 60-day filing deadline is jurisdictional, then the Court does not need to reach the equitable tolling analysis, because jurisdictional procedural bars cannot be tolled.  See FEMA's Equitable Tolling Brief at 15 n.4.

[10]FEMA also alleges that, even if the 60-day clock starts when FEMA issues Letters of Determination for these Plaintiffs, one plaintiff -- Gallegos -- misses that deadline too.  See FEMA's Equitable Tolling Brief at 19 n.6 (asserting that the Complaint "was filed more than 60 days after Petitioner Gallegos' LOD").

not stand in Petitioners' way and prevent them from seeking judicial review within 240 days" of their Notice of Loss submission, and that the Plaintiffs were "fully aware of the statutory deadlines." FEMA's Equitable Tolling Brief at 20-21.

### 8. **The Plaintiffs' Equitable Tolling Brief.**

On July 15, 2025, the Plaintiffs ask the Court to "reject any argument by FEMA that Plaintiffs' judicial-review actions are untimely." Plaintiffs' Brief Regarding the Timeliness Issue at 5, filed July 15, 2025 (Doc. 72)("Plaintiffs' Equitable Tolling Brief"). First, the Plaintiffs argue that the "Plaintiffs timely sought judicial review under the HPFAA's plain text," because the Plaintiffs file the Complaint within 60 days after FEMA issued a Letter of Determination for each Plaintiff except for Gallegos. Plaintiffs' Equitable Tolling Brief at 6-7. Regarding Gallegos, the Plaintiffs assert that, even though the Complaint comes more than 60 days after Gallegos' Letter of Determination, FEMA has forfeited its argument that Gallegos' claims are untimely, because FEMA waited until after the Court adjudicated Gallegos' claims on the merits to make this argument. See Plaintiffs' Equitable Tolling Brief at 18-19 (citing Kontrick v. Ryan, 540 U.S. 443, 458 (2004), and Rawers v. United States, 488 F. Supp. 3d 1059, 1127 (D.N.M. 2020)(Browning, J.)). Using that same logic, the Plaintiffs argue that FEMA forfeits its untimeliness challenge for all Plaintiffs, because FEMA waits until three days before the § 104(i) hearings to raise the issue. See Plaintiffs' Equitable Tolling Brief at 17.

Next, the Plaintiffs argue that the 60-day filing deadline is nonjurisdictional, because: (i) statutes of limitations are presumptively nonjurisdictional; (ii) the 60-day deadline is directed at the claimant rather than at the Court; (iii) Congress frames the 60-day deadline in permissive terms; (iv) Congress does not include the word "jurisdiction" in the 60-day deadline provision; (v) the deadline is short; and (vi) FEMA understands the 60-day deadline to be "subject to extension." Plaintiffs' Equitable Tolling Brief at 11-15. Finally, the Plaintiffs argue that the 60-

day deadline should be tolled, because "FEMA published guidelines, issued regulations, and sent correspondence which led claimants to believe they had far more than 240 days from filing a notice of loss to seek judicial review."  Plaintiffs' Equitable Tolling Brief at 20.  The Plaintiffs identify six allegedly inducing actions.  See Plaintiffs' Equitable Tolling Brief at 20-23.  First, the Plaintiffs identify FEMA's guidelines and regulations, which state that the 180-day clock starts only when FEMA acknowledges a claim rather than when a claimant submits a Notice of Loss.  Plaintiffs' Equitable Tolling Brief at 20 (citing 44 C.F.R. § 296.10(f); Federal Emergency Management Agency, Hermit's Peak/Calf Canyon Fire Assistance Regulation Summary at 2 (dated November, 2022)(attached as Exhibit 1 to Plaintiffs' Equitable Tolling Brief)(PCOE 0018)("Regulations Summary").  Second, the Plaintiffs highlight FEMA's correspondences with the Plaintiffs, where FEMA "induced claimants to wait months after submitting a notice of loss before expecting FEMA to 'acknowledge' a claim, citing logistical challenges with setting up claims offices and processing claims."  Plaintiffs' Equitable Tolling Brief at 21 (internal quotations have no citation)(citing Email from Angela Gladwell to Singleton Schreiber re: Hermit's Peak/Calf Canyon Claims Office Update at 1 (dated March 1, 2023)(attached as Exhibit 18 to Plaintiffs' Equitable Tolling Brief)(PCOE 0273)(AR-Gallegos-00098)).  Third, the Plaintiffs assert that "FEMA induced claimants to wait still longer by telling claimants that they could not 'acknowledge' their notice of loss until claimants resubmitted a notice of loss using a since-revised form."  Plaintiffs' Equitable Tolling Brief at 21 (internal quotations have no citation)(citing Letter from A. Donald Siler to Singleton Schreiber re: Hermit's Peak/Calf Canyon Claimants at 1 (dated April 6, 2023)(attached as Exhibit 20 to Plaintiffs' Equitable Tolling Brief)(PCOE 0279)(AR-Gallegos-00087)).  Fourth, the Plaintiffs assert that "FEMA's guidelines and regulations stated that before claimants could seek judicial review of a claim determination, they first had to complete FEMA's administrative

appeal process." Plaintiffs' Equitable Tolling Brief at 21-22 (citing Regulations Summary at 2 (PCOE 0018); 88 Fed. Reg. 59,730 (Aug. 29, 2023)).  Fifth, the Plaintiffs insist that "FEMA's guidelines and regulations stated that claimants had 120 days after receiving a letter of determination."  Plaintiffs' Equitable Tolling Brief at 22 (citing Regulations Summary at 4-5 (PCOE 0020-21).  Sixth, the Plaintiffs assert that "FEMA's guidelines and regulations stated that claimants had 60 days after the decision in the administrative appeal (not the letter of determination) to seek judicial review."  Plaintiffs' Equitable Tolling Brief at 22 (emphasis in original)(citing Regulations Summary at 5 (PCOE 0021)).  The Plaintiffs argue that, in sum, FEMA induced them to miss the deadline, because "FEMA's published guidelines and regulations expressly stated that claimants had at least 360 days (180 + 120 + 60 =360), plus however long it took for FEMA to 'acknowledge' the notice of loss, which was often many months."  Plaintiffs' Equitable Tolling Brief at 23 (internal quotations have no citation).

## LAW REGARDING SUBJECT-MATTER JURISDICTION

It is a fundamental precept of American law that the federal courts are "courts of limited jurisdiction."  Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005).  Federal courts "possess only that power authorized by Constitution and statute."  Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).  Among the powers that Congress has bestowed upon the courts is the power to hear controversies arising under federal law -- federal question jurisdiction -- and controversies arising between citizens of different states -- diversity jurisdiction. See 28 U.S.C. §§ 1331, 1332.

Pursuant to rule 12(h)(3) of the Federal Rules of Civil Procedure, "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."  Fed. R. Civ. P. 12(h)(3).  Objection to a federal court's subject-matter jurisdiction "may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry

of judgment." Arbaugh v. Y & H Corp., 546 U.S. 500, 506 (2006).  See Kontrick v. Ryan, 540 U.S. 443, 455 (2004)("A litigant generally may raise a court's lack of subject-matter jurisdiction at any time in the same civil action, even initially at the highest appellate instance."); Mansfield, Coldwater & Lake Mich. Ry. Co. v. Swan, 111 U.S. 379, 382 (1884)(holding that federal judicial power's nature and limits require the court to raise the issue of subject-matter jurisdiction sua sponte).  Whenever the court lacks jurisdiction of the subject matter involved in an action, the court must dismiss the action.  See Tuck v. United States Auto. Ass'n, 859 F.2d 842, 844 (10th Cir. 1988).

    "'The party seeking the exercise of jurisdiction bears the burden of establishing jurisdiction and must allege in his pleading the facts essential to show jurisdiction.'"  United States ex rel. General Rock & Sand Corp. v. Chuska Dev. Corp., 55 F.3d 1491, 1495 (10th Cir. 1995)(quoting Penteco Corp. v. Union Gas Sys., Inc., 929 F.2d 1519, 1521 (10th Cir. 1991)).  In determining whether a party adequately has presented facts sufficient to establish jurisdiction, the court should look to the complaint's face, see Whitelock v. Leatherman, 460 F.2d 507, 514 (10th Cir. 1972), accepting the well-pleaded factual allegations as true, see United States v. Rodriguez-Aguirre, 264 F.3d 1195, 1203 (10th Cir. 2001), but ignoring conclusory allegations of jurisdiction, see Groundhog v. Keeler, 442 F.2d 674, 677 (10th Cir. 1971).  "[D]ismissals for lack of jurisdiction should be without prejudice, because the court, having determined that it lacks jurisdiction over the action, is incapable of reaching a disposition on the merits of the underlying claims."  Brereton v. Bountiful City Corp., 434 F.3d 1213, 1218 (10th Cir. 2006)(emphasis in original).

    The Court has addressed subject-matter jurisdiction in a number of cases.  For example, the Court has determined whether the plaintiff properly has invoked the Court's diversity jurisdiction.  See 28 U.S.C. § 1332.  In Denny v. Orient Lines, 375 F. Supp. 2d 1320 (D.N.M.

2005)(Browning, J.), the Court dismisses the complaint for lack of subject-matter jurisdiction, because, although the parties are citizens of different States and, therefore, diversity jurisdiction is present, the amount in controversy is less than $75,000.00.  See 375 F. Supp. 2d at 1323.  In U.S. Bank Nat'l Ass'n for Chase Mortg. Fin. Corp. Multiclass Mortg. Pass-Through Certificates Chaseflex Tr. Series 2006-1 v. First Morgan, 299 F. Supp. 3d 1202 (D.N.M. 2017)(Browning, J.), the Court remands the case to State court, because the removing parties do not demonstrate that complete diversity exists among the parties or that there is $75,000.00 in controversy.  See 299 F. Supp. 3d at 1206-09.  The Court also has had ample cause to consider the scope of its federal-question jurisdiction.  See 28 U.S.C. § 1331.  In Gallup Med Flight, LLC v. Builders Tr. of N.M., 240 F. Supp. 3d 1161 (D.N.M. 2017)(Browning, J.), a contract dispute, the Court concludes that there is not a "substantial federal question of law at issue" when the complaint is "based entirely on New Mexico contract causes of action . . . ."  240 F. Supp. 3d at 1231.  In Warner Bros. Ent. Inc. v. Loyd, No. CIV 20-0062, 2023 WL 5727468 (D.N.M. September 5, 2023)(Browning, J.), the Court holds that it has subject-matter jurisdiction over the plaintiffs' claims, which properly arise under a range of federal statutes.  See 2023 WL 5727468, *96-97.  In Darr v. New Mexico Dep't of Game & Fish, 403 F. Supp. 3d 967 (D.N.M. 2019)(Browning, J.), a case removed from State court, the Court remands the case, because the plaintiff's complaint is "based entirely on New Mexico employment and disability causes of action, none of which on their face turn on a federal issue."  403 F. Supp. 3d at 1015.  The Court also exercises its supplemental jurisdiction under 28 U.S.C. § 1367(a) to hear State-law claims that were a part of the same federal claims over which the Court had original jurisdiction.  See, e.g., 2023 WL 5727468, *98-99.

### LAW REGARDING THE UNITED STATES' SOVEREIGN IMMUNITY

The United States of America, as the sovereign, "cannot be sued without its consent." Garcia v. United States, 709 F. Supp. 2d 1133, 1137 (D.N.M. 2010)(Browning, J.).  A court has

no jurisdiction over a suit against the United States unless the United States consents to be sued. See United States v. Mitchell, 463 U.S. 206, 212 (1983)(holding that it is "axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction"); FDIC v. Meyer, 510 U.S. 471, 475 (1983)("Sovereign immunity is jurisdictional in nature."); Cortez v. E.E.O.C., 585 F. Supp. 2d 1273, 1282 (D.N.M. 2007)(Browning, J.)("If Congress has not waived sovereign immunity, the federal court does not have jurisdiction to hear the claim."). The United States' agencies also have sovereign immunity absent a waiver. See FDIC v. Meyer, 510 U.S. at 475 ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."); Cortez v. E.E.O.C., 585 F. Supp. 2d at 1283. Furthermore, "[w]hen the acts complained of by the plaintiff pertain to actions of defendants in their official capacity as agents of the United States, the claim is, in actuality, against the United States." Begay v. Pub. Serv. Co. of New Mexico, 710 F. Supp. 2d 1161, at 1190 (D.N.M. 2010)(Browning, J.). See Kentucky v. Graham, 473 U.S. 159, 165-166 (1985)(recognizing that suits against officials in their official capacities "represent only another way of pleading an action against an entity of which an officer is an agent"). "The party bringing suit against the United States bears the burden of proving that sovereign immunity has been waived." James v. United States, 970 F.2d 750, 753 (10th Cir. 1992).

Congress often has waived the United States' sovereign immunity by statute. Such statutory waivers of the United States' sovereign immunity "must be unequivocally expressed in statutory text" and cannot be "implied." Lane v. Pena, 518 U.S. 187, 192 (1996). See Pueblo of Jemez v. United States, 430 F. Supp. 3d 943, 1149-50 (D.N.M. 2019)(Browning, J.), amended on reconsideration, 483 F. Supp. 3d 1024 (D.N.M. 2020), aff'd in part, vacated in part, rev'd in part, 63 F.4th 881 (10th Cir. 2023). Accordingly, a "statute's legislative history cannot supply a waiver

that does not appear clearly in any statutory text." Lane v. Pena, 518 U.S. at 192. "Moreover, a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." Lane v. Pena, 518 U.S. at 192. For example, the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680 ("FTCA"), waives sovereign immunity "for certain torts that United States employees cause while acting within the scope of their office or of their employment," De Baca v. United States, 403 F. Supp. 3d 1098, 1121 (D.N.M. 2019)(Browning, J.). See Cortez v. E.E.O.C., 585 F. Supp. 2d at 1284 ("The only statutory authority to sue the United States for common-law torts is under the Federal Tort Claims Act . . . ."). Similarly, the Tucker Act, 28 U.S.C. § 1491, establishes a waiver of sovereign immunity for non-tortious claims seeking money damages "founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491.

Perhaps the most important waiver of the United States' sovereign immunity is in 5 U.S.C. § 702, which provides a limited waiver of sovereign immunity for challenges to agency action that do not seek money damages. See United States v. Murdock Mach. & Eng'g Co. of Utah, 81 F.3d 922, 930 n.8 (10th Cir. 1996)(noting that 5 U.S.C. § 702 provides "a general waiver of the government's sovereign immunity from injunctive relief"). Specifically, under 5 U.S.C. § 702, the United States waives sovereign immunity as to actions "in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority." 5 U.S.C. § 702. The waiver found in 5 U.S.C. § 702 "is not limited to suits under the Administrative Procedure Act." Simmat v. U.S. Bureau of Prisons, 413 F.3d 1225, 1233 (10th Cir. 2005). See Gilmore v. Weatherford, 694 F.3d 1160, 1166 n.1 (10th Cir. 2012)("Whether plaintiffs' claims

arise under the APA or common law is also immaterial with respect to the sovereign immunity analysis."); Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv., 58 F. Supp. 3d 1191, 1223 (D.N.M. 2014)(Browning, J.).  Because "the APA does not grant subject-matter jurisdiction," however, the APA cannot waive sovereign immunity "when the relevant statute 'precludes judicial review' or when 'agency action is committed to agency discretion by law.'"  New Mexico v. McAleenan, 450 F. Supp. 3d at 1194-95 (quoting 5 U.S.C. § 701(a)(1)-(2)).

## LAW REGARDING EQUITABLE TOLLING

"As a general matter, equitable tolling pauses the running of, or 'tolls,' a statute of limitations when a litigant has pursued his rights diligently but some extraordinary circumstance prevents him from bringing a timely action."  Lozano v. Montoya Alvarez, 572 U.S. 1, 10 (2014)(internal quotations have no citation).  Equitable tolling of a statute of limitations applies only in "rare and exceptional circumstances."  Laurson v. Leyba, 507 F.3d 1230, 1232 (10th Cir. 2007).  "Generally, equitable tolling requires a litigant to establish two elements: '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way.'"  Yang v. Archuleta, 525 F.3d 925, 928 (10th Cir. 2008)(quoting Lawrence v. Florida, 549 U.S. 327, 336 (2007)).  "Such extraordinary events include conduct by a defendant that caused the plaintiff to refrain from filing an action during the applicable period."  Roberts v. Barreras, 484 F.3d 1236, 1241 (10th Cir. 2007).  See Gibson v. Klinger, 232 F.3d 799, 808 (10th Cir. 2000)(stating that the equitable remedy "would be appropriate, for example, when a [plaintiff] is actually innocent, when an adversary's conduct -- or other uncontrollable circumstances -- prevents a [plaintiff] from timely filing, or when a [plaintiff] actively pursues judicial remedies but files a defective pleading during the statutory period.").  "[A] rebuttable presumption of equitable tolling applies to statutes of limitations that would otherwise bar suits filed against the United States."  Carter v. United States Dep't of Def., No. CIV 16-0786 JB/SMV, 2017 WL

2271416, at *11 (D.N.M. February 28, 2017)(Browning, J.)(citing Irwin v. Department of Veterans Affairs, 498 U.S. 89, 95-96 (1990)("Irwin")).  The Supreme Court of the United States suggests that equitable tolling is more appropriate for "remedial statutes" which are "designed to be 'unusually protective of claimants'" or for statutes "'in which laymen, unassisted by trained lawyers, initiate the process,'" than for statutes designed for "'sophisticated' institutional [entities] assisted by legal counsel."  Sebelius v. Auburn Reg'l Med. Ctr., 568 U.S. 145, 160 (2013)(holding that 42 U.S.C. § 1395oo(a)(3)'s 180-day deadline to file an internal agency appeal challenging an agency's calculation of a hospital's adjusted Medicare reimbursement rate is not subject to equitable tolling)(first quoting Bowen v. City of New York, 476 U.S. 467, 480 (1986)("Bowen"); then quoting Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 397 (1982)("Zipes"); and then quoting Your Home Visiting Nurse Servs., Inc. v. Shalala, 525 U.S. 449, 456 (1999)).

In Carter v. United States Department of Defense, the Court dismisses a plaintiff's claims under the Privacy Act, 5 U.S.C. §§ 552a, for lack of subject-matter jurisdiction, because the plaintiff files his claims outside of the Privacy Act's two-year statute of limitations.  See 2017 WL 2271416, at *12.  Notwithstanding the Court's dismissal for lack of subject-matter jurisdiction, the Court notes that that Irwin's equitable tolling holding "implies that the Privacy Act's statute of limitations does not impose a jurisdictional bar":

> In considering the legal effect of the running of the Privacy Act's statute of limitations, the Court considers the implications raised by the Supreme Court's opinion in Irwin v. Department of Veterans Affairs, which considered a limitations period in another statutory context.  See 498 U.S. at 95-96.  In that case, the Supreme Court held that a rebuttable presumption of equitable tolling applies to statutes of limitations that would otherwise bar suits filed against the United States.  See Irwin v. Department of Veterans Affairs, 498 U.S. at 95-96 (holding "that the same rebuttable presumption of equitable tolling applicable to suits against private defendants should also apply to suits against the United States").  Consequently, the Supreme Court held that equitable tolling applied to 42 U.S.C. § 2000e-16(c), which required the petitioner, Shirley Irwin, to file a complaint within thirty days of the Equal Employment Opportunity Commission's decision.

Justice White concurred in part, but did "not join the portion of the opinion holding that the 30 day time period is subject to equitable tolling." Irwin v. Department of Veterans Affairs, 498 U.S. at 97 (White, J., concurring in part). Justice White reasoned that "statutory deadlines for suits against the Government, such as the one in this case, are conditions on the Government's waiver of sovereign immunity," 498 U.S. at 97 (White, J., concurring in part), and, therefore, "must be 'strictly observed and exceptions thereto are not to be implied,'" 498 U.S. at 97 (White, J., concurring in part)(quoting Lehman v. Nakshian, 453 U.S. 156, 161 (1981)). As a result, Justice White declined to join the Supreme Court's holding that equitable tolling applied to 42 U.S.C. § 2000e-16(c), because "Congress did not expressly provide for equitable tolling of the 30-day filing deadline in § 2000e-16(c)." Irwin v. Department of Veterans Affairs, 498 U.S. at 97 (White, J., concurring in part).

If the issue of equitable tolling of federal statutes of limitations were open, then the Court would agree with Justice White's reasoning that, unless Congress expressly provides for equitable tolling in a waiver of sovereign immunity, it does not make sense to apply the judge-made doctrine of equitable tolling to statutes of limitations that otherwise bar suits filed against the United States. See Irwin v. Department of Veterans Affairs, 498 U.S. at 97 (White, J., concurring in part). The Court recognizes, however, that the issue is not open. See Irwin v. Department of Veterans Affairs, 498 U.S. at 95-96 (holding "that the same rebuttable presumption of equitable tolling applicable to suits against private defendants should also apply to suits against the United States"). Consequently, in light of Irwin v. Department of Veterans Affairs, the Court agrees with the Ninth Circuit's and the D.C. Circuit's reasoning that it does not make sense to treat the Privacy Act's statute of limitations as a jurisdictional bar. See Rouse v. U.S. Dep't of State, 567 F.3d [408] 415[(9th Cir. 2009)]; Chung v. U.S. Dep't of Justice, 333 F.3d [273] 277 [(D.C. Cir. 2003)]. In Rouse v. U.S. Dep't of State, the Ninth Circuit explained why: (i) if the Privacy Act's statute of limitations is a jurisdictional bar, then the traditional defense of equitable tolling cannot apply, see Rouse v. U.S. Dep't of State, 567 F.3d at 415 (citing Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982)); (ii) but because "the Supreme Court announced [in Irwin v. Department of Veterans Affairs] a 'general rule' that 'the same rebuttable presumption of equitable tolling applicable to suits against private defendants should also apply to suits against the United States,'" see Rouse v. U.S. Dep't of State, 567 F.3d at 415 (quoting Irwin v. Department of Veterans Affairs, 498 U.S. at 95-96); (iii) therefore, because the Privacy Act's statute of limitations may be equitably tolled, it cannot be a categorically jurisdictional bar, see Rouse v. U.S. Dep't of State, 567 F.3d at 416 (citing Chung v. U.S. Dep't of Justice, 333 F.3d at 277).

Notwithstanding the Court's view that the Supreme Court's analysis in Irwin v. Department of Veterans Affairs implies that the Privacy Act's statute of limitations does not impose a jurisdictional bar, the Court is bound to follow faithfully the Tenth Circuit's view that a plaintiff's failure to file a Privacy Act claim against the United States within the Privacy Act's limitations period "deprives the court of subject matter jurisdiction." Jackson v. Shinseki, 526

F. App'x [814] 816 [(10th Cir. 2013)](citing <u>Harrell v. Fleming</u>, 285 F.3d [1292] 1293-94 [(10th Cir. 2002)]). Accordingly, the Court dismisses Carter's Privacy Act claims pursuant to rule 12(b)(1) for lack of subject-matter jurisdiction, according to the Tenth Circuit's guidance in <u>Jackson v. Shinseki</u>, 526 F. App'x at 816, and <u>Harrell v. Fleming</u>, 285 F.3d at 1293.

<u>Carter v. United States Dep't of Def.</u>, 2017 WL 2271416, at *11-12.

The Court also evaluates equitable tolling in other contexts. See <u>Rivera v. Torrez</u>, No. CIV 23-1100 JB/KK, 2025 WL 1263705, at *7 (D.N.M. April 30, 2025)(Browning, J.)(concluding that, although the one-year statute of limitations to file a habeas corpus petition under 28 U.S.C. § 2244(d) is subject to equitable tolling, the Court will not apply equitable tolling to a habeas petitioner who: (i) has limited access to prison law libraries during COVID-19 quarantine lockdowns; (ii) experiences delays in sending and receiving prison mail; and (iii) "does not describe what steps, if any, [he] took to pursue his [habeas] claims before the expiration of the one-year limitation period"); <u>Benavidez v. Sandia Nat'l Lab'ys</u>, No. CIV 15-0922 JB/LF, 2017 WL 3052765, at *59 (D.N.M. June 21, 2017)(Browning, J.)(concluding that, although the "ninety-day period for filing a Title VII lawsuit is subject to equitable tolling," the Court will not apply equitable tolling, where: (i) "[n]othing prevented [the plaintiffs] from filing separate lawsuits to beat the running of the limitations period or from engaging in negotiations with [the defendants] to enter into a tolling agreement"; (ii) the defendants "did not do anything to prevent the [] Plaintiffs from filing separate lawsuits;" and (iii) the defendants "tried to help the [] Plaintiffs by suggesting that they enter into tolling agreement negotiations").

## <u>LAW REGARDING JUDICIAL NOTICE</u>

Rule 201 of the Federal Rules of Evidence allows a court to, at any stage of the proceeding, take notice of "adjudicative" facts that fall into one of two categories: (i) facts that are "generally known within the territorial jurisdiction of the trial court;" or (ii) facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

Fed. R. Evid. 201(b), (d).  "Adjudicative facts are simply the facts of the particular case."  United

States v. Wolny, 133 F.3d 758, 764 (10th Cir. 1998)(quoting Advisory Committee Notes to rule

201).  A court has discretion to take judicial notice of such facts, regardless whether requested.

See Fed. R. Evid. 201(c).

On the other hand, if a party requests that the court take judicial notice of certain facts, and

supplies the necessary information to the court, judicial notice is mandatory.  See Fed. R. Evid.

201(d).  Also, if the parties timely request an opportunity to be heard, the Court must grant such

an opportunity "as to the propriety of taking judicial notice and the tenor of the matter noticed."

Fed. R. Evid. 201(e).  That judicial notice may be taken during any stage of the judicial proceeding

includes the motion to dismiss stage.  See 21 B C. Wright & K. Graham, Jr., Fed. Prac. & Proc.

Evid. § 5110, at 294 & n.17 (2d ed. 2005).  Moreover, while ordinarily, a motion to dismiss must

be converted to a motion for summary judgment when the court considers matters outside the

Complaint, see Fed. R. Civ. P. 12(d), matters that are judicially noticeable do not have that effect,

see Duprey v. Twelfth Judicial Dist. Court, 760 F. Supp. 2d 1180, 1193 (D.N.M. 2009)(Browning,

J.)(citing Grynberg v. Koch Gateway Pipeline Co., 390 F.3d 1276, 1279 n.1 (10th Cir. 2004)).

Also, when considering a motion to dismiss, "the court is permitted to take judicial notice of its

own files and records, as well as facts which are a matter of public record."  Van Woudenberg v.

Gibson, 211 F.3d 560, 568 (10th Cir. 2000) abrogated on other grounds by McGregor v. Gibson,

248 F.3d 946, 955 (10th Cir. 2001).  The documents judicially noticed, however, should not be

considered for the truth of the matters asserted therein.  See Tal v. Hogan, 453 F.3d 1244, 1265

n.24 (10th Cir. 2006).  The Court has previously judicially noticed news publications and public

filings with the Securities and Exchange Commission.  See S.E.C. v. Goldstone, 952 F. Supp. 2d

at 1219-20; In re Thornburg Mortg., Inc. Sec. Litig., 2009 WL 5851089, at *3-4.  See also Gallegos

v. Bernalillo Cnty. Bd. of Cnty. Comm'rs, 278 F. Supp. 3d 1245 (D.N.M. 2017)(Browning,
J.)(ruling that the Court may take judicial notice of State court orders); A.M ex rel. Youngers v.
N.M. Dep't of Health, 117 F. Supp. 3d 1220, 1232 n.6 (D.N.M. 2015)(Browning, J.).

## ANALYSIS

The Court undertakes its analysis in four sections.  First, the Court concludes that the
Plaintiffs' § 104(i) claims are properly before the Court, even though the Plaintiffs miss the
Hermit's Peak Act's 60-day filing deadline, because the filing deadline has been tolled equitably.
Second, the Court denies the Plaintiffs' Judicial Notice Request and determines that: (i) it will not
take judicial notice of the Plaintiffs' identified State court documents, because those documents
were not part of the record before the Administrator; and (ii) it will consider those documents as
it considers judicial cases in arguments.  Third, the Court grants in part and denies in part FEMA's
Motion in Limine and determines that it will limit its judicial review to materials presented to
FEMA before FEMA issued the decisions which the Court is reviewing -- which, in the Plaintiffs'
cases, are the Letters of Determination -- because the Hermit's Peak Act provides that a district
court "shall" review a challenged decision "on the record made before the Administrator."
Hermit's Peak Act § 104(i)(1)-(2).  Fourth, the Court evaluates each Plaintiffs' § 104(i) claim,
conducts a substantial-evidence review of the record before FEMA, and modifies FEMA's
economic and noneconomic damages awards.

## I.      THE PLAINTIFFS' § 104(i) CLAIMS ARE PROPERLY BEFORE THE COURT.

The Court holds that the Plaintiffs' § 104(i) claims are properly before the Court, even
though they miss the Hermit's Peak Act's 60-day filing deadline, because the filing deadline has
been equitably tolled.  To reach this holding, the Court makes four conclusions.  First, the Court
determines that the 60-day filing deadline is nonjurisdictional, because the 60-day deadline does
not set the bounds of the Court's adjudicatory authority.  Second, the Court determines that the 60-

day filing deadline is subject to equitable tolling -- i.e., the deadline may be equitably tolled -- because the Hermit's Peak Act is a remedial statute designed to protect and compensate fire victims. Third, the Court determines the 60-day filing deadline has been tolled equitably for these twelve Plaintiffs, because (i) the Plaintiffs pursued their rights diligently; and (ii) FEMA's actions and regulations lulled the Plaintiffs into missing the 60-day deadline. Fourth, the Court concludes that these twelve Plaintiffs' 60-day clocks start ticking when FEMA issues their Letters of Determination. Because these twelve Plaintiffs file the Complaint within 60 days of FEMA issuing their Letters of Determination, these twelve Plaintiffs' § 104(i) claims are properly before the Court.

## A.     THE 60-DAY DEADLINE IS NONJURISDICTIONAL.

The 60-day deadline is nonjurisdictional. "A 'jurisdictional' prescription sets the bounds of the 'court's adjudicatory authority.'" Santos-Zacaria v. Garland, 598 U.S. 411, 416 (2023)(quoting Kontrick v. Ryan, 540 U.S. 443, 455 (2004)). "By contrast, nonjurisdictional rules govern how courts and litigants operate within those bounds." Santos-Zacaria v. Garland, 598 U.S. at 416. "'[H]arsh consequences' attend the jurisdictional brand." Fort Bend Cnty. v. Davis, 587 U.S. 541, 548 (2019)(quoting United States v. Wong, 575 U.S. 402, 409 (2015))(brackets in Fort Bend Cnty. v. Davis, but not in United States v. Wong). As relevant here, a jurisdictional rule cannot be tolled equitably. See Santos-Zacaria v. Garland, 598 U.S. at 416 ("For example, because courts are not able to exceed limits on their adjudicative authority, they cannot grant equitable exceptions to jurisdictional rules."); Sebelius, 568 U.S. at 154 ("We reiterate what it would mean were we to type the governing statute, 42 U.S.C. § 1395$oo$(a)(3), 'jurisdictional.'. . . [T]here [could] be no equitable tolling.")(internal quotations have no citation).

"[A] rule should not be referred to as jurisdictional unless it governs a court's adjudicatory capacity, that is, its subject-matter or personal jurisdiction." Henderson ex rel. Henderson v.

Shinseki, 562 U.S. 428, 435 (2011)("Henderson"). The Supreme Court has "repeatedly held that procedural rules, including time bars, cabin a court's power only if Congress has 'clearly state[d]' as much." United States v. Wong, 575 U.S. at 409 (quoting Sebelius, 568 U.S. at 153)(brackets in United States v. Wong and Sebelius). "Congress, of course, need not use magic words in order to speak clearly on this point." Henderson, 562 U.S.at 436. "But traditional tools of statutory construction must plainly show that Congress imbued a procedural bar with jurisdictional consequences." United States v. Wong, 575 U.S. at 410. "[C]ontext, including this Court's interpretation of similar provisions in many years past, is relevant to whether a statute ranks a requirement as jurisdictional." Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154, 168 (2010).

> And in applying that clear statement rule, we have made plain that most time bars are nonjurisdictional. See, e.g., [Sebelius, 568 U.S.] at [154-55] . . .(noting the rarity of jurisdictional time limits). Time and again, we have described filing deadlines as "quintessential claim-processing rules," which "seek to promote the orderly progress of litigation," but do not deprive a court of authority to hear a case. Henderson[], 562 U.S. [at] 435 . . .; see [Sebelius], 568 U.S., at [154-55] . . .; Scarborough v. Principi, 541 U.S. 401, 413 . . . (2004). That is so, contrary to the dissent's suggestion, see post, at 1640, 1643-1644, even when the time limit is important (most are) and even when it is framed in mandatory terms (again, most are); indeed, that is so "however emphatic[ally]" expressed those terms may be, Henderson, 562 U.S., at 439 . . . (quoting Union Pacific R. Co. v. Locomotive Engineers, 558 U.S. 67, 81, 130 . . . (2009)). Congress must do something special, beyond setting an exception-free deadline, to tag a statute of limitations as jurisdictional and so prohibit a court from tolling it.

United States v. Wong, 575 U.S. at 410.

In Vigil v. FEMA, No. CIV 23-0941 JB/JFR, 2024 WL 2404487 (D.N.M. May 23, 2024)(Browning, J.)("Vigil"), the Court makes several holdings regarding which parts of the sovereign immunity waiver of the Hermit's Peak Act are jurisdictional, and which parts are nonjurisdictional. See 2024 WL 2404487, at *28. These holdings do not address, however, whether the 60-day filing deadline is jurisdictional. See 2024 WL 2404487, at *28. In Vigil, the Court denies a request for a temporary restraining order enjoining FEMA from communicating

with legally represented victims of the Hermit's Peak Fire.  See 2024 WL 2404487, at *1.  In analyzing whether the Court has subject-matter jurisdiction over the Vigil Plaintiffs' claims, the Court analogizes § 104(i) to 42 U.S.C. § 405(g)("§ 405(g)") -- which "provides for district court review of" the Social Security Administration's benefits determination, 42 U.S.C. § 405 -- and concludes that § 104(i)(1), like 42 U.S.C. § 405(g), waives FEMA's sovereign immunity if: (i) the claimants have presented their claims to FEMA; and (ii) the claimants have exhausted their administrative remedies and obtained a final decision.  See 2024 WL 2404487, at *28.  The Court also holds that the first element of the sovereign immunity waiver of the Hermit's Peak Act -- presentment -- is "'purely "jurisdictional" in the sense that it cannot be "waived,"'" whereas the second element -- exhaustion -- is not jurisdictional, because it is waivable.  Vigil, 2024 WL 2404487, at *28 (quoting Mathews v. Eldridge, 424 U.S. 319, 328 (1976)(Powell, J.))(internal quotations have no citation).  As relevant to this Memorandum Opinion, the Court does not decide in Vigil whether the Hermit's Peak Act's 60-day filing deadline is jurisdictional.

In the MTD MOO, the Court holds that FEMA has waived a nonjurisdictional, waivable element of the sovereign immunity waiver of the Hermit's Peak Act: the exhaustion requirement.  See MTD MOO at 109.  Like in Vigil, the Court does not decide whether the Hermit's Peak Act's 60-day deadline is jurisdictional.  Rather, the Court determines that the 60-day deadline is mandatory.  See MTD MOO at 103 ("If any of the Plaintiffs wait longer than 60 days after receiving a final decision . . . to seek judicial review, then those Plaintiffs miss the Congressionally mandated deadline, and Congress has not waived FEMA's sovereign immunity.").  The Court's conclusion that the 60-day deadline is mandatory does not mean that the 60-day deadline is jurisdictional, because "[a] rule may be 'mandatory,' yet not 'jurisdictional.'" E.P.A. v. EME Homer City Generation, L.P., 572 U.S. 489, 512 (2014)(internal

quotations have no citation)(holding that a statutory requirement that an objection to an agency rule must be raised with "reasonable specificity" during public comment period is not jurisdictional, where the requirement "does not speak to a court's authority, but only to a party's procedural obligations").

Looking at § 104(i)'s text and the Supreme Court's interpretation of similar deadline provisions, the Court concludes that the 60-day deadline is nonjurisdictional. The 60-day filing deadline is a "quintessential claim-processing rule," which "should not be described as jurisdictional." Henderson, 562 U.S. at 435. See United States v. Wong, 575 U.S. at 410. "When faced with a type of statutory requirement that 'ordinarily [is] not jurisdictional,' we naturally expect the ordinary case, not an 'exceptional one.'" Santos-Zacaria v. Garland, 598 U.S. at 417, (quoting Sebelius, 568 U.S. at 154-55)(brackets in Santos-Zacaria v. Garland, but not in Sebelius). Although "'Congress is free to attach' jurisdictional consequences to a requirement that usually exists as a claim-processing rule . . . to be confident Congress took that unexpected tack, we would need unmistakable evidence, on par with express language addressing the court's jurisdiction." Santos-Zacaria v. Garland, 598 U.S. at 418 (quoting Henderson, 562 U.S. at 435).

Section 104(i) provides:

> Any claimant aggrieved by a final decision of the Administrator under this Act may, not later than 60 days after the date on which the decision is issued, bring a civil action in the United States District Court for the District of New Mexico, to modify or set aside the decision, in whole or in part.

Hermit's Peak Act § 104(i)(1). This provision does not include "express language addressing the court's jurisdiction." Santos-Zacaria v. Garland, 598 U.S. at 418. Instead, § 104(i) speaks "only to a party's procedural obligations," E.P.A. v. EME Homer City Generation, L.P., 572 U.S. at 512, by introducing a procedural hurdle for the plaintiff, who must come to court within 60 days of receiving a "final decision," Hermit's Peak Act § 104(i)(1). If Congress wants the 60-day deadline

"to be treated as jurisdictional, it could have cast that provision in language like that in" other jurisdictional provisions. Henderson, 562 U.S. at 438. For example, in immigration law, Congress has "specified that 'no court shall have jurisdiction' to review certain matters." Santos-Zacaria v. Garland, 598 U.S. at 418-19 (quoting and citing 8 U.S.C. §§ 1252(a)(2)(A), (a)(2)(B), (a)(2)(C), (b)(9), (g), 1182(a)(9)(B)(v), (d)(3)(B)(i), (d)(12), (h), (i)(2), 1158(a)(3), 1227(a)(3) (C)(ii), 1229c(f ), 1255a(f )(4)(C), and 1225(b)(1)(D)). In the law governing judicial review of the Department of Veterans Affairs' benefits determinations, a claimant challenging the determination of the Court of Appeals for Veterans Claims ("Veterans Court") -- an Article I tribunal -- must file in the Court of Appeals for the Federal Circuit "'within the time and in the manner prescribed for appeal to a United States court of appeals from United States district courts.'" Henderson, 562 U.S. at 428 (quoting 38 U.S.C. § 7292). "Because the time for taking an appeal from a district court to a court of appeals in a civil case has long been understood to be jurisdictional . . . this language clearly signals an intent to impose the same restrictions on appeals from the Veterans Court to the Federal Circuit." Henderson, 562 U.S. at 438-39. Unlike those jurisdictional rules, § 104(i)(1) "eschew[s] such plainly jurisdictional language." Santos-Zacaria v. Garland, 598 U.S. at 419. Accordingly, the Court concludes that the 60-day filing deadline language does not "plainly show that Congress imbued a procedural bar with jurisdictional consequences." United States v. Wong, 575 U.S. at 410.

The Supreme Court's treatment of similar filing deadlines reinforces the Court's reading that the 60-day filing deadline is nonjurisdictional. For example, in Henderson, the Supreme Court concludes that the following filing deadline is nonjurisdictional:

> In order to obtain review by the Court of Appeals for Veterans Claims of a final decision of the Board of Veterans' Appeals, a person adversely affected by such decision shall file a notice of appeal with the Court within 120 days after the date on which notice of the decision is mailed pursuant to section 7104(e) of this title.

38 U.S.C. § 7266(a).  See Henderson, 562 U.S. at 438-39.  Like the provision in Henderson, § 104(i)(1) says that a "claimant aggrieved by a final decision of the Administrator under this Act may, not later than 60 days after the date on which the decision is issued, bring a civil action" in federal court.  Hermit's Peak Act § 104(i)(1).  If anything, the 60-day filing deadline's tone is less jurisdictional than the Henderson filing deadline's tone, because § 104(i)(1) says that an aggrieved claimant "may" file in federal court, whereas the Henderson provision says that an aggrieved claimant "shall" file in federal court, and the Supreme Court has interpreted the Henderson provision's "shall" as mandatory.  Hermit's Peak Act § 104(i)(1); 38 U.S.C. § 7266(a).  See Sebelius, 568 U.S. at 154 (observing that a statutory filing deadline which uses the word "may" is "less 'jurisdictional' in tone than the provision held to be nonjurisdictional in Henderson")(internal quotations have no citation).  The Court's analogizing § 104(i) to § 405(g) in Vigil also supports a nonjurisdictional interpretation, because the Supreme Court has "held that the deadline for obtaining review of Social Security benefits decisions in district court, 42 U.S.C. § 405(g), is not jurisdictional."  Henderson, 562 U.S. at 437 (citing Bowen, 476 U.S. at 478 & n.10; Mathews v. Eldridge, 424 U.S. at 328, n.9; and Weinberger v. Salfi, 422 U.S. 749, 763-764 (1975)).  In sum, both § 104(i)(1)'s text and the Supreme Court's interpretation of similar filing deadlines lead the Court to conclude that the 60-day filing deadline is nonjurisdictional.

### B.    THE 60-DAY DEADLINE IS SUBJECT TO EQUITABLE TOLLING.

The 60-day deadline is subject to equitable tolling, i.e., it is tollable.  The Court's earlier conclusion that the 60-deadline is nonjurisdictional, see supra, at 49, does not mean that it is subject to equitable tolling; the deadline's nonjurisdictional character is a necessary but not a sufficient condition for equitable tolling's availability.  See Sebelius, 568 U.S. at 153-58 (determining that a statutory deadline is nonjurisdictional and not subject to equitable tolling, and noting that, if the deadline is jurisdictional, then equitable tolling is not available).  To determine whether equitable

tolling is available, the Court must evaluate whether equitable tolling is "consistent with Congress' intent in enacting [the] particular statutory scheme" -- in this case, the Hermit's Peak Act. Bowen, 476 U.S. at 480. Cf. Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 363 (1991)(concluding that equitable tolling is not available where tolling "is fundamentally inconsistent with" the underlying statutory scheme). Statutes of limitations to file cases in federal court are usually tollable, and "the same rebuttable presumption of equitable tolling applicable to suits against private defendants should also apply to suits against the United States." Irwin, 498 U.S. at 96. See Rotella v. Wood, 528 U.S. 549, 560-61 (2000)("[F]ederal statutes of limitations are generally subject to equitable principles of tolling."); Carter v. United States Dep't of Def., 2017 WL 2271416, at *11 ("[A] rebuttable presumption of equitable tolling applies to statutes of limitations that would otherwise bar suits filed against the United States.").

Equitable tolling is consistent with Congress' intent in enacting the Hermit's Peak Act. In Bowen, the Supreme Court holds that a similar filing deadline -- § 405(g)'s 60-day deadline for obtaining review of Social Security benefits decisions in district court -- is subject to equitable tolling. See Bowen, 476 U.S. at 480. Applying Bowen's holding here aligns with this Court's other decisions regarding the Hermit's Peak Act's procedural requirements. In Vigil, the Court analogizes the Hermit's Peak Act's sovereign immunity waiver to § 405(g)'s sovereign immunity waiver, and concludes that the Hermit's Peak Act's exhaustion requirement, like its § 405(g) counterpart, is nonjurisdictional and, therefore, waivable. See Vigil, 2024 WL 2404487 at *28. Extending Vigil's analysis to the 60-day deadline makes sense. The Court has concluded that the Hermit's Peak Act's sovereign immunity waiver operates similarly to § 405(g)'s sovereign immunity waiver. See Vigil, 2024 WL 2404487 at *28. The Court sees no reason why that analogy does not also include the 60-day deadline, which, like the exhaustion requirement, is a

nonjurisdictional element of the Hermit's Peak Act's sovereign immunity waiver.  See supra, at 49.  Extending the Court's Vigil analogy here, the Court concludes that Bowen's equitable tolling holding applies to the Hermit's Peak Act's 60-day deadline.

Even without the Vigil analogy, Bowen's facts and legal reasoning are applicable here. Both § 405(g) and § 104(i) involve 60-day deadlines to obtain district court review of a federal agency's compensation determination.  See § 405(g); § 104(i).  Congress designs both statutory schemes to protect claimants and help them get full compensation from the United States  See Bowen, 476 U.S. at 480; supra, at 5.  In Bowen, the Supreme Court notes that the process for review and adjudication of disputed Social Security claims is "'unusually protective'" of claimants, and that Congress authorizes the Secretary of Health and Human Services to toll the filing deadline, "thus expressing its clear intention to allow tolling in some case."  Bowen, 476 U.S. at 480 (quoting Heckler v. Day, 467 U.S. 104, 106 (1984)).  Although the Bowen court does not explain what is so protective about the Social Security scheme, the phrase, "unusually protective," comes from an earlier Supreme Court opinion, Heckler v. Day, which provides more detail:

> To facilitate the orderly and sympathetic administration of the disability program of Title II, the Secretary and Congress have established an unusually protective four-step process for the review and adjudication of disputed claims.  First, a state agency determines whether the claimant has a disability and the date the disability began or ceased.  42 U.S.C. § 421(a); 20 CFR § 404.1503 (1983).  Second, if the claimant is dissatisfied with that determination, he may request reconsideration of the determination.  This involves a de novo reconsideration of the disability claim by the state agency, and in some cases a full evidentiary hearing.  §§ 404.907-404.921. Additional evidence may be submitted at this stage, either on the request of the claimant or by order of the agency.  Third, if the claimant receives an adverse reconsideration determination, he is entitled by statute to an evidentiary hearing and to a de novo review by an Administrative Law Judge (ALJ). 42 U.S.C. § 405(b); 20 CFR §§ 404.929-404.961 (1983).  Finally, if the claimant is dissatisfied with the decision of the ALJ, he may take an appeal to the Appeals Council of the Department of Health and Human Services (HHS). §§ 404.967-404.983.

Heckler v. Day, 467 U.S. at 106-07 (footnotes omitted).

The Hermit's Peak Act is not a perfect one-to-one analogue to the Social Security scheme at issue in Bowen and Heckler v. Day, because the Hermit's Peak Act does not have multiple opportunities for internal agency review and appeals. Nonetheless, other elements of the Hermit's Peak Act illustrate that the Hermit's Peak is, like its Social Security counterpart, highly protective of claimants. For example, the Hermit's Peak Act's available damages categories are generous. In Lands and Dolan, the Court observes that, on the economic damages side, the Hermit's Peak Act provides compensation for, among other things: (i) uninsured property loss; (ii) unrealized decrease in the value of real property; (iii) damage to acequia[11] systems; (iv) paying an insurance deductible; (v) financial losses from reasonable efforts to reduce wildfire, flood, and other natural disaster risk by the impacted counties; and (vi) financial losses greater than are recoverable under a Small Business Administration disaster assistance loan. See Lands and Dolan, 760 F. Supp. 3d at 1262-63. These listed categories are generous, because New Mexico State law does not provide specifically for them. See Lands and Dolan, 760 F. Supp. 3d at 1262-63 (noting that the Court is not able to find any New Mexico State law that provides specifically for these damages categories). The Court also interprets the Hermit's Peak Act to be similarly generous on the noneconomic damages side. See Lands and Dolan, 760 F. Supp. 3d at 1252-61. In addition to providing for economic damages, the Hermit's Peak Act provides for noneconomic damages that are available under applicable tort claims like nuisance or trespass. See Lands and Dolan, 760 F. Supp. 3d at 1252. On top of including generous damages provisions, Congress goes out of its way to make it

---

[11]Acequias are community irrigation systems in the villages and Pueblos of New Mexico. The New Mexico Legislature has provided that acequias are "political subdivisions" or local government entities with all the attendant rights and responsibilities. See Brigette Buynak, Esq. & Jerold Widdison, Acequias, University of New Mexico Utton Center (2017), https://uttoncenter.unm.edu/resources/research-resources/acequias.pdf (last visited June 12, 2025).

easier for claimants to get compensation under the Hermit's Peak Act.  The Hermit's Peak Act

gives claimants two years after FEMA promulgates regulations to submit compensation claims,

see Hermit's Peak Act § 104(b), and Congress twice extends that two-year window by several

months, see supra, at 8.  Also, FEMA must compensate fire victims, "regardless of the citizenship

or alien status of the individual."  Hermit's Peak Act § 103(4).  Generous damages provisions, a

lengthy internal filing window that is extended twice, and a citizenship-blind definition of qualified

claimants all indicate that the Hermit's Peak Act is, like the Social Security scheme in Bowen,

highly protective of claimants.  Accordingly, the Court concludes that equitable tolling of the 60-

day deadline is consistent with Congress' intent in enacting the statute, and, thus, that the 60-day

deadline is subject to equitable tolling.

## C.    EACH PLAINTIFF'S 60-DAY DEADLINE HAS BEEN TOLLED EQUITABLY.

Each Plaintiff's 60-day deadline has been tolled equitably, because: (i) the Plaintiffs

pursued their rights diligently; and (ii) FEMA's actions and regulations lulled the Plaintiffs into

missing the 60-day deadline.  "As a general matter, equitable tolling pauses the running of, or

'tolls,' a statute of limitations when a litigant has pursued his rights diligently but some

extraordinary circumstance prevents him from bringing a timely action."  Lozano v. Montoya

Alvarez, 572 U.S. at 10 (internal quotations have no citation).  "[W]hether to grant equitable tolling

is a discretionary matter for the district court."  Chance v. Zinke, 898 F.3d 1025, 1034 (10th Cir.

2018).  "[A] litigant is entitled to equitable tolling of a statute of limitations only if the litigant

establishes two elements: '(1) that he has been pursuing his rights diligently, and (2) that some

extraordinary circumstance stood in his way and prevented timely filing.'"  Menominee Indian

Tribe of Wis. v. United States, 577 U.S. 250, 255 (2016)(quoting Holland v. Florida, 560 U.S. 631,

649 (2010)).  These two components are "'elements,' not merely factors of indeterminate or

commensurable weight." Menominee Indian Tribe of Wis. v. United States, 577 U.S. at 255

(quoting Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005)). Both elements are required, and the

Supreme Court has rejected equitable tolling requests where a litigant fails to satisfy one of the

factors without addressing whether he satisfies the other factor. See, e.g., Menominee Indian Tribe

of Wis. v. United States, 577 U.S. at 257-58; Pace v. DiGuglielmo, 544 U.S. at 418; Lawrence v.

Florida, 549 U.S. 327, 336-37 (2007).

### 1.    The Plaintiffs Pursue Their Rights Diligently.

The Court concludes that the Plaintiffs pursue their rights diligently, because they follow

FEMA's administrative scheme to obtain compensation before suing, and they file in federal court

within 60 days of receiving a Letter of Determination. A plaintiff who pursues administrative

remedies and, nonetheless, misses a statutory deadline based on an agency's incorrect

representation of the deadline exercises reasonable diligence. See Martinez v. Orr, 738 F.2d 1107,

1112 (10th Cir. 1984)("Martinez")("We refuse to hold that in seeking to pursue all administrative

avenues before resorting to litigation Martinez thereby waived his right to sue, when nothing on

the face of the notice he received [from the agency] explicitly foretold such a result."). Cf. Chance

v. Zinke, 898 F.3d at 1034 (concluding that there is no equitable tolling where the plaintiff "fails

to point to a single action that he took to pursue his rights before filing this lawsuit"). See also

Holland v. Florida, 560 U.S. at 653 (concluding that a habeas petitioner who misses a deadline

exercises reasonable diligence, where the petitioner "wrote his attorney numerous letters seeking

crucial information and providing direction," and "repeatedly contacted the state courts, their

clerks, and the Florida State Bar Association in an effort to have" his attorney -- who failed to file

timely petitions, conduct relevant research, and inform the petitioner about the deadlines --

removed). Here, the Plaintiffs follow FEMA's regulations, guidelines, and correspondence to

obtain compensation through administrative channels. See Plaintiffs' Equitable Tolling Brief at

20-23.  When those channels break down, the Plaintiffs file in federal court within 60 days of receiving their Letters of Determination.[12]  See Plaintiffs' Equitable Tolling Brief at 7; FEMA's Equitable Tolling Brief at 19.  This case is not one where a claimant files a compensation request, does nothing, and then sues in federal court after missing a well-communicated filing deadline. Instead, case is one where a claimant tries to cooperate with an agency and then comes to federal court when he finally gets a decision which can be reviewed.  Arguing that the Plaintiffs have not been diligent does not account for most of this case's pre-history, where the Plaintiffs and FEMA work for months to hash out their disputes, and when FEMA tells the Plaintiffs to follow its regulations and guidelines, which preclude filing in federal court within 240 days of the Notices of Loss.  Accordingly, the Court concludes that the Plaintiffs exercise due diligence in pursuing their judicial review rights.

---

[12]The parties agree that all Plaintiffs, except for Gallegos, file within 60 days of their Letters of Determination.  See Plaintiffs' Equitable Tolling Brief at 7; FEMA's Equitable Tolling Brief at 19.  Both parties are incorrect, however, about Gallegos, because Gallegos also files within 60 days of his Letter of Determination.  FEMA issues Gallegos' Letter of Determination on December 19, 2023.  See Plaintiffs' Equitable Tolling Brief at 7; FEMA's Equitable Tolling Brief at 19; Letter from Angela Gladwell to Anthony Gallegos re: FINAL LETTER OF DETERMINATION at 1 (dated December 19, 2023)(AR-Gallegos-000150)("Gallegos Letter of Determination").  60 days after December 19, 2023, is February 17, 2024, which is a Saturday. See Fed. R. Civ. P. 6(a)(1) (explaining how to count days).  If the last day of the counting period "is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday."  Fed. R. Civ. P. 6(a)(1).  Because Monday, February 19, 2024, was President's Day, Gallegos' 60-day filing period ended on Tuesday, February 20, 2025.  See Gunter v. Oklahoma, No. 24-6049, 2025 WL 902493, at *2 & n.1 (10th Cir. Mar. 25, 2025)(concluding that a 60-day deadline to file a notice of appeal from a judgment entered on December 19, 2023, is February 20, 2024, because the sixtieth day -- February 17, 2024 -- is a Saturday, and Monday, February 19, 2024 is a federal holiday).  Thus, all Plaintiffs -- Gallegos included -- came to federal court within 60 days of receiving their Letters of Determination.

2.      **Extraordinary Circumstances Prevent The Plaintiffs From Meeting The 60-Day Deadline.**

The Court concludes that extraordinary circumstances prevent the Plaintiffs from meeting the 60-day deadline, because FEMA's regulations, guidelines, and communications lull the Plaintiffs into missing the deadline. "[T]olling is appropriate 'when the defendant's conduct rises to the level of active deception; where a plaintiff has been lulled into inaction by a defendant, and likewise, if a plaintiff is actively misled or has in some extraordinary way been prevented from asserting his or her rights.'" Impact Energy Res., LLC v. Salazar, 693 F.3d 1239, 1246 (10th Cir. 2012) (quoting United States v. Clymore, 245 F.3d 1195, 1199 (10th Cir. 2001)). "[T]he second prong of the equitable tolling test is met only where the circumstances that caused a litigant's delay are both extraordinary and beyond its control." Menominee Indian Tribe of Wis. v. United States, 577 U.S. at 257 (emphasis in original)(reasoning that "the diligence prong already covers those affairs within the litigant's control; the extraordinary-circumstances prong, by contrast, is meant to cover matters outside its control"). Equitable tolling is appropriate when an agency does not explain how a filing deadline works. See Martinez, 738 F.2d at 1111-12. In Martinez, Leroy Martinez sues Verne Orr in his then-capacity as Secretary of the Air Force of the United States for unlawful discrimination after the Air Force declines to hire him as an aircraft mechanic inspector at Kirtland Air Force Base in Albuquerque, New Mexico. See Martinez, 738 F.2d at 1108. Before filing suit, Martinez works through the appropriate administrative apparatus: he contacts the Equal Employment Opportunity Counselor at the base, attempts informally to resolve the dispute, files a formal complaint with the Air Force, and appeals to the Equal Employment Opportunity Commission ("EEOC"). See 738 F.2d at 1108. On August 12, 1981, the EEOC sends Martinez a notice informing him of its decision affirming the Air Force's conclusion of no discrimination. See 738 F.2d at 1109. In this notice, the EEOC says that its decision is final and that Martinez

may: (i)  file a civil action in federal court within thirty days of receipt of the notice; and (ii) may request that the EEOC reopen his complaint for reconsideration.  See 738 F.2d at 1109.  Martinez opts for the second option, and the EEOC denies his reconsideration request on May 24, 1982. See, 738 F.2d at 1109.  On June 16, 1982, Martinez files his discrimination lawsuit in federal court. See 738 F.2d at 1109.

The district court dismisses Martinez' suit as untimely, because Martinez does not come to federal court within thirty days of receiving the EEOC's August 12, 1981, notice of final action. See 738 F.2d at 1109.  Martinez appeals, and the Tenth Circuit reverses.  See 738 F.2d at 1112. The Tenth Circuit concludes that "Martinez was in fact misled and lulled into action by the EEOC," because the notice "fails to make clear that the right to sue and the right to request reopening are distinct, independent rights, and that an election to pursue only the latter completely waives the former."  738 F.2d at 1111-12.  Accordingly, the Tenth Circuit holds that the thirty-day limitations period has been tolled equitably, and the clock does not start ticking until the EEOC tells Martinez that it denies his reconsideration request on May 24, 1982.  See 738 F.2d at 1112.

The same logic applies to the Plaintiffs' situations.  Not only does FEMA "fail[] to make clear" that the Plaintiffs must file in federal court within 240 days of submitting a Notice of Loss, but also FEMA creates roadblocks for filing on time and directs the Plaintiffs to wait beyond the 240 days.  Martinez, 738 F.2d at 1111.  First, FEMA's regulations and guidelines state that a Notice of Loss is "deemed to be filed on the date is received and acknowledged by the Claims Office." 44 C.F.R. § 296.10.  See Regulations Summary at 2 (PCOE 0018)(providing that FEMA will contact the claimant after "acknowledgment by the Claims Office").  FEMA waited months to acknowledge the Plaintiffs' Notices of Loss and begin the review process.  See Plaintiffs Hearing Brief at 20-21.  Although this delay is FEMA's original inducement, it is not the only way that

FEMA lulls the Plaintiffs into missing the statutory deadline. FEMA tells the Plaintiffs that they cannot come to federal court until they complete FEMA's internal administrative appeal process. See Regulations Summary at 2 ("If the Claimant is not satisfied with the decision, the Claimant may file an Administrative Appeal . . . . If the Claimant is not satisfied after appeal, the dispute may be resolved through binding arbitration or heard in the United States District Court for the District of New Mexico."); 88 Fed. Reg. 59,730 (same). FEMA also tells the Plaintiffs that they have 120 days after receiving a Letter of Determination either to accept the award or initiate an administrative appeal, and that the Plaintiffs have 60 days after receiving an administrative appeal decision to file in federal court. See Regulations Summary at 4-5 (PCOE 0020-21). In all, FEMA's administrative landscape encourages the Plaintiffs to take their time and miss the statutory deadline along the way. Like the EEOC's ambiguous notice in Martinez, FEMA's administrative rules and regulations are outside of the Plaintiff's control and mislead the Plaintiffs into thinking that the statutory deadline is later than it actually is. See Martinez, 738 F.2d at 1111-12. Accordingly, the Court concludes that the 60-day deadline has been tolled equitably.

> **D.    THESE TWELVE PLAINTIFFS' 60-DAY CLOCKS START TICKING WHEN FEMA ISSUES THEIR LETTERS OF DETERMINATION.**

The Court concludes that these twelve Plaintiffs' 60-day clocks start ticking when FEMA issues their Letters of Determination, because these twelve Plaintiffs establish equitable tolling. Although the Tenth Circuit in Martinez does not explain why Martinez' clock starts ticking when he receives the EEOC's reconsideration denial, the Tenth Circuit's conclusion provides helpful guidance. In Martinez, the agency sends Martinez an ambiguous notice -- purporting to be a "final" action -- which misleads him into thinking that he can seek reconsideration before coming to federal court. 738 F.2d at 1111-12. Martinez follows that reasonable interpretation, pursues reconsideration, and files in federal court within thirty days of learning that the EEOC denies his

reconsideration request.  See 738 F.2d at 1109.  It makes sense for the Tenth Circuit to conclude

that Martinez' federal filing clock starts at the EEOC's reconsideration denial, because that is when

Martinez exhausts his administrative remedies.  Without any remaining administrative remedies,

Martinez must come to federal court for relief, and, accordingly, his filing clock begins.  Similarly

here, it makes sense for the Court to conclude that these twelve Plaintiffs' 60-day clock starts

ticking when they receive a "final" Letter of Determination, because, by that point, these twelve

Plaintiffs have exhausted administrative remedies and have received a concrete decision from

FEMA which the Court can review.  Letter from Angela Gladwell to Anthony Gallegos re: FINAL

LETTER OF DETERMINATION at 1 (dated December 19, 2023)(AR-Gallegos-

000150)("Gallegos Letter of Determination").  See MTD MOO at 102-08 (concluding that the

Plaintiffs exhaust administrative remedies at day 180).  Accordingly, the Court concludes that

these twelve Plaintiffs' 60-day clocks start ticking when FEMA issues their Letters of

Determination, because these twelve Plaintiffs establish equitable tolling.  Because these twelve

Plaintiffs file the Complaint within 60 days of FEMA issuing their Letters of Determination, these

twelve Plaintiffs' § 104(i) claims are properly before the Court.

## II.    **THE COURT DENIES THE PLAINTIFFS' JUDICIAL NOTICE REQUEST.**

The Court denies the Plaintiffs' Judicial Notice Request, because the Plaintiffs identify

State court documents that are not part of the record made before the Administrator.  Rule 201 of

the Federal Rules of Evidence allows a court to, at any stage of the proceeding, take notice of

"adjudicative" facts that fall into one of two categories: (i) facts that are "generally known within

the territorial jurisdiction of the trial court;" or (ii) facts that are "capable of accurate and ready

determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R.

Evid. 201(b), (d).  "A court has discretion to take judicial notice of such facts."  Fuqua v. Santa Fe

Cnty. Sheriff's Off., No. CIV 23-0685 JB/LF, 2025 WL 1331667, at *14 (D.N.M. May 7,

2025)(Browning, J.)(citing Fed. R. Evid. 201(d)), appeal docketed No. 24-2152 (10th Cir. Oct. 9, 2024). The Plaintiffs ask the Court to take judicial notice of the Oregon State Court Verdicts and the California Wildfire Documents, which provide information how other courts and tribunals have evaluated noneconomic damages for other wildfires. See Plaintiffs' Judicial Notice Request at 3-5. Although the Oregon State Court Verdicts and the California Wildfire Documents are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," the Court declines to exercise its discretion to take judicial notice of these facts. Fed. R. Evid. 201(b)(2), (d). Congress dictates that a district court's review of FEMA's final decisions is limited to "the record made before the Administrator." Hermit's Peak Act § 104(i)(2). Thus, the Court may consider only materials which the Plaintiffs present to FEMA in support of their Hermit's Peak Act compensation claims. The Court will not expand the record in its § 104(i) review to include materials which the Plaintiffs do not present to FEMA. The Plaintiffs do not present the Oregon State Court Verdicts and the California Wildfire Documents to FEMA when requesting compensation under the Hermit's Peak Act. Accordingly, the Court will not add those documents to the record, and, thus, denies the Plaintiffs' Judicial Notice Request.

Although the Court denies the Plaintiffs' Judicial Notice Request, the Court considers the Oregon State Court Verdicts and the California Wildfire Documents as arguments for the Plaintiffs' § 104(i) claims. The Plaintiffs argue that the Oregon State Court Verdicts and the California Wildfire Documents provide guidance how to evaluate noneconomic damages in wildfire cases. See Plaintiffs' Judicial Notice Request at 4-5. The Court agrees that these documents are useful, to the extent that they show how other courts and tribunals evaluate noneconomic damages in other wildfires. The Plaintiffs would be able to cite to Oregon and California cases in their arguments, and these documents are, at most, persuasive authority. They

are not part of the record of this case, but they are persuasive, nonbinding authority, like any other persuasive, nonbinding authority, on which the Court can give any weight it deems sound. Accordingly, although the Court will not add these documents to the record, the Court will consider them as arguments.

## III.    THE COURT GRANTS IN PART AND DENIES IN PART FEMA'S MOTION IN LIMINE.

The Court grants in part and denies in part FEMA's Motion in Limine: the Court will consider materials which the Plaintiffs presented to FEMA before FEMA issued the decision which the Court is reviewing.  FEMA asks the Court to limit its review in two ways.  See FEMA's Motion in Limine at 2.  First, FEMA asks the Court to limit its judicial review to the administrative record as it existed when FEMA issued final decisions for each Plaintiffs.  See FEMA's Motion in Limine at 2.  The Court denies this request, and holds that it will review documents submitted to FEMA before FEMA issues the decisions under § 104(i) review, which, in the Plaintiffs' cases, are the Letters of Determination.   Second, FEMA asks the Court to exclude the Plaintiffs' supplemental documents and live testimony from the § 104(i) Hearing.  See FEMA's Motion in Limine at 2.  The Court grants in part this request, and holds that: (i) it will not consider live testimony, unless that testimony is information which the Plaintiffs present to FEMA before FEMA issues the decision which the Court is reviewing and that evidence is not already reflected in the documents; and (ii) it will consider the Plaintiffs' supplemental documents, as long as the Plaintiffs submitted those documents to FEMA before FEMA issues the decision which the Court is reviewing.

The Court denies FEMA's Motion in Limine to the extent that it asks the Court to limit its judicial review to the administrative record as it existed when FEMA issued final decisions for each Plaintiffs.  Under § 104(i)(2), the Court may consider only materials which the Plaintiffs

present to FEMA in support of their Hermit's Peak Act compensation claims.  See § 104(i)(2).  It follows that the Court's review is limited to materials that satisfy two conditions.  First, the Plaintiffs must present the materials to the FEMA administrator.  Second, the Plaintiffs must present those materials before FEMA issues the decision which the Court is reviewing.  To hold otherwise makes little sense.  If the Court is reviewing the "decision of the Administrator . . . on the record made before the Administrator," then the Court cannot consider documents submitted after FEMA issues that decision, because FEMA cannot have considered those later-submitted documents when the agency issues the decision which the Court is reviewing.  Hermit's Peak Act § 104(i).  Thus, the Court will not consider documents submitted after FEMA issues its decision which the Court is reviewing.  Using this logic, Court grants FEMA's Motion in Limine to the extent it asks the Court to not consider live witness testimony, unless that testimony is information which the Plaintiffs present to FEMA before FEMA issues the decision the Court is reviewing and that evidence is not already reflected in the documents.[13]

The Court denies FEMA's Motion in Limine to the extent it asks the Court to limit its review to documents submitted before day 180.  See FEMA's Motion in Limine at 15-17.  The Court does not grant FEMA's request.  In the MTD MOO, the Court holds that FEMA's decision becomes judicially reviewable at day 180.  See MTD MOO at 86-95; id. at 102.  The Court will not freeze the record at day 180, even though there is a judicially reviewable decision on that date.  Instead, the Court will consider any materials submitted to FEMA before FEMA issues the

---

[13]The Court can envision a situation when the claimant orally tells FEMA something the claimant does not document. The Plaintiffs said that they had no such evidence in this case.  See May 5, 2025, Tr. at 29:15-17 (Siminou).  The Plaintiffs and other claimants are not permitted to get on the stand, and "explain" their documents and thus enlarge the record.  There also is no need for the Plaintiffs and other claimants to repeat what is already in the documents.  Thus, it is unlikely that there will be an appropriate time or need for live testimony.

decision which the Court is reviewing, which, in this case, that decision under review is the Letter of Determination.[14] See supra, at 58-64; Complaint ¶¶ 10-21, at 4-9. Thus, the Court will consider any materials submitted to FEMA before FEMA issues the Letter of Determination.

As discussed earlier, the 60-day deadline to file in federal court has been tolled for the Plaintiffs, and their clocks start running when FEMA provides a Letter of Determination, rather than at day 180. See supra, at 58-64. Even though the 60-day clock starts running for these Plaintiffs when FEMA provides a Letter of Determination, the Plaintiffs still could have filed in federal court at day 180, because, as the Court holds in the MTD MOO, FEMA's decision becomes judicially reviewable at day 180. See MTD MOO at 86-95. The record of § 104(i) review does not get cut off, however, at day 180. The statute's plain text indicates that the record of § 104(i) review includes all documents presented to FEMA before FEMA issues the decision which the Court is reviewing, which is, in this case, the Letter of Determination. Paragraph (1) of the Hermit's Peak Act's judicial review provision states: "Any claimant aggrieved by a final decision of the Administrator under this Act may, not later than 60 days after the date on which the decision is issued, bring a civil action" in federal court. Hermit's Peak Act § 104(i)(1). Paragraph (2) states: "The court shall hear a civil action under paragraph (1) on the record made before the Administrator." Hermit's Peak Act § 104(i)(2). In this case, the "final decision" by which the claimants are "aggrieved" is not whatever is on the table at day 180 -- again, FEMA has put nothing on the table at day 180 for the Plaintiffs -- that "final decision" is the Letter of Determination. Hermit's Peak Act § 104(i)(1). See supra, at 58-64. Because "[t]he court shall hear a civil action under paragraph (1) on the record made before the Administrator" and paragraph (1) permits a

_____

[14]All the Plaintiffs have received Letters of Determination. See Complaint ¶¶ 10-21, at 4-9.

plaintiff to challenge FEMA's "final decision" in federal court, it follows that the "record made before the Administrator" includes materials submitted to FEMA before FEMA issues whatever "final decision" the plaintiff is challenging under paragraph (1). Hermit's Peak Act § 104(i). Thus, in this case, where the Plaintiffs ask the Court to review the Letters of Determination, and there has been equitable tolling, the Letters of Determination dates are the record cutoff dates. Accordingly, the Court grants in part FEMA's Motion in Limine and holds that the Court may consider only documents which a Plaintiff submits to FEMA before FEMA issues its Letter of Determination for that Plaintiff.[15]

Separately, the Court denies FEMA's Motion in Limine to the extent that it asks the Court to exclude the Plaintiffs' documents entirely. According to FEMA, the Plaintiffs do not show that their supplemental documents were presented to FEMA before FEMA issued final decisions. See FEMA's Motion in Limine at 19; FEMA's Motion in Limine Reply at 2-3. FEMA argues that the Plaintiffs "do not offer any certification of the Supplemental Record or an individualized description of why the documents should properly be part of the Administrative Record." FEMA's Motion in Limine Reply at 2. FEMA identifies correctly several of the Plaintiffs' supplemental documents which were submitted to FEMA too late. See FEMA's Motion in Limine Reply at 2. The Court will not consider those documents. Beyond those documents, however, FEMA does not assert that any of the Plaintiffs' supplemental documents were not submitted to FEMA before the final decision. Accordingly, the Court will stick to its holding and consider any materials

---

[15]Applying this holding, the Court also will not consider documents filed as part of FEMA's internal appeal process which are filed after FEMA issues the Letter of Determination. The Court is reviewing the Letter of Determination. The Court is not reviewing what FEMA does during an internal appeals process after issuing the Letter of Determination. FEMA could not have considered those later-submitted documents when it issued the Letter of Determination. Thus, those later-submitted documents are not a part of the Court's substantial-evidence review.

which were submitted to FEMA before the Letter of Determination, even if the Plaintiffs do not

"offer any certification" about those documents or provide "individualized descriptions" about

those documents.  FEMA's Motion in Limine Reply at 2.   If FEMA disputes any documents or

evidence, the Plaintiffs and claimants may need to present affidavit and argument explaining why

the evidence is part of the record made before the Administrator.

**IV.    THE COURT MUST UPHOLD FEMA'S CLAIM DETERMINATIONS THAT SUBSTANTIAL EVIDENCE SUPPORTS.**

The Court upholds FEMA's claim determinations that substantial evidence supports.  See

Hermit's Peak Act § 104(i)(3) ("The decision of the Administrator incorporating the findings of

the Administrator shall be upheld if the decision is supported by substantial evidence on the record

considered as a whole.").  "To satisfy the substantial evidence standard, an agency need only rely

on 'such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'" Andalex Res., Inc. v. Mine Safety & Health Admin., 792 F.3d 1252, 1257 (10th Cir.

2015)(quoting Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007)).  The standard "requires more

than a scintilla, but less than a preponderance."  Lax v. Astrue, 489 F.3d at 1084.  Courts

conducting substantial evidence review "neither reweigh the evidence nor substitute [their]

judgment for that of the agency."  Branum v. Barnhart, 385 F.3d 1268, 1270 (10th Cir. 2004).

Substantial evidence review "is 'very deferential to the agency,'" and "'a presumption of validity

attaches to the agency action and the burden of proof rests with the parties who challenge it.'"

BNSF R. Co. v. U.S. Dep't of Lab., 816 F.3d 628, 638 (10th Cir. 2016)(quoting Ron Peterson

Firearms, LLC v. Jones, 760 F.3d 1147, 1161-62 (10th Cir. 2014)).

> "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.  Thus, we may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo."

Plateau Mining Corp. v. Fed. Mine Safety & Health Rev. Comm'n, 519 F.3d 1176, 1194 (10th Cir. 2008)(quoting Zoltanski v. F.A.A., 372 F.3d 1195, 1200 (10th Cir. 2004)).  See McCray v. Soc. Sec. Admin., 435 F. Supp. 3d 1186, 1193 (D.N.M. 2020)(Browning, J.)(describing substantial evidence standard of review).

## V.    UNDER THE STATUTE'S PLAIN LANGUAGE, THE HERMIT'S PEAK ACT PROVIDES COMPENSATION FOR CONSTRUCTION CONTINGENCY FEES AND NEITHER THE STATUTE'S PLAIN LANGUAGE NOR SUBSTANTIAL EVIDENCE SUPPORTS EXCLUDING CATEGORICALLY THOSE FEES OR CAPPING THEM BELOW TEN PERCENT.

Under the statute's plain language, the Hermit's Peak Act provides compensation for construction contingency fees.  Neither the statute's language nor substantial evidence supports excluding categorically those fees or capping them below ten percent.  A construction contingency fee is "a predetermined amount or percentage of the contract held for unpredictable changes in the project."  Managing the contingency allowance (dated November 30, 2023), AMERICAN INSTITUTE OF ARCHITECTS, available at https://www.aia.org/resource-center/managing-the-contingency-allowance (last accessed June 24, 2025); May 5, 2025, Tr. at 71:20-21 (Go)(asserting that construction contingency fees "build[] in additional cost for unforeseen events"); May 5, 2025, Tr. at 92:11-93:12 (Berkstresser)(asserting that construction contingency fees account for fluctuations in the labor and materials market).  The Plaintiffs argue that FEMA should compensate them for construction contingency fees, because the final labor and materials costs likely will be higher than the initial estimates.  See May 5, 2025, Tr. at 92:11-93:12 (Berkstresser).  The Plaintiffs argue further that contingency fees are appropriate here, where construction often will not begin for several years, because claimants must wait for FEMA to give them their compensation before breaking ground.  See May 5, 2025, Tr. at 92:11-93:12 (Berkstresser).  FEMA argues that construction contingency fees are not compensable, because the Hermit's Peak Act does not

provide specifically for those damages.  See May 5, 2025, Tr. at 71:8-14 (Go)(citing Hermit's Peak Act § 104(d)(4)).

The Court disagrees with FEMA.  Under the statute's plain language, the Hermit's Peak Act provides compensation for "a cost of reforestation or revegetation."  Hermit's Peak Act § 104(d)(4)(A)(v).  As federal courts around the country recognize, construction contingency fees are routine parts of the construction business and are often included in construction bids and estimates.  See 2 Bruner & O'Connor Construction Law § 7:14 (November 2024 update)("Contractors include money in their bids during the estimating process for 'contingencies' . . . .  It is not uncommon for contractors to estimate the costs of a project and add an amount based upon a set percentage (e.g., 10% of the total cost) as the contingency amount to be included in the bid.")(internal quotations have no citation); Hira N. Anuja, S. P Dozzi, & S.M. Abourizik, Project Management: Techniques in Planning and Controlling Construction Projects, 2d ed. at 206 (1994)("A specific provision [in a contractor's estimate] must be included to account for unforeseen elements of cost.  Contingency is therefore a legitimate and anticipated cost for unknowns."); Jenkins by Agyei v. State of Mo., 931 F.2d 470, 481 (8th Cir. 1991)(affirming district court's approval of a school district's increased construction budget, where the initial budget omits construction contingency fees); Valley Hous. LP v. City of Derby, 802 F. Supp. 2d 359, 392 (D. Conn. 2011)(Melancon, J.)(awarding damages for a 12.2% construction contingency fee); Gaylor v. Georgia Dep't of Nat. Res., No. 11-CIV-288-RWS, 2014 WL 4545810, at *4 (N.D. Ga. Sept. 12, 2014)(Story, J.)(declining to exclude an expert who testifies about construction contingency fees); The Hanover Ins. Co. v. Clark, No. 05-CIV-2162, 2006 WL 2375428, at *5 (N.D. Ill. Aug. 15, 2006)(Pallmeyer, J.)(rejecting a defendant's argument that a construction contingency fee is too high and, accordingly, granting a plaintiff's request to order the defendant

to place in trust $855,870.99 for a construction project); Eng. Woods Civic Ass'n/Resident Cmty. Council v. Cincinnati Metro. Hous. Auth., No. 03-CIV-0186, 2004 WL 3019505, at *3 (S.D. Ohio Dec. 17, 2004)(Black, M.J.)(concluding that an expert's construction cost estimate, which includes a construction contingency fee, is "more credible [than the opposing expert's lower estimate] because [it] reflects a comprehensive needs assessment rather than simply a structural needs assessment"). Because reforestation costs are compensable, the reforester's contingency fee is compensable as a part of those reforestation costs. The same logic holds for contingency fees related to road regrading and erosion control. Because road regarding and erosion control costs are compensable, the road regrader's contingency fee is compensable as part of those road regrading and erosion control costs. See Hermit's Peak Act § 104(d)(4)(ii) and (iii) (providing compensation for property value diminution and "damage to physical infrastructure"). Accordingly, the Court concludes that, under the statute's plain language, the Hermit's Peak Act provides compensation for reasonable contingency fees as long as those fees are tied to a project for which FEMA is already providing compensation.

Applying the substantial-evidence standard, the Court also concludes that substantial evidence does not support excluding categorically construction contingency fees or capping those fees below ten percent. FEMA does not introduce any evidence to dispute the construction contingency fees. FEMA does not introduce, for example, expert testimony suggesting that the Plaintiffs' requested construction contingency fees are too high, or competing estimates with lower construction contingency fees. Instead, FEMA makes a legal argument that the Hermit's Peak Act does not provide for construction contingency fees. See, e.g., May 5, 2025, Tr. at 144:18-145:6 (Sydow)(arguing that construction contingency fees, which account for future increased costs, are "not properly part of the damages" because "the Court is conducting a record

review . . . whether FEMA's determination of this amount of damages at the time it made its letter of determination and was assessing the proof of loss that was initially submitted was reasonable"). An incorrect legal argument is not substantial evidence -- it is no evidence -- because it is less than a "scintilla." Lax v. Astrue, 489 F.3d at 1084. Thus, the Court concludes that substantial evidence does not support FEMA's categorical denial of construction contingency fees.

At the same time, the Court will not permit the Plaintiffs to tack on any contingency fee and gouge the United States without limit. The contingency fees must be reasonable. See Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 30, 118 N.M. 203, 212, 880 P.2d 300, 309 ("'It is a fundamental tenet of the law of contract remedies that, regardless of the character of the breach, an injured party should not be put in a better position than had the contract been performed.'")(quoting 3 E. Allan Farnsworth, Farnsworth on Contracts § 12.8, at 189-90 (1990)); N.M.R.A. UJI 13-850 (indicating that, under New Mexico law, a defendant found liable for defective or unfinished construction must pay the "reasonable cost of completing the construction called for in the contract"). The two disputed reforestation contingency fees in this case -- Leyba's and Lungstrum's -- are ten percent. See May 5, 2025, Tr. at 71:1-5 (Go); id. at 145:11-18 (Sydow). Ten percent is a reasonable construction contingency fee. See Valley Hous. LP v. City of Derby, 802 F. Supp. 2d at 392 (awarding damages for a 12.2% construction contingency fee for a housing development project); Managing the contingency allowance (dated November 30, 2023), AMERICAN INSTITUTE OF ARCHITECTS, available at https://www.aia.org/resource-center/managing-the-contingency-allowance (last accessed June 24, 2025)(noting that a five to ten percent construction contingency fee is "common"); Emmett Roy, What Is A Typical Construction Contingency Percentage? (dated June 5, 2025), MIDDLEBRIDGE CONSULTING, available at https://www.middlebridgeconsulting.com/what-is-a-typical-construction-

contingency-percentage (last accessed June 24, 2025)(noting that a five to ten percent construction contingency fee is "typical"); Alex Benarroche, What is Construction Contingency? (dated December 10, 2024), PROCORE.COM, available at https://www.procore.com/library/construction-contingency?msockid=03ce9f4dbc6f6d613f8d8959bd926c3f (last accessed June 24, 2025)(noting that "[m]ost projects will use a rate of around 5-10% of the total budget for contingencies"); Robbie Reynolds, Construction Contingency: A Rundown for Subcontractors (undated), BILLD.COM, available at https://billd.com/blog/construction-contingency/ (last accessed June 24, 2025)("Construction contingencies are typically calculated at 5-10% of the construction budget."). Although substantial-evidence review "is 'very deferential to the agency'" and "'a presumption of validity attaches to the agency action and the burden of proof rests with the parties who challenge it,'" the Plaintiffs carry their "burden of proof" here, where the Plaintiffs explain why ten percent is reasonable, and FEMA does not introduce any evidence indicating otherwise. BNSF R. Co. v. U.S. Dep't of Lab., 816 F.3d at 638 (quoting Ron Peterson Firearms, LLC v. Jones, 760 F.3d at 1161-62). See May 5, 2025, Tr. at 92:11-93:12 (Berkstresser for the Plaintiffs)(asserting that: (i) "in a post-disaster scenario . . . [m]aterials and labor vary greatly . . . where the labor market is going to be inundated, and the materials market is going to be inundated"; (ii) the Plaintiffs must wait for FEMA to give them their compensation before beginning construction; and (iii) the estimates were made in 2022, shortly after the Hermit's Peak/Calf Canyon Fire, and FEMA has yet to provide compensation); May 5, 2025, Tr. at 71:8-14 (Go for FEMA)( making only a legal argument against awarding construction contingency fees); id. at 144:18-145:6 (Sydow for FEMA)(making only a legal argument against awarding construction contingency fees). Accordingly, the Court concludes that neither the plain language of the Hermit's Peak Act or substantial evidence supports excluding categorically construction contingency fees or capping

them below ten percent. Thus, the Court modifies FEMA's awards for Leyba and Lungstrum and orders FEMA to compensate those Plaintiffs for their requested ten-percent construction contingency fees for reforestation or revegetation. Lungstrum also asks for a thirty-five percent contingency fee award for road regrading and erosion control damages. See May 5, 2025, Tr. at 150:9-160:22 (Sydow, Court). A thirty-five percent contingency fee is not reasonable. See supra, at 74-75. Accordingly, the Court concludes that the statute's plain language and substantial evidence support limiting Lungstrum's road regrading and erosion control contingency fee to ten percent. Thus, the Court modifies FEMA's award for Lungstrum and orders FEMA to compensate Lungstrum for a ten percent road regrading and erosion control contingency fee.

**VI.  UNDER THE STATUTE'S PLAIN LANGUAGE, THE HERMIT'S PEAK ACT PROVIDES COMPENSATION FOR AESTHETIC DAMAGES WHICH DIMINISH REAL PROPERTY VALUE, AND NEITHER THE STATUTE'S LANAGUGE NOR SUBSTANTIAL EVIDENCE SUPPORTS EXCLUDING CATEGORICALLY AESTHETIC DAMAGES.**

Under the statute's plain language, the Hermit's Peak Act provides compensation for aesthetic damages which diminish real property value. Neither the statute's language nor substantial evidence supports excluding categorically aesthetic damages. The Plaintiffs assert that the Hermit's Peak/Calf Canyon Fire causes them aesthetic harm, because, even though FEMA agrees to reseed and reforest their burned-down trees, the claimants -- particularly if they are elderly -- are not going to see those mature, "100 year old trees," as they existed before the Hermit's Peak/Calf Canyon Fire, again. See May 5, 2025, Tr. at 91:8-92:9 (Berkstresser, Court). FEMA argues that the Hermit's Peak Act does not provide compensation for aesthetic damages. See May 5, 2025, Tr. at 72:1-23 (Court, Go, Sydow). The Court disagrees with FEMA. The Hermit's Peak Act provides compensation for "a decrease in the value of real property." Hermit's Peak Act § 104(d)(4)(A)(ii). A property's aesthetic qualities, including its views, contribute to its value. See Restatement (Third) of Property § 6.9 cmt. d (2000)(noting that "preventing aesthetic

nuisances" are "likely to increase property values"); Schanzenbach v. Town of Opal, 706 F.3d 1269, 1275 (10th Cir. 2013)(upholding town ordinance which "simply embodies the town council's judgment that the aesthetics and property values of its neighborhoods would be protected by preventing the installation of homes older than 10 years"); Branson Sch. Dist. RE-82 v. Romer, 161 F.3d 619, 638 (10th Cir. 1998)(determining that a trustee may conclude fairly that "protecting and enhancing the aesthetic value of a property will increase its long-term economic potential and productivity"); Evans v. Bd. of Cnty. Comm'rs, 994 F.2d 755, 763 (10th Cir. 1993)(upholding municipality's decision to deny a permit to construct an antenna tower, where the municipality's "legitimate purposes behind denying the permit were to preserve the aesthetic views and maintain the property values in the community"); Sprint Spectrum L.P. v. Willoth, 176 F.3d 630, 646 (2d Cir. 1999)(upholding municipality's decision to deny a permit to construct a communications tower which "would have a significant negative aesthetic impact," where the municipality's experts "stated that the towers would have a stigmatizing effect based in part on aesthetics which would reduce the buyer pool, leading to a 10% to 25% reduction in property values" and the permit applicant's expert "even admitted that 'a diminished supply of potential buyers . . . concededly may exist for a property which views or is in the vicinity of a nearby tower installation'")(quoting the permit applicant's expert)(ellipses added in Sprint Spectrum L.P. v. Willoth).  Thus, under the plain language of the Hermit's Peak Act, the Hermit's Peak Act provides compensation for aesthetic damages which diminish real property value.

Applying the substantial-evidence standard, the Court also concludes that substantial evidence does not support FEMA's categorical denial of aesthetic damages. FEMA does not point to any evidence indicating that the Plaintiffs' aesthetic damages are unreasonably high or unwarranted.  For example, FEMA does not introduce evidence suggesting that Leyba's and

Lungstrum's trees -- before the Hermit's Peak/Calf/Canyon Fire -- are not aesthetically pleasing or that the reforestation efforts maintain Leyba's and Lungstrum's property values, notwithstanding the difference between mature tree and seedlings.  FEMA's incorrect legal argument is not evidence, or substantial evidence.  See supra, at 74.  On the other hand, the Plaintiffs carry their "'burden of proof'" under the substantial-evidence standard to challenge FEMA's categorical denial, because the Plaintiffs introduce consultant reports quantifying the aesthetic damages that they seek, and FEMA does not introduce any evidence disputing those numbers.  BNSF R. Co. v. U.S. Dep't of Lab., 816 F.3d at 638 (quoting Ron Peterson Firearms, LLC v. Jones, 760 F.3d at 1161-62).  See Western Wildfire Associates, Client Report Summary at 1 (dated December, 2022)(AR-Leyba-00093)("Leyba Western Wildfire Report")(identifying $41,155.00 in aesthetic damages); Western Wildfire Associates, Client Report Summary at 1 (dated October, 2022)(AR-Lungstrum-00230)("Lungstrum Western Wildfire Report")(identifying $54,933.00 in aesthetic damages).  Accordingly, the Court concludes that neither the plain language of the Hermit's Peak Act nor substantial evidence supports FEMA's categorical denial of aesthetic damages, and, accordingly, the Court modifies FEMA's compensation determinations for Leyba and Lungstrum.  Pursuant to the Court's modification, FEMA must pay Leyba $41,155.00 in aesthetic damages and Lungstrum $54,933.00 in aesthetic damages.

**VII.    UNDER THE STATUTE'S PLAIN LANGUAGE, THE HERMIT'S PEAK ACT PROVIDES COMPENSATION FOR LOST RESOURCES, AND NEITHER THE STATUTE'S LANAGUGE NOR SUBSTANTIAL EVIDENCE SUPPORTS EXCLUDING CATEGORICALLY LOST RESOURCES DAMAGES.**

Under the statute's plain language, the Hermit's Peak Act provides compensation for lost resources, and neither the statute's language nor substantial evidence supports excluding categorially lost resources damages.  The Plaintiffs argue that they are entitled to lost resources damages, which account for a timber-quality tree's additional value as a source of timber, which

the owner could sell.  See May 5, 2025 Tr. at 146:25-146:19 (Berkstresser).  FEMA argues: "To

provide for replacement of trees and the lost value would be double counting the property damages

available under New Mexico law, and under the Hermit's Peak Act, Section 104(d)(4)."  May 5,

2025 Tr. at 143:18-21 (Sydow).  The Court disagrees with FEMA.  FEMA does not explain which

§ 104(d)(4) damages category is being double counted.  On the contrary, the Hermit's Peak Act

provides compensation for "a cost resulting from lost subsistence from hunting, fishing, firewood

gather, timbering, grazing, or agricultural activities."  Hermit's Peak Act § 104(d)(4)(A)(iv).  The

Hermit's Peak Act also provides compensation for "a decrease in the value of real property,"

Hermit's Peak Act§ 104(d)(4)(A)(ii), and natural resources, like timber-quality trees, contribute to

a property's value:

> It is unnecessary to quote authorities to show that, in estimating the market value
> of land, everything which gives it intrinsic value is a proper element for
> consideration.  Not only its present use, but its capabilities, are to be considered.
> Even unimproved land lying at the foot of a mountain range is obviously more
> valuable than similar land less eligibly situated.

Wetmore v. Rymer, 169 U.S. 115, 128 (1898)(Shiras, J.)(noting that disputed lands are particularly

valuable "on account of their location and the quality of their timber").  The Hermit's Peak Act

also provides compensation for the business loss of "[d]amage to tangible assets or inventory,

including natural resources."  Hermit's Peak Act § 104(d)(4)(B)(i).  Thus, the plain language of

the Hermit's Peak Act indicates that lost timber resources are compensable as "a cost resulting

from lost subsistence from . . . timbering," as a "decrease in the value of real property," or as

"[d]amage to . . . natural resources."  Hermit's Peak Act § 104(d)(4)(A)(iv), (A)(ii), & (B)(i).

The Court understands FEMA's argument about double counting and recognizes that it

could happen.  For example, a claimant hires a property assessor to evaluate his property's lost

value, and then asks FEMA for a lump sum to account for the lost value under § 104(d)(4)(A)(ii).

If that same claimant also asks FEMA for additional compensation for "lost subsistence from . . .

timbering" under Hermit's Peak Act § 104(d)(4)(A)(iv), that additional award would be double counting, because the timber value is a part of the lost property value. Hermit's Peak Act § 104(d)(4)(A)(iv). If the same claimant also says that he has a timber business and asks FEMA for additional compensation for "damage to . . . natural resources" under § 104(d)(4)(B)(i), that additional award would be triple counting, because the lost timber business value is part of the property value and part of the lost subsistence value. Hermit's Peak Act § 104(d)(4)(B)(i). Although lost resources are available under the Hermit's Peak Act, a claimant can ask for lost resources damages only one time. A claimant may not identify a single damage, call it three different things, and expect FEMA to cover all three line items. FEMA does not introduce, however, substantial evidence indicating that there is double or triple counting here. One Plaintiff -- Lungstrum -- asks for lost resources. See supra, at 29. Lungstrum requests $96,252.00 for lost resources damages stemming from his burned down timber-quality trees. See Lungstrum Western Wildfire Report at 1; Hermit's Peak/Calf Canyon Claims Office, Revegetation Claim Review Memo at 1 (undated)(AR-Lungstrum-00177)("Lungstrum Revegetation Claim Review Memo.")(acknowledging that Lungstrum requests $96,252.00 for lost resources). Lungstrum makes only one lost resources damages request, and he does not make a separate decreased property value request or an additional business loss request connected to his timber-quality trees. See Lungstrum Western Wildfire Report at 1; Lungstrum Revegetation Claim Review Memo. at 2-5. When FEMA denies categorically Lungstrum's lost resources request, FEMA does not allege that the request is duplicative. See Lungstrum Revegetation Claim Review Memo. at 1. Instead, FEMA asserts that "lost resources are not eligible under the Hermit's Peak/Calf Canyon Fire assistance act and implementing regulations." Lungstrum Revegetation Claim Review Memo. at 1. Thus, the Court concludes that there is no double-counting here.

FEMA also does not introduce evidence disputing Lungstrum's lost damages request on factual grounds. See Lungstrum Revegetation Claim Review Memo. at 1-11. For example, FEMA could have introduced evidence challenging how many timber-quality trees Lungstrum had before the Hermit's Peak/Calf Canyon Fire. FEMA could have introduced evidence showing that the two tree species[16] which Lungstrum asserts are of timber-quality are not of timber-quality. FEMA could have introduced evidence showing that the Lungstrum's timber-quality trees are not as valuable as he says they are. FEMA does not introduce any evidence. Instead, FEMA makes a legal argument that the Hermit's Peak Act does not provide compensation for lost resources, because that compensation is a form of double counting. See Lungstrum Revegetation Claim Review Memo. at 1; May 5, 2025 Tr. at 143:18-21 (Sydow). As discussed, FEMA's incorrect legal argument is not substantial evidence, because it is not evidence. See supra, at 74. Thus, the Court concludes that substantial evidence does not support FEMA's categorical denial of Lungstrum's lost resources request. Accordingly, the Court modifies FEMA's claim determination for Lungstrum and orders FEMA to compensate him for his $96,252.00 lost resources damages request.

---

[16]Lungstrum identifies two timber-quality trees: "Engleman Spruce" and "White Fir." By "Engleman Spruce," the Court assumes that Lungstrum refers to the Englemann spruce tree, which "is widely used for Christmas trees," can be used for "home construction, pre-fabricated wood products, and plywood manufacture," and, "[l]ess commonly," can be used for "specialty items such as food containers, and sounding boards for violins, pianos, and guitars." United States Department of Agriculture, Plant Guide: Engelmann Spruce, available at https://plants.usda.gov/DocumentLibrary/plantguide/pdf/pg_pien.pdf (last accessed June 30, 2025). White fir is "cut for lumber, boxes and crates, planning mill products, sashes, doors, and general mill work and pulpwood," and "[i]t is light in weight, easy to work, and relatively free from splitting when nailed; it holds nails only moderately well." United States Department of Agriculture, Plant Fact Sheet: White Fir, available at https://plants.usda.gov/DocumentLibrary/factsheet/pdf/fs_abco.pdf (last accessed June 30, 2025).

## VIII.  THE COURT MODIFIES FEMA'S FINAL DECISIONS.

In this section, the Court modifies FEMA's final decisions for each Plaintiff, pursuant to § 104(i).  As discussed, because each Plaintiff's 60-day deadline to file in federal court has been tolled equitably, the final decision under 104(i) review is each Plaintiff's Letter of Determination, which FEMA issues after each Plaintiff's day 180.  The Court addresses each Plaintiff in turn.

### A.  THE COURT MODIFIES FEMA'S FINAL DECISION FOR GALLEGOS AND ENTERS $11,118.58 IN TOTAL COMPENSATION.

The Court modifies FEMA's final decision for Gallegos and enters $11,118.58 in total compensation, which includes $9,000.00 in noneconomic nuisance damages.  Neither the law nor substantial evidence supports giving Gallegos $0.00 in noneconomic damages.  The parties agree that FEMA's final economic damages offer for Gallegos is $2,118.58 and that Gallegos challenges only FEMA's denial of his $60,000.00 noneconomic nuisance damages request.  See May 5, 2025, Tr. at 25:19-23 (Ritchey); id. at 27:5-22 (Court, Siminou); id. at 33:15-16 (Ritchey); Gallegos Letter of Determination at 1(AR-Gallegos-000150)(awarding $0.00 in noneconomic damages); Proof of Loss at 2-3 (dated November 2, 2023)(AR-Gallegos-000136-37)("Gallegos Proof of Loss")(requesting $60,000.00 in noneconomic damages and directing the claims reviewer to "[r]efer to narrative in the Notice of Loss"); Notice of Loss at 5-6 (dated January 26, 2023)(AR-Gallegos-000021-22)("Gallegos Notice of Loss").  Gallegos tells FEMA that the Hermit's Peak/Calf Canyon Fire leaves him homeless for ten days, because the FEMA shelter "was awful . . . there was no AC, the food was uneatable and at night it was so loud due to dogs barking." Gallegos Notice of Loss at 5 (AR-Gallegos-000021).  Gallegos tells FEMA that he "survived off fast food the entire time he was evacuated, [] he had to drive all the way to Santa Fe to get food," and, "[a]t night, he slept in his car at any open campground near Las Vegas, NM." Gallegos Notice of Loss at 5 (AR-Gallegos-000021).  Gallegos tells FEMA that he is "struggling to get water as

the water is contaminated in NM because of the fire," and that he "has not recovered from the trauma of the fire as he still [sic] going through the suffering."  Gallegos Notice of Loss at 5-6 (AR-Gallegos-000021-22).   FEMA awards Gallegos $0.00 in noneconomic damages.   See Gallegos Letter of Determination at 1 (AR-Gallegos-000150).

FEMA maintains that that the agency should not award any noneconomic damages, because, according to FEMA, the Hermit's Peak Act does not provide, as a matter of law, compensation for noneconomic damages.   See May 5, 2025, Tr. at 32:11-15 (Ritchey).   As discussed, a legal argument is not substantial evidence.  See supra, at 74.  FEMA does not point to any record evidence which disputes Gallegos' noneconomic damages request.   Thus, the Court concludes that neither the law nor substantial evidence supports the $0.00 noneconomic damages figure in the Gallegos Letter of Determination, which is the "final decision" under review here. Hermit's Peak Act § 104(i)(1).   On the other hand, Gallegos' request for $60,000.00 for discomfort, inconvenience, and annoyance he has suffered seems too much.  Accordingly, the Court modifies FEMA's final decision and enters $9,000.00 in noneconomic damages, because, although Gallegos' $60,000.00 request is a little rich, the Gallegos Notice of Loss describes how the Hermit's Peak/Calf Canyon Fire displaces him for ten days, causing not insignificant discomfort, inconvenience, and annoyance.

When the Court asks FEMA to put a noneconomic damages offer on the table, FEMA says that "no more than $1,000 is warranted in this case for nuisance damages."  May 5, 2025, Tr. at 33:21-24 (Ritchey).   Gallegos does not seek judicial review of FEMA's offer at the hearing, because that offer is neither "a final decision of the Administrator" by which Gallegos is "aggrieved,"  nor is it a "final decision" which Gallegos asks the Court to "modify or set aside." Hermit's Peak Act § 104(i)(1).  Instead, Gallegos asks the Court to modify or set aside FEMA's

final decision in the Gallegos Letter of Determination.  See Gallegos Complaint ¶ 10, at 4-5; id. ¶ 37-42, at 14-16 (seeking judicial review, pursuant to Section 104(i)(1), of the Gallegos Letter of Determination).  Thus, because FEMA's offer at the hearing is not under Section 104(i)(1) review, FEMA's offer at the hearing is not subject to substantial-evidence review.  Nevertheless, FEMA's offer at the hearing is helpful to the Court's thinking and analysis.  The Court concludes, however, that substantial evidence also does not support FEMA's $1,000.00 offer at the hearing, because that offer is almost $0.00 and does not reflect the not insignificant discomfort, inconvenience, and annoyance that Gallegos experiences during his ten-day displacement. Accordingly, The Court orders FEMA to pay Gallegos $11,118.58 in total damages for his disputed claim here, which includes $9,000.00 in noneconomic nuisance damages.

### B.    THE COURT MODIFIES FEMA'S FINAL DECISION FOR PRIDDY AND ENTERS $206,991.36 IN TOTAL COMPENSATION.

The Court modifies FEMA's final decision for Priddy and enters $206,991.36 in total compensation, which includes $150,000.00 in noneconomic nuisance damages.  Neither the law nor substantial evidence supports giving Priddy $0.00 in noneconomic damages.  The parties agree that FEMA's final economic damages offer for Priddy is $56,991.36 and that Priddy challenges only FEMA's denial of his $150,000.00 noneconomic nuisance damages request.  See May 5, 2025, Tr. at 35:7-37:13 (Court, Siminou, Ritchey, Yang); id. at 42:11-22 (Siminou); Letter from Angela Gladwell to Olen Priddy re: FINAL LETTER OF DETERMINATION at 1 (dated January 8, 2024)(AR-Priddy-000434)("Priddy Letter of Determination")(awarding $0.00 in noneconomic damages); Proof of Loss at 2-3 (dated October 17, 2023)(AR-Priddy-000039-40)("Priddy Proof of Loss")(requesting $150,000 in noneconomic damages and directing the claims reviewer to "[r]efer to narrative included in the Notice of Loss"); Notice of Loss at 4 (dated June 13, 2023)(AR-Priddy-000091)("Priddy Notice of Loss").  Priddy tells FEMA that he and his wife, Rosanne, "always

dreamed of retiring in the mountains in a log home and that dream finally came true in 2006" when they "purchased their property and later built their home." Notice of Loss at 4 (AR-Priddy-000091). Priddy tells FEMA that he and his wife became stressed and anxious "being on standby and watching the fire" grow in May, 2022, and that they both had difficulty concentrating and sleeping. Notice of Loss at 4 (AR-Priddy-000091). Priddy tells FEMA that, on May 10, 2022, he and his wife left their long-awaited retirement home behind as the ashfall thickened and the wildfire blazed. See Notice of Loss at 4 (AR-Priddy-000091). Priddy tells FEMA that, for sixteen days, he and his wife stayed at their daughter's home, a friend's bed and breakfast, a temporarily rented condominium, and, finally, a travel trailer, which they purchased to hold them over until they were able to return home on May 26, 2022. See Notice of Loss at 4 (AR-Priddy-000091). Priddy tells FEMA that, when they returned home, they cleaned "all the soot and ash and used a power washer," and discovered their dream property had lost "about thirty pine and aspen trees." Notice of Loss at 4 (AR-Priddy-000091). Priddy tells FEMA that, although they "feel very fortunate to not have lost their home," they "still become anxious whenever they see or smell smoke in their area," and they "were also hesitant to unpack their belongings for a long time in fear of having to be evacuated again." Notice of Loss at 4 (AR-Priddy-000091). FEMA awards Priddy $0.00 in noneconomic damages. See Priddy Letter of Determination at 1 (AR-Priddy-000434).

FEMA maintains that that the agency should not award any noneconomic damages, because, according to FEMA, the Hermit's Peak Act does not provide compensation for noneconomic damages as a matter of law. See May 5, 2025, Tr. at 44:6-9 (Yang). As discussed, a legal argument is not substantial evidence. See supra, at 74. Thus, the Court concludes that neither the law nor substantial evidence supports the $0.00 noneconomic damages figure in the

Cavitt-Olguin Letter of Determination, which is the "final decision" under review here. Hermit's Peak Act § 104(i)(1).

At the hearing, FEMA suggests that $1,000.00 in noneconomic damages is appropriate, because the Priddys were displaced for only sixteen days and that they always had a place to stay. See May 5, 2025, Tr. at 43:2-11 (Yang). As discussed, FEMA's offer at the hearing is not under Section 104(i) substantial-evidence review. See supra, at 83-84. FEMA's offer at the hearing is, however, helpful to the Court's thinking and analysis. The Court concludes that FEMA's $1,000.00 offer at the hearing is not reasonable, because it does not reflect the Priddy's discomfort, inconvenience, and annoyance. That the Priddys had a place to stay does not neutralize their noneconomic nuisance damages. Bouncing from one place to another is discomforting, inconvenient, and annoying. Thus, the Court also concludes that neither the law nor substantial evidence supports the FEMA's offer at the hearing. Accordingly, the Court modifies FEMA's final decision and enters $150,000.00 in noneconomic damages, because Priddy's request is reasonable, and the evidence in the record supports annoyance and inconvenience in that amount. Priddy and his wife's dream of living in the mountains turned into a nightmare in May, 2022. It is significantly discomforting, inconvenient, and annoying for the Priddys to leave their dream home behind, live in multiple places over several weeks, and, upon returning, discover that dozens of their beautiful trees burned down. It is discomforting and annoying for the Priddys to continue to become anxious when they see or smell smoke near their retirement home, and it was inconvenient to not unpack their belongings for a long time. Accordingly, the Court orders FEMA to pay Priddy $206,991.36 in total damages for her disputed claim here, which includes $150,000.00 in noneconomic nuisance damages.

### C.    THE COURT MODIFIES FEMA'S FINAL DECISION FOR CAVITT-OLGUIN AND ENTERS $314,198.68 IN TOTAL COMPENSATION.

The Court modifies FEMA's final decision for Cavitt-Olguin and enters $314,198.68 in total compensation, which includes $215,000.00 in noneconomic nuisance damages. Neither the law nor substantial evidence supports giving Cavitt-Olguin $0.00 in noneconomic damages. The parties agree that Cavitt-Olguin accepted FEMA's economic damages offer of $99,198.68 and that Cavitt-Olguin challenges only FEMA's denial of her $215,000.00 noneconomic nuisance damages request. See May 5, 2025, Tr. at 46:3-47:3 (Ritchey, Court Siminou); Letter from Angela Gladwell to Sheila Cavitt-Olguin re: FINAL LETTER OF DETERMINATION at 1 (dated January 10, 2024)(AR-Cavitt-Olguin-000211)("Cavitt-Olguin Letter of Determination")(awarding Cavitt-Olguin $0.00 in noneconomic damages); Proof of Loss at 2-3 (dated August 1, 2023)(AR-Cavitt-Olguin-00013-14)("Cavitt-Olguin Proof of Loss")(requesting $215,000.00 in noneconomic damages and directing the claims reviewer to "narrative included in Notice of Loss"); Notice of Loss at 5 (undated)(AR-Cavitt-Olguin-000145)("Cavitt-Olguin Notice of Loss"). Cavitt-Olguin tells FEMA that she lived in an RV "on family owned land" -- "her grandmother owned the land and her mother was born on the land as well." Cavitt-Olguin Notice of Loss at 5 (AR-Cavitt-Olguin-000145). Cavitt-Olguin tells FEMA that she "prefers to live in solitude so her home was her sanctuary," and that the home "provided her a peace and comfort as a sufferer of PTSD." Cavitt-Olguin Notice of Loss at 5 (AR-Cavitt-Olguin-000145). Cavitt-Olguin tells FEMA that she "spent at least nine years gathering materials to eventually build herself a log cabin." Cavitt-Olguin Notice of Loss at 5 (AR-Cavitt-Olguin-000145). Cavitt-Olguin tells FEMA that she is "permanently displaced and has sought shelter at churches, hotels, non profits, and has resigned to living in her car." Cavitt-Olguin Notice of Loss at 5 (AR-Cavitt-Olguin-000145). FEMA awards

Cavitt-Olguin $0.00 in noneconomic damages.  See Cavitt-Olguin Letter of Determination at 1 (AR-Cavitt-Olguin-000211).

FEMA maintains that that the agency should not award any noneconomic damages, because, according to FEMA, the Hermit's Peak Act does not provide compensation for noneconomic damages as a matter of law.  See May 5, 2025, Tr. at 51:18-19 (Ritchey).  As discussed, a legal argument is not substantial evidence.  See supra, at 74.  Thus, the Court concludes that neither the law nor substantial evidence supports the $0.00 noneconomic damages figure in the Cavitt-Olguin Letter of Determination, which is the "final decision" under review here.  Hermit's Peak Act § 104(i)(1).

At the hearing, FEMA suggests that, if the Court is going to modify the Administrator's decision then the Court should give Cavitt-Olguin $40,000.00 in noneconomic damages.  See May 5, 2025, Tr. at 51:16-23 (Ritchey).  FEMA points to one document in the record to argue that Cavitt-Olguin's noneconomic damages request is too high and that $40,000.00 is more reasonable: FEMA's issuance of a $30,990.28 check on September 29, 2022, to replace Cavitt-Olguin's mobile home.  See May 5, 2025, Tr. at 49:23-50:15 (Ritchey)(citing AR-Cavitt-Olguin-000098 and arguing that "if [Cavitt-Olguin] hasn't purchased another mobile home, I think the Court needs to factor that into consideration, if she's still claiming to be homeless").  Although the record does not indicate when Cavitt-Olguin evacuated, her Notice of Loss states that she "was ordered to evacuate after the local sheriff knocked on her door."  Cavitt-Olguin Notice of Loss at 5 (AR-Cavitt-Olguin-000145).  By May, 2022, the Hermit's Peak/Calf Canyon Fire caused evacuations in multiple villages and communities, including the San Miguel county jail, the State's psychiatric hospital, the United World College, and New Mexico Highlands University.  See Hermit's Peak Act § 102(a).  Putting these two facts together, it is likely that Cavitt-Olguin became homeless in

May, 2022. FEMA's September 29, 2022, check, even if cashed immediately and spent on a mobile home, does not change the fact that Cavitt-Olguin was homeless between May, 2022, and September 29, 2022. Four months of homelessness causes Cavitt-Olguin significant inconvenience, annoyance, and discomfort, particularly given that she prefers to live in solitude. See Cavitt-Olguin Notice of Loss at 5 (AR-Cavitt-Olguin-000145). Although, as discussed, FEMA's $40,000.00 offer at the hearing is not under § 104(i) substantial-evidence review, FEMA's offer is helpful to the Court's thinking and analysis. See supra, at 83-84. The Court concludes, however, that neither the law nor substantial evidence supports FEMA's $40,000.00 noneconomic damages offer, because that offer does not reflect Cavitt-Olguin's significant discomfort, inconvenience, and annoyance she suffers while displaced. The Court modifies FEMA's final decision and enters $215,000.00 in noneconomic damages, because Cavitt-Olguin's request is reasonable. Cavitt-Olguin's great loss from losing the home which provided her much-needed solitude, as well as her extended homelessness, cause her significant discomfort, inconvenience, and annoyance. The Court orders FEMA to pay Cavitt-Olguin $314,198.68 in total damages for her disputed claim here, including $215,000.00 in noneconomic nuisance damages.

### D.    THE COURT MODIFIES FEMA'S FINAL DECISION FOR KEMP AND ENTERS $31,146.35 IN TOTAL COMPENSATION.

The Court modifies FEMA's final decision for Kemp and enters $31,146.35 in total compensation, which includes $24,000.00 in noneconomic nuisance damages. Neither the law nor substantial evidence supports giving Kemp $0.00 in noneconomic damages. The parties agree that FEMA's final economic damages offer is $7,146.35 and that Kemp challenges only FEMA's denial of his $35,000.00 noneconomic nuisance damages request. See May 5, 2025, Tr. at 60:2-18 (Berkstresser, Court, Go); id. at 64:4-8 (Court, Berkstresser); Letter from Angela Gladwell to Tyler Kemp re: FINAL LETTER OF DETERMINATION at 1 (dated January 13, 2024)(AR-

Kemp-000316)("Kemp Letter of Determination")(awarding Kemp $0.00 in noneconomic damages); Proof of Loss at 2-3 (dated October 31, 2023)(AR-Kemp-00087-88)("Kemp Proof of Loss")(requesting $35,000.00 in noneconomic damages and directing the claims reviewer to "[r]efer to narrative in the Notice of Loss"); Notice of Loss at 5 (dated January 26, 2023)(AR-Kemp-000339)("Kemp Notice of Loss").  Kemp tells FEMA that he "is a recovering addict of 11 years and has been diagnosed with autism spectrum disorder" and asthma.  Kemp Notice of Loss at 1 (AR-Kemp-000339).  Kemp tells FEMA that he "thrives on routine and his home was set up perfectly for him to succeed in daily life."  Kemp Notice of Loss at 1 (AR-Kemp-000339).  Kemp tells FEMA that he "voluntarily left" his home in May, 2022, because "he struggled to often breath [sic]and had the added fear of the safety of his cats."  Kemp Notice of Loss at 1 (AR-Kemp-000339).  Kemp tells FEMA that he lived in a motel in Santa Fe while evacuated, and, when he returned, he cleaned the ash and soot in his house for "two full days."  Kemp Notice of Loss at 1 (AR-Kemp-000339).  Kemp tells FEMA that he "lost income due to his health being affected by the fire," "continues to have low energy and struggles to have a day-to-day routine," and "has been in therapy over the year but now the focus is how to process the trauma of evacuating."  Kemp Notice of Loss at 1 (AR-Kemp-000339).  FEMA awards Cavitt-Olguin $0.00 in noneconomic damages.  See Kemp Letter of Determination at 1 (AR-Kemp-000316).

FEMA maintains that that the agency should not award any noneconomic damages, because, according to FEMA, the Hermit's Peak Act does not provide compensation for noneconomic damages as a matter of law.  See May 5, 2025, Tr. at 63:10-11 (Go).  As discussed, a legal argument is not substantial evidence.  See supra, at 74.  Thus, the Court concludes that substantial evidence does not support the $0.00 noneconomic damages figure in the Kemp Letter of Determination, which is the "final decision" under review here.  Hermit's Peak Act § 104(i)(1).

At the hearing, FEMA suggests that, if the Court thinks Kemp should receive noneconomic damages, then the Court should modify the amount to give Kemp $4,000.00 in noneconomic nuisance damages.  See May 5, 2025, Tr. at 62:4-63:19 (Go).  To dispute Kemp's noneconomic damages request on factual grounds, FEMA notes that: (i) the agency "has received no documentation supporting" any of his medical diagnoses; (ii) FEMA has compensated Kemp for lost income, evacuation expenses, and travel expenses; and (iii) on the lost income line item, FEMA "subtracted earnings that Mr. Kemp actually has accrued," which, according to FEMA, "undercuts the contention or the argument that Mr. Kemp has been unable to earn a living."  May 5, 2025, Tr. at 62:10-63:8 (Go).  On the medical conditions point, the Court acknowledges that there is no record evidence of Kemp's diagnoses.  On the arguments regarding FEMA's payments to Kemp for lost income, evacuation expenses, and travel expenses, the Court does not think that those payments detract from Kemp's discomfort, inconvenience, and annoyance.  FEMA's later compensation for Kemp's lost income, evacuation expenses, and travel expense does not change the fact that Kemp's lost income and displacement causes him significant discomfort, inconvenience, and annoyance.  Although, as discussed, FEMA's $4,000.00 offer at the hearing is not under § 104(i) substantial-evidence review, FEMA's offer is helpful to the Court's thinking and analysis.  See supra, at 83-84.  The Court concludes, however, that substantial evidence does not support FEMA's $4,000.00 noneconomic damages offer, because Kemp's discomfort, inconvenience, and annoyance are worth more than $4,000.00.  Accordingly, the Court modifies FEMA's final decision and enters $24,000.00 in noneconomic damages, because, although Kemp's $35,000.00 request is a little rich, his lost income, displacement, and two days of cleaning ash and soot causes him significant discomfort, inconvenience, and annoyance.  The Court orders

FEMA to pay Kemp $31,146.35 in total damages for his disputed claim here, including $24,000.00 in noneconomic nuisance damages.

### E.    THE COURT MODIFIES FEMA'S FINAL DECISION FOR LEYBA AND ENTERS $269,782.43 IN TOTAL COMPENSATION.

The Court modifies FEMA's final decision for Leyba and enters $269,782.43 in total compensation, which includes $100,000.00 in noneconomic nuisance damages.  In addition to contesting FEMA's denial of her $100,000.00 noneconomic nuisance damages request, Leyba challenges FEMA's partial denial of two economic damages requests: (i) $226,538.00 for reforestation and taxes associated with the reforestation; for which FEMA awards $107,865.43 and (ii) $280,280.43 for road regrading and erosion control, for which FEMA awards $0.00.  See May 5, 2025, Tr. at 67:13-24 (Berkstresser, Go); Letter from Angela Gladwell to Deborah Leyba re: FINAL LETTER OF DETERMINATION at 1-2 (dated May 14, 2024)(AR-Leyba-00090-91)("Leyba Letter of Determination")(awarding Leyba: (i) $0.00 in noneconomic damages; (ii) $107.865.43 for reforestation; and (iii) $0.00 for road regrading); Proof of Loss at 1-3 (dated October 27, 2023)(AR-Leyba-000001-3)("Leyba Proof of Loss")(requesting: (i) $100,000.00 in noneconomic damages and directing the claims reviewer to "[r]efer to narrative in the Notice of Loss"; (ii) $236,538.00 for reforestation; and (iii) $280,280.43 for "Debris Removal and Other Clean-Up Costs"); Notice of Loss at 5 (dated March 13, 2023)(AR-Leyba-000310)("Leyba Notice of Loss").  On the noneconomic damages issue, Leyba tells FEMA that she is a native of Mora, New Mexico, and that she "bought the property for her cattle to graze the pasture."  Leyba Notice of Loss at 5 (AR-Leyba-000310).  Leyba tells FEMA that "[t]he property is special to her because it's a simple and beautiful area."  Leyba Notice of Loss at 5 (AR-Leyba-000310).  Leyba tells FEMA that her property is "mountainous and covered in trees," and that she "had many plans for the property when she retired, but now everything is burned and destroyed."  Leyba Notice of Loss

at 5 (AR-Leyba-000310).  FEMA awards Leyba $0.00 in noneconomic damages.  <u>See</u> Leyba Letter of Determination at 1-2 (AR-Leyba-000090-91).

FEMA maintains that that the agency should not award any noneconomic damages, because, according to FEMA, the Hermit's Peak Act does not provide, as a matter of law, compensation for noneconomic damages.  <u>See</u> May 5, 2025, Tr. at 113:23-114:3 (Go).  At the hearing, FEMA sticks to its initial $0.00 offer.  <u>See</u> May 5, 2025, Tr. at 113:23-115:10 (Go).  As discussed, a legal argument is not substantial evidence.  <u>See</u> <u>supra</u>, at 74.  FEMA proposes a second legal argument to challenge Leyba's noneconomic damages request: because Leyba was not on her property as the fire encroached and she never had to evacuate, she should not get any noneconomic damages, because, according to FEMA, "only an occupier of the land is entitled to noneconomic damages."  May 5, 2025, Tr. at 114:21-115:2 (Go); FEMA's Hearing Brief at 22 (citing Restatement (Second) of Torts § 929(1)(c) (stating that an individual who experiences "harm to land resulting from a past invasion and not amounting to a total destruction of value" is entitled to "discomfort and annoyance to him as an occupant")).  The Court disagrees with FEMA's argument, because Leyba is an occupant, even though she is not at the property during the fire.  An occupant is "[s]omeone who has possessory rights in, or control over, certain property or premises."  <u>Occupant</u>, Black's Law Dictionary at 1294 (12th ed. 2024).  FEMA does not dispute that Leyba has "possessory rights in, or control over" her burned-down property.  <u>Occupant</u>, Black's Law Dictionary at 1294.  Moreover, Leyba alleges that she suffers discomfort, inconvenience and annoyance from the fact that her beautiful property burned, and now her retirement plans are ruined.  <u>See</u> Leyba Notice of Loss at 5 (AR-Leyba-000310).  Those nuisance damages are cognizable, even if they are not tied to an evacuation experience, because it is discomforting, inconvenient, and annoying for Leyba to lose the beautiful property at which she

planned to retire. Again, FEMA's incorrect legal argument about Leyba's status as an occupant is not substantial evidence, because it is not evidence. See supra, at 74. Thus, the Court concludes that neither the law nor substantial evidence supports the $0.00 noneconomic damages figure in the Leyba Letter of Determination, which is the "final decision" under review here. Hermit's Peak Act § 104(i)(1). Leyba has proposed a reasonable amount to compensate her for her discomfort, inconvenience, and annoyance. Accordingly, the Court modifies FEMA's final decision and enters $100,000.00 in noneconomic damages, because Leyba suffers significant discomfort, inconvenience, and annoyance from losing her beautiful retirement property.

For reforestation and associated taxes, FEMA awards Leyba $107,865.43, despite her $226,538.00 request. See Leyba Letter of Determination at 2 (AR-Leyba-000091). There are four disputed issues here: (i) FEMA's associated taxes denial; (ii) FEMA's contingency fee denial; (iii) FEMA's aesthetic damages denial; and (iv) FEMA's lower valuation for the reforestation costs. The Court address each issue in turn.

Although Leyba challenges FEMA's denial of "the associated tax line item for reforestation," May 5, 2025, Tr. at 67:17-18 (Berkstresser), the parties do not identify the tax request in the record. The Court notes, however, that Leyba's $226,538.00 reforestation request is $4,300.00 higher than the reforestation estimate that Leyba's expert makes. See Leyba Western Wildlife Report at 1)(AR-Leyba-000108)(estimating $222,238.00 in reforestation costs). That second, lower number -- $222,238.00 -- is what FEMA considers as the "request[ed] claim amount" in its internal review of Leyba's reforestation claim. Hermit's Peak/Calf Canyon Claims Office, Revegetation Claim Review Memo at 1 (undated)(AR-Leyba-00102)("Leyba Revegetation Claim Review Memo."). The first, higher number -- $226,538.00 -- is what FEMA considers, however, as the requested reforestation amount in Leyba's Letter of Determination. See

Leyba Letter of Determination at 1 (AR-Leyba-00090).  The Plaintiffs represent that the "tax line item cannot be offered without the reforestation line item," and that the two costs "are offered together, and in conjunction, and are dependent on one another, so they cannot be separated out." May 5, 2025, Tr. at 67:25-68:4 (Berkstresser).  FEMA does not challenge that representation. Moreover, FEMA agrees that the disputed reforestation amount is $226,538.00 and not $222,238.00.  See May 5, 2025, Tr. at 67:21-22 (Go).  The Plaintiffs also explain the $4,300.00 discrepancy:

> So when we put the line item for reforestation, we also include in that line item the expert fees, which are compensable under the act, as well as [gross receipt tax], which is also compensable, on which FEMA has also agreed is compensable because they've also put it on the letter of determination.

May 5, 2025, Tr. at 100:19-101:1.  FEMA does not challenge that representation.  The Court concludes, therefore that the associated-tax line item is included in the larger $226,538.00 figure, and that it is a part of the reforestation cost.

Because the tax line item is a part of the reforestation cost, the tax line item is compensable under the Hermit's Peak Act.  See Hermit's Peak Act § 104(d)(4)(A)(v)(providing compensation for "a cost of reforestation or revegetation").  FEMA does not argue that reforestation tax line items are not compensable under the Hermit's Peak Act; rather, FEMA challenges the tax line item, because that line item "was not cited in" the Plaintiff's Hearing Brief.  May 5, 2025, Tr. at 67:19-24 (Go).  The Court disagrees with this legal argument.  There is no statutory requirement that the Plaintiffs must identify each challenged line item in a brief.  What is important is the record before the Administrator, and the tax line item was before the Administrator.  As stated, an incorrect legal argument is not substantial evidence, because it is not evidence.  See supra, at 74. On the factual side, FEMA introduces no evidence disputing the tax line item.  The only evidence in the record is Leyba's requested amount.  Thus, the Court concludes that neither the statute's

plain language nor substantial evidence support FEMA's denial of the reforestation tax line item. Accordingly, the Court modifies FEMA's final decision regarding the associated tax line item and enters a $4,300.00 award for taxes associated with Leyba's reforestation.

Regarding the contingency fee and aesthetic damages issues, the Court concludes that: (i) the Hermit's Peak Act provides for both damages categories; and (ii) neither the statute's plain language nor substantial evidence supports FEMA's denial of Leyba's aesthetic damages and contingency fee requests. See supra at 71-78. The Court also concludes that ten percent is a reasonable contingency fee and "orders FEMA to compensate those Plaintiffs for their requested ten percent construction contingency fees for reforestation or revegetation." Supra, at 74-75. Leyba's requested ten percent contingency fee amounts to $16,462.00. See Leyba Western Wildlife Report at 1 (AR-Leyba-000108). Accordingly, the Court modifies FEMA's final decision, and enters a $16,462.00 award to compensate Leyba for the reforestation contingency fee. The Court also modifies FEMA's final decision regarding Leyba's aesthetic damages request and orders FEMA to pay Leyba her requested $41,155.00 in aesthetic damages. See supra, at 76.

Finally, Leyba challenges FEMA's undervaluation of her reforestation costs. Adding compensation for taxes, a contingency fee, and aesthetic damages to FEMA's $107,865.43 award puts Leyba at $169,782.43, which is still $56,755.57 less than her $226,538.00 reforestation request. To account for the $56,755.57 difference, FEMA points to the Leyba Revegetation Claim Review Memo. See May 5, 2025, Tr. at 70:4-11 (Go). FEMA does not assert that it sent someone to Leyba's property to assess the damage. FEMA says that, instead, it uses claimant's submitted evidence, as well as its own methodology based on a FEMA-generated Severity Burn Map, to calculate its alternative valuation. See May 5, 2025, Tr. at 80:18-82:7 (Court, Go); id.. at 83:5-84:12 (Sydow, Court, Starita). FEMA creates the Burn Severity Map by using a Geographic

Information System ("GIS") to map each claimant's property and evaluate the severity of the burn on that property. See May 5, 2025, Tr. at 83:5-84:12 (Sydow, Court, Starita); Leyba Revegetation Claim Review Memo. at 6 (AR-Leyba-000107)(depicting the Burn Severity Map for Leyba's property); id. at 2 (AR-Leyba-000103)(explaining how the Burn Severity Map informs FEMA's reforestation costs estimates). From that assessment, FEMA determines how many acres experienced low, moderate, or high burning. See May 5, 2025, Tr. at 85:12-18 (Go). Based on those acreage calculations, FEMA uses unit costs derived from the Natural Resources Conservation Service to calculate how much it costs to reforest the burned areas. See May 5, 2025, Tr. at 86:20-87:1 (Go). FEMA admits that the Natural Resources Conservation Service unit costs are not in the record. See May 5, 2025, Tr. at 87:13-14 (Go).

On the other hand, Leyba submits to FEMA a report by a "certified arborist" who visited her property and estimated how much it costs to reforest. May 5, 2025, Tr. at 96:14 (Berkstresser). See Leyba Western Wildlife Report at 1-2 (AR-Leyba-000108-09);. FEMA's Leyba Revegetation Claim Review Memo. neither challenges the qualifications of Leyba's arborist nor explains how the arborist's calculations are incorrect. See Leyba Revegetation Claim Review Memo. at 1-2 (AR-Leyba-000102-03). One reason why FEMA's Leyba Revegetation Claim Review Memo. and the Leyba Wester Wildlife Report have different total valuations is that the two reports assign different unit costs to the same items. For example, although both parties agree that FEMA must pay to rebuild 1,456 feet of Leyba's burned fence, FEMA says that the fencing costs $5.34 per foot, and Leyba's expert says that the fencing costs $16.00 per foot. See Leyba Revegetation Claim Review Memo. at 4 (AR-Leyba-000105); Leyba Western Wildlife Report at 1 (AR-Leba-000108). FEMA admits that its sources for determining unit costs are not in the record. See May

5, 2025, Tr. at 88:4-10 (Court, Go). FEMA also notes that Leyba's expert's sources for determining unit costs are not in the record. See May 5, 2025, Tr. at 94:25-96:7 (Sydow).

FEMA's Leyba Revegetation Claim Review Memo. is substantial evidence, even if Leyba's expert report may be better. "To satisfy the substantial evidence standard, an agency need only rely on 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Andalex Res., Inc. v. Mine Safety & Health Admin., 792 F.3d at 1257 (quoting Lax v. Astrue, 489 F.3d at 1084). The standard "requires more than a scintilla, but less than a preponderance." Lax v. Astrue, 489 F.3d at 1084. Courts conducting substantial evidence review "neither reweigh the evidence nor substitute [their] judgment for that of the agency." Branum v. Barnhart, 385 F.3d at 1270. Substantial evidence review "is 'very deferential to the agency,'" and "'a presumption of validity attaches to the agency action and the burden of proof rests with the parties who challenge it.'" BNSF R. Co. v. U.S. Dep't of Lab., 816 F.3d at 638 (quoting Ron Peterson Firearms, LLC v. Jones, 760 F.3d at 1161-62).

> "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence. Thus, we may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo."

Plateau Mining Corp. v. Fed. Mine Safety & Health Rev. Comm'n, 519 F.3d at 1194 (quoting Zoltanski v. F.A.A., 372 F.3d at 1200. The two reports present "fairly conflicting views," Zoltanski v. F.A.A., 372 F.3d at 1200, about revegetation costs, and, even if the Court would make a different choice than FEMA's, it is not the Court's job to reweigh the evidence, see Branum v. Barnhart, 385 F.3d at 1270.

As an initial matter, FEMA is not obligated to accept Leyba's expert report as correct, and FEMA may rely on its own experts who offer a different cost calculation. See Sprint Spectrum L.P. v. Willoth, 176 F.3d 630, 646 (2d Cir. 1999)(determining that substantial evidence supports

an agency's decision, and noting that the agency is "entitled to disregard [the] prediction [of the plaintiff's expert] where two of its own real estate experts concluded otherwise"). More importantly, an expert's opinion or report can be substantial evidence, even if the expert withholds some underlying data. See Biestek v. Berryhill, 587 U.S. 97, 108 (2019)("Biestek"). In Biestek, the Supreme Court holds that an expert's refusal to provide underlying data does not preclude categorically her testimony from counting as substantial evidence. See 587 U.S. at 99. Instead, even when some underlying data is missing, the substantial evidence inquiry is "case-by-case." 587 U.S. at 108. The Honorable Elena Kagan, Associate Justice of the Supreme Court of the United States, provides guidance:

> Sometimes an expert's withholding of such data, when combined with other aspects of the record, will prevent her testimony from qualifying as substantial evidence. That would be so, for example, if the expert has no good reason to keep the data private and her testimony lacks other markers of reliability. But sometimes the reservation of data will have no such effect. Even though the applicant might wish for the data, the expert's testimony still will clear (even handily so) the more-than-a-mere-scintilla threshold.

Biestek v. Berryhill, 587 U.S. at 108.

In Leyba's case, FEMA's Leyba Revegetation Claim Review Memo., even without the unit costs source, is "such relevant evidence as a reasonable mind might accept as adequate to support" FEMA's cost calculation, Lax v. Astrue, 489 F.3d at 1084, because the memorandum bears important "markers of reliability," Biestek v. Berryhill, 587 U.S. at 108. For example, FEMA's Leyba Revegetation Claim Review Memo. says that FEMA uses "GIS overlay mapping" to determine that Leyba's fence is 1,456 feet long. See Leyba Revegetation Claim Review Memo. at 2 (AR-Leyba-000103). That figure matches Leyba's expert's calculation. Compare Leyba Revegetation Claim Review Memo. at 2 (AR-Leyba-000103) with Leyba Western Wildlife Report at 1 (AR-Leyba-000108). Also, FEMA does not refuse to provide the underlying data. Rather, FEMA represents that its reviewers get the data from the Natural Resources Conservation Service.

See May 5, 2025, Tr. at 86:20-87:1 (Go).  The Natural Resources Conservation Service is the United States Department of Agriculture's "primary lands conservation agency," and the agency "generate[s], manage[s], and share[s] the data, technology, and standards that enable partners and policymakers to make decisions informed by objective, reliable science."  United States Department of Agriculture, Natural Resources Conservation Service, About NRCS (undated), available at https://www.nrcs.usda.gov/about (last accessed on July 18, 2025).  As a government steward of conservation-related data, the Natural Resources Conservation Service is a reliable source, and it is not fatal that FEMA's reviewers did not include the underlying unit costs in the record.[17]  FEMA is not hiding the data, and the Plaintiffs do not allege that the Natural Resources Conservation Service is unreliable.  Thus, the Court concludes that substantial evidence supports FEMA alternative revegetation cost calculations.  Accordingly, the Court modifies in part and upholds in part FEMA's revegetation cost calculation for Leyba.  FEMA must pay Leyba the tax line item, the contingency fee, and the aesthetic damages.  FEMA does not need to give Leyba additional compensation to match her expert's report on other line items.  Accordingly, the Court enters a $169,782.43 reforestation award.

Finally, the Court turns to the disputed erosion and road regrading award.  Although Leyba requests $280,280.43 for erosion and road regrading, FEMA gives her $0.00.  See Leyba Letter of Determination at 1 (AR-Leyba-000090).  To support its $0.00 erosion award, FEMA points to a FEMA review memorandum, which, like the Leyba Revegetation Claim Review Memo., evaluates Leyba's underlying expert report.  See May 5, 2025, Tr. at 101:10-23 (Go)(citing Hermit's

---

[17]The National Resources Conservation Service's data and reports are publicly available.  See United States Department of Agriculture, Natural Resources Conservation Service, Data and Reports (undated), available at https://www.nrcs.usda.gov/resources?title=&resource_type=18 (last accessed on July 20, 2025).

Peak/Calf Canyon Claims Office, SME Review Memo for Repairs/Risk Reduction/Erosion Control at 1-4 (undated)(AR-Leyba-000098-101)("Leyba Erosion Claim Review Memo")). The Leyba Erosion Claim Review Memo asserts that the photographs in Leyba's expert report do not demonstrate that the roads are damaged or that the roads "face[] heighted risk for additional future damages such as being located where burned slopes are increasing the energy (velocity, force, and volume) of run off." Leyba Erosion Claim Review Memo at 2 (AR-Leyba-000099). Having reviewed Leyba's erosion expert report, the Court agrees with FEMA. The photographs do not show that any roads are damaged, and the expert's prediction that the roads will require multiple regradings is too speculative to overcome the deference the Court must give to FEMA under substantial-evidence review. See Cost Estimate for Deborah Leyba Property Repairs at 16-31 (AR-Leyba-000052-67)("Leyba ESI Erosion Report")(depicting undamaged roads and describing several possible flooding scenarios). Accordingly, the Court concludes that substantial evidence supports FEMA's $0.00 erosion award. In sum, the Court modifies FEMA's final decision for Leyba and orders FEMA to pay Leyba $269,782.43 in total damages for her disputed claim here, including: (i) $100,000.00 in noneconomic nuisance damages; (ii) $169,782.43 in reforestation damages; and (iii) $0.00 in erosion damages.

### F.    THE COURT MODIFIES FEMA'S FINAL DECISION FOR MARQUEZ AND ENTERS $15,112.35 IN TOTAL COMPENSATION.

The Court modifies FEMA's final decision for Marquez and enters $15,112.35 in total compensation, which includes $12,000.00 in noneconomic nuisance damages. Neither the law nor substantial evidence supports giving Marquez $0.00 in noneconomic damages. The parties agree that Marquez accepted FEMA's final economic damages offer of $3,112.35 and that Marquez challenges only FEMA's denial of her $80,000.00 noneconomic nuisance damages request. See May 5, 2025, Tr. at 117:7-119:25 (Court, Starita, Ritchey); Letter from Angela Gladwell to Rose

Anna Marquez re: FINAL LETTER OF DETERMINATION at 1 (dated January 13, 2024)(AR-Marquez-000084)("Marquez Letter of Determination")(awarding Marquez $0.00 in noneconomic damages); Proof of Loss at 2-3 (dated October 20, 2023)(AR-Marquez-00008-9)("Marquez Proof of Loss")(requesting $80,000.00 in noneconomic damages and directing the claims reviewer to "refer to narrative in the Notice of Loss"); Notice of Loss at 5 (undated)(AR-Marquez-000062)("Marquez Notice of Loss").  Marquez tells FEMA that, after State police officers order her to evacuate at 4:00 a.m., she rushes out of her home, leaving her birds and other sentimental items behind.  See Marquez Notice of Loss at 5 (AR-Marquez-000062).  Marquez tell FEMA that, during the evacuation, she "feared her birds were going to burn" and that she did not sleep for four days.  Marquez Notice of Loss at 5 (AR-Marquez-000062).   Marquez tells FEMA that she continues to have problems sleeping, that "loud noises and orange lights trigger her PTSD," and that she is "always on edge and cannot stay in her home alone."  Marquez Notice of Loss at 5 (AR-Marquez-000062).  Marquez tells FEMA, in detail, about the Hermit's Peak/Calf Canyon Fire's impact on her personal life:

> When claimant thinks about the fire it upsets her because she used to take her children fishing and camping since they were little.  When her son passed away, she would take his kids up to the now burned areas fishing and camping.  This has since been a family tradition.  She will never be able to take her great grandchildren to the area to see the beauty.  The areas she would go and reminisce of her son who passed away are destroyed, claimant felt her son was there with her and now all she sees is destruction and sadness.

> Claimant no longer has a place where she can go and find peace . . . you never know how much things are taken for granted until you cannot go sit by the river to feel and hear nature.  The wind whispering softly in your ear, the soothing sound of the river flowing next to you while sitting by a tree.  It's something that she will never see or feel again because the government was careless and took this enjoyment away from her.  What they may just see as trees or land is way more than just that, and now everyone is deprived of the mountain life.  Unless you have experienced nature like that you would not know what she is talking about.

Marquez Notice of Loss at 5 (AR-Marquez-000062)(ellipses in original). FEMA awards Marquez $0.00 in noneconomic damages. See Marquez Letter of Determination at 1 (AR-Marquez-000084).

FEMA maintains that that the agency should not award any noneconomic damages, because, according to FEMA, Marquez' noneconomic damages "speak[] to emotional distress." May 5, 2025, Tr. at 120:8-121:5 (Ritchey). The Court disagrees with FEMA. It is discomforting, inconvenient, and annoying for Marquez to leave sentimental items behind in an emergency evacuation. It is discomforting, inconvenient, and annoying for Marquez to not be able to share a meaningful natural space, which reminds her of her deceased son, with her great grandchildren. As discussed, FEMA's incorrect legal argument is not substantial evidence. See supra, at 74. Thus, the Court concludes that neither the law nor substantial evidence supports the $0.00 noneconomic damages figure in the Marquez Letter of Determination, which is the "final decision" under review here. Hermit's Peak Act § 104(i)(1).

FEMA also suggests that the Court should award, "at most," $1,000.00 or $2,000.00 by comparing Marquez' ordeal to those of her co-Plaintiffs. May 5, 2025, Tr. at 121:16-21 (Ritchey). For example, FEMA notes that Gallegos, for whom the Court enters a $9,000.00 noneconomic nuisance award, was homeless for fifteen days, whereas Marquez was never homeless. See May 5, 2025, Tr. at 121:22-122:20 (Ritchey). As discussed, FEMA's noneconomic damages offers at the hearing are not FEMA's final decisions which the Court is reviewing. See supra, at 83-84. FEMA's noneconomic damages offers at the hearing are not subject to substantial-evidence review, but they are helpful to the Court's thinking and analysis. The Court notes, however, that substantial evidence does not support FEMA's low amount for Marquez. Although she was never homeless, she experienced significant discomfort, inconvenience, and annoyance. The Hermit's

Peak/Calf Canyon Fire scarred a landscape connected to her deceased son.  Losing that connection is worth more than $2,000.00 in discomfort, inconvenience, and annoyance.    Accordingly, the Court modifies FEMA's final decision and enters $12,000.00 in noneconomic damages, because, although Marquez' $80,000.00 request is a little rich for her situation, the Marquez Notice of Loss describes how the Hermit's Peak/Calf Canyon Fire "deprive[s her] of the mountain life," which she values greatly.  Marquez Notice of Loss at 5 (AR-Marquez-000062).  While Marquez' amount is slightly higher than Gallegos' amount, the Court thinks Marquez' discomfort, inconvenience, and annoyance here justifies the slightly higher amount.  The Court orders FEMA to pay Marquez $15,112.35 in total damages for her disputed claim here, which includes $12,000.00 in noneconomic nuisance damages.

### G.    THE COURT MODIFIES FEMA'S FINAL DECISION FOR D. JOSLIN AND ENTERS $330,000.00 IN NONECONOMIC DAMAGES.

The Court modifies FEMA's final decision for D. Joslin and enters $330,000.00 in noneconomic nuisance damages.  Neither the law nor substantial evidence supports giving D. Joslin $0.00 in noneconomic damages.  The parties agree that Joslin challenges only FEMA's denial of his $330,000.00 noneconomic nuisance damages request.[18]  See May 5, 2025, Tr. at 124:18-127:10 (Court, Starita, Go); Letter from Angela Gladwell to Daniel H. Joslin re: FINAL LETTER OF DETERMINATION at 1 (dated January 18, 2024)(AR-Joslin-01070)("Joslin Letter

---

[18]At the hearing, the parties do not agree on what FEMA's final economic damages offer is.  See May 5, 2025, Tr. at 130:9-25 (Court, Starita, Go).  The Plaintiffs throw out a figure of $1,362,337.70, and, although FEMA says that its calculations do not match that number, FEMA does not allege that the Plaintiffs' figure is far off.  See May 5, 2025, Tr. at 130:9-25 (Court, Starita, Go).  The parties agree, however, that, because Joslin challenges only FEMA's noneconomic damages denial, they do not need to "get our math right here today," and the parties agree to tell the Court, at a later date, what the final economic damages offer is.  May 5, 2025, Tr. at 131:10-20 (Sydow, Court, Colon).  To date, the parties have not provided the Court with the final economic damages offer.

of Determination")(awarding Joslin $0.00 in noneconomic damages); Proof of Loss at 2-3 (dated August 17, 2023)(AR-Joslin-00135-36)("Joslin Proof of Loss")(requesting $30,000.00 in noneconomic damages and directing the claims reviewer to "refer to narrative included in the Notice of Loss"); Notice of Loss at 4 (dated April 11, 2023)(AR-Joslin-00562)("Joslin Notice of Loss"). D. Joslin tells FEMA that he and his wife, Vicki Joslin, purchased the property in 2001, "intended to spend their retirement years on the property," and "spent many years developing the land to make their dream a reality." Joslin Notice of Loss at 4 (AR-Joslin-00562). D. Joslin tells FEMA that he "grew up in the area and his uncle's ranch was near their property," and, accordingly, "[t]he nostalgia of being raised in the area and the location of the property held great sentimental value." Notice of Loss at 4 (AR-Joslin-00562). D. Joslin tells FEMA that he and V. Joslin "loved the quietness, trees, and tranquil views." Notice of Loss at 4 (AR-Joslin-00562). D. Joslin tells FEMA that, when they evacuated, they "grabbed as many valuables as they could" and "stayed in their camper in the back of their newly opened business during the remainder of the evacuation." Notice of Loss at 4 (AR-Joslin-00562). D. Joslin tells FEMA that, when they returned to their property after the fire and "found that everything was destroyed and only smoke remained," they "felt a rush of emotions from anger to sadness and Daniel could do nothing but scream." Notice of Loss at 4 (AR-Joslin-00562). D. Joslin tells FEMA that he and V. Joslin "have since relocated to Las Vegas and left behind their dream of retiring in the quiet and peaceful countryside due to high rebuild costs." Notice of Loss at 4 (AR-Joslin-00562). D. Joslin tells FEMA that it "grieves them that they no longer have anything to leave as a legacy for their children and grandchildren," and that "many irreplaceable and sentimental items were lost in the fire including a rare table brought over on the Santa Fe trail." Notice of Loss at 4 (AR-Joslin-00562). Joslin concludes: "Claimants find it extremely difficult to reconcile that everything they worked

so hard for to enjoy later in their retirement years no longer exists."  Notice of Loss at 4 (AR-Joslin-00562).    FEMA awards Joslin $0.00 in noneconomic damages.    See Joslin Letter of Determination at (AR-Joslin-01070).

In addition to arguing that the Hermit's Peak Act does not allow for noneconomic damages, FEMA argues that D. Joslin should not get any noneconomic damages award, because both FEMA and Joslin's insurance company provided adequate economic compensation.  See May 5, 2025, Tr. at 127:16-129:8 (Go).  FEMA does not make another offer at the hearing.  See May 5, 2025, Tr. at 127:16-129:8 (Go).  The Court disagrees with both of FEMA's arguments.  First, FEMA's incorrect legal argument -- that Hermit's Peak Act does not allow for noneconomic damages -- is not substantial evidence, because it is not evidence.  See supra, at 74.  Second, FEMA does not point to any compensation -- which either FEMA or D. Joslin's insurance company provides -- which addresses noneconomic nuisance damages.  D. Joslin's noneconomic damages, as the Notice of Loss describes, remain uncompensated.  Thus, the Court concludes that neither the law nor substantial evidence supports the $0.00 noneconomic damages figure in the Joslin Letter of Determination, which is the "final decision" under review here.  Hermit's Peak Act § 104(i)(1).  Joslin's $330,000 ask is high.  The Court concludes, however, that his request is reasonable, given the significant discomfort, inconvenience, and annoyance that he and V. Joslin experience.  The Joslins planned to retire in the mountains to grow old in its unique solitude and beauty.  D. Joslin experienced a special nostalgia at his burned-down home, because he grew up in the area and his uncle's ranch was nearby.  The Joslins spent many years cultivating their dream.  They planned to pass on this special property to their grandchildren.  They lost irreplaceable and sentimental items.  Losing all of this is a significantly discomforting, inconvenient, and annoying experience for the Joslins.  Accordingly, the Court concludes that D. Joslin's $330,000.00 request is reasonable.  The

Court modifies FEMA's final decision and orders FEMA to pay Joslin $330,000.00 in noneconomic damages.

### H.    THE COURT MODIFIES FEMA'S FINAL DECISION FOR LUNGSTRUM AND ENTERS $1,661,794.88 IN TOTAL COMPENSATION.

The Court modifies FEMA's final decision for Lungstrum and enters $1,661,794.88 in total compensation, which includes $300,000.00 in noneconomic nuisance damages.  In addition to contesting FEMA's denial of his $300,000.00 noneconomic nuisance damages request, Lungstrum challenges FEMA's partial denial of three economic damages requests: (i) $1,263,451.00 for reforestation, for which FEMA awards $744,558.83; (ii) $1,200,957.00 for road regrading and erosion control, for which FEMA awards $49,008.00; and (iii) $175,000.00 for loss of hunting revenue, for which FEMA awards $0.00.  See May 5, 2025, Tr. at 132:6-134:17 (Court, Berkstresser, Sydow); id. at 147:14-148:6 (Court, Berkstresser, Sydow); id. at 164:23-165:8 (Court, Berkstresser); id. at 174:14-15 (Court, Berkstresser); Letter from Angela Gladwell to Gregory Lungstrum re: Final Letter of Determination at 1-2 (dated January 18, 2024)(AR-Lungstrum-000779-80)("First Lungstrum Letter of Determination")(awarding Lungstrum: (i) $0.00 in noneconomic damages; (ii) $907,518.83 for reforestation; (iii) $0.00 for road regrading and erosion; and (iv) $0.00 for lost hunting revenue); Letter from Angela Gladwell to Gregory Lungstrum re: Final Letter of Determination at 1-2 (dated May 16, 2024)(AR-Lungstrum-0000169-70)("Updated Lungstrum Letter of Determination")(awarding Lungstrum: (i) $0.00 in noneconomic damages; (ii) $774,558.83 for reforestation; (iii) $49,008.00 for road regrading; and (iv) $0.00 for lost hunting revenue); Proof of Loss at 3 (dated August 19, 2024)(AR-Lungstrum-000199)("Initial Lungstrum Proof of Loss")(requesting: (i) $300,000.00 in noneconomic damages and directing the claims reviewer to "[r]efer to narrative included in the Notice of Loss"; (ii) $972.063.00 for reforestation; (iii) $1,200,957.00 for road regrading and erosion; and

(iv) $465,500.00 for lost hunting revenue); Proof of Loss at 3 (dated February 2, 2024)(AR-Lungstrum-000094)("Lungstrum Proof of Loss Addition")(revising: (i) the reforestation request to $1,263,451.00; and (ii) the lost hunting revenue request to $175,000.00); Notice of Loss at 5-6 (dated March 3, 2023)(AR-Lungstrum-000060-61)("Lungstrum Notice of Loss").  Regarding his noneconomic damages request, Lungstrum tells FEMA that he and his wife, Judith, owned a "grand ranch with a phenomenal environment surrounded by unique wildlife and an untouched natural mountain water spring that runs through the ranch."  Lungstrum Notice of Loss at 5 (AR-Lungstrum-000060).  Lungstrum tells FEMA that the ranch has "vast amounts of land with a scenic view," and that he and his wife "love that this property is remote and located at the end of a road with no people close by."  Lungstrum Notice of Loss at 5 (AR-Lungstrum-000060).  Lungstrum tells FEMA that, although and his wife "were not on the property at the time of the fire," the fire "burned down the entire ranch, along with scorching the once untouched natural land within the property."  Lungstrum Notice of Loss at 5 (AR-Lungstrum-000060).  Lungstrum tells FEMA that his "first thoughts of learning about the fire destroying their ranch property made him feel like he wanted to throw up," because he "thought about how he lost his retirement, lost his future, lost his dream property, and lost a part of his life."  Lungstrum Notice of Loss at 5 (AR-Lungstrum-000060).  Lungstrum tells FEMA that the fire "destroyed everything within the property -- destroyed the once gorgeous scenic views, destroyed the ability to enjoy the property, and killed all the wildlife that were not able to escape from the fire."  Lungstrum Notice of Loss at 5 (AR-Lungstrum-000060).  Lungstrum tells FEMA that he "has become very depressed not knowing how he will retire" and that the ranch "went from his greatest asset to his biggest liability."  Lungstrum Notice of Loss at 5 (AR-Lungstrum-000060).  Lungstrum tells FEMA that he and his wife are "very upset since the ranch property is now essentially worthless," which "ruins their

plans to build on the land." Lungstrum Notice of Loss at 5 (AR-Lungstrum-000060). Lungstrum concludes: "On top of this, they are filled with sorrow from discovering various amounts of deceased animals surrounding his property and realizing that the present and future for them is now ruined due to the destruction of the fire." Lungstrum Notice of Loss at 5 (AR-Lungstrum-000060). FEMA awards Lungstrum $0.00 in noneconomic damages. See Updated Lungstrum Letter of Determination at 2 (AR-Lungstrum-000170).

FEMA denies categorically Lungstrum's noneconomic damages request, because, according to FEMA, "[t]he claimed damages are not eligible under the Hermit's Peak/Calf Canyon Fire Assistance Act and implementing regulations." Updated Lungstrum Letter of Determination at 1-2 (AR-Lungstrum-000169-70). As discussed, FEMA's incorrect legal argument is not substantial evidence. See supra, at 74. Thus, the Court concludes that neither the law nor substantial evidence supports the $0.00 noneconomic damages figure in the Updated Lungstrum Letter of Determination, which is the "final decision" under review here. Hermit's Peak Act § 104(i)(1).

At the hearing, FEMA argues that, because Lungstrum was not an occupant of the damaged property during the fire, Lungstrum's noneconomic damages compensation should be "closer to [that of] the petitioners" who were "temporarily displaced and had less [] fundamental disruptions to their immediate life and home." May 5, 2025, Tr. at 175:13-178:6 (Sydow). The Court disagrees with FEMA. The Lungstrums suffer significant discomfort, inconvenience, and annoyance, because the fire destroyed their dream retirement home. It is highly discomforting, inconvenient, and annoying for the Lungstrums to reconfigure their retirement plans, particularly when those plans revolved around their unique and beautiful mountain home. It also is discomforting, inconvenient, and annoying for the Lungstrums to discover many deceased animals

on their property after the fire. Accordingly, the Court concludes that the Lungstrums' $300,000.00 noneconomic damages request is reasonable, and the Court modifies FEMA's noneconomic damages award to match that request.

For reforestation, FEMA awards Lungstrum $744,558.83, despite his $1,263,451.00 request. See Updated Lungstrum Letter of Determination at 2 (AR-Lungstrum-0000170); Lungstrum Proof of Loss Addition at 3 (AR-Lungstrum-000094). The disputed issues are similar to Leyba's disputed issues: (i) FEMA's categorical denial of a ten-percent contingency fee, aesthetics, and lost resources; and (ii) FEMA's alleged undervaluation of the reforestation costs, based on different unit costs. See May 5, 2025, Tr. at 142:10-143:8 (Court, Berkstresser). At the hearing, Lungstrum asserts that the situation is "very similar, if not identical to the Leyba situation," because, according to Lungstrum, FEMA's Lungstrum Revegetation Claim Review Memo. "does not contain sufficient information" to support a substantial evidence finding. See May 5, 2025, Tr. at 134:21-135:7 (Berkstresser, Court)(citing Lungstrum Western Wildfire Report (AR-Lungstrum-000230)). FEMA agrees that the situation is like Leyba's, and FEMA, again, argues that its Lungstrum Revegetation Claim Review Memo. constitutes substantial evidence. See May 5, 2025, Tr. at 135:12-140:6 (citing Lungstrum Revegetation Claim Review Memo. at 1-6 (AR-Lungstrum-000177-82)). The Court agrees with the parties: the situation involves the same legal and factual disputes as Leyba's. Accordingly, the Court applies the same analysis as it did for Leyba. See supra, at 96-100. Using that same analysis, the Court concludes that neither the law nor substantial evidence supports FEMA's categorical denial of the ten-percent contingency fee, aesthetic damages, and lost resources damages. See supra, at 71-82. Accordingly, the Court modifies FEMA's award regarding those line items, and enters: (i) a $109,865.00 ten percent contingency fee award; (ii) a $54,933.00 aesthetic damages award; and (iii) a $96,252.00 lost

resources damages award. See Lungstrum Western Wildlife Report at 1 (AR-Lungstrum-000230)(listing requested amounts). Using that same analysis, the Court concludes that substantial evidence supports FEMA's calculation of the other reforestation line items; thus, the Court upholds FEMA's final decision regarding those calculations. See supra, at 71-82. Adding the ten-percent contingency fee, aesthetic damages, and lost-resources damages to FEMA's $744,558.83 reforestation award, the Court modifies FEMA's final reforestation decision and enters a $1,035,608.83 reforestation award for Lungstrum.

For erosion, FEMA awards Lungstrum $49,008.00, despite his $1,200,957.00 request. See Updated Lungstrum Letter of Determination at 2 (AR-Lungstrum-0000170); Initial Lungstrum Proof of Loss at 3 (AR-Lungstrum-000199). Lungstrum argues that substantial evidence does not support FEMA's low award, because FEMA's review memorandum is less reliable than Lungstrum's expert report. See May 5, 2025, Tr. at 149:13-23 (Berkstresser)(citing Cost Estimate for Gregory Lungstrum Property Repairs at 1-46 (dated January 11, 2023)(AR-Lungstrum-000707-52)("Lungstrum ESI Erosion Report"); SME Review Memo for Repairs/Risk Reduction/Erosion Control at 1-4 (AR-Lungstrum-000188-91)("Lungstrum Erosion Claim Review Memo."). FEMA argues that, although it does not dispute the erosion unit costs -- $3.79 per square yard of road to be regraded -- FEMA's Lungstrum Erosion Claim Review Memo. is substantial evidence, because: (i) the Lungstrum Erosion Claim Review Memo. concludes correctly that the Hermit's Peak Act does not authorize a thirty-five percent contingency fee; (ii) the reviewers, after studying Lungstrum's submitted photographs, maps, and other aerial images, conclude reasonably that only 4,889 square yards of road need to be regraded, as opposed to Lungstrum's estimated 54,436 square yards; and (iii) the reviewers, after evaluating at Lungstrum's expert report, conclude reasonably that the roads need to be regraded once, rather

than three times, as Lungstrum's expert asserts.  May 5, 2025, Tr. at 150:9-160:22 (Sydow, Court).

In response, Lungstrum notes that, although Lungstrum's expert report provides a map and

photographs identifies approximately 54,436 square yards of damaged roads, FEMA's Lungstrum

Erosion Claim Review Memo. does not say which parts of that approximately 54,436 square yards

calculation the agency is contesting.  See May 5, 2025, Tr. at 161:9-25 (Berkstresser)("So there is

no way to know exactly what they are referring to in their report, because they did not provide a

map discussing which ones they don't believe existed or were not damaged.").

On the contingency fee issue, the Court concludes that, although the Hermit's Peak Act

provides compensation for contingency fees, those fees must be reasonable.  See supra, at 74-75.

A thirty-five percent contingency fee is not reasonable.  See supra, at 74-75.  Accordingly, the

Court modifies FEMA's final decision, and enters a ten-percent contingency fee award, which is

reasonable and consistent with the other contingency fees which the Court has approved in this

Memorandum Opinion and Order.  See supra, at 96, 110.

Regarding the number of regradings required, the Court concludes that substantial evidence

supports FEMA's conclusion that the roads need to be regraded once.  FEMA's subject-matter

experts evaluated Lungstrum's expert report, and used their professional judgment to conclude

that some roads were damaged and could be regraded, but that those roads did not need multiple

regradings.  See Lungstrum Erosion Claim Review Memo. at 2 (AR-Lungstrum-000189);

Lungstrum ESI Erosion Report at 46 (AR-Lungstrum-000752)(indicating that Lungstrum's

property has a "moderate" risk of debris flow and flooding).  Additional regradings are too

speculative at this stage, and, affording FEMA the deference it enjoys under substantial-evidence

review, the Court upholds FEMA's determination that only one regrading is required.

Regarding the square footage calculation, the Court concludes that substantial evidence does not support FEMA's calculation. FEMA's Lungstrum Erosion Claim Review Memo. does not explain which roads the agency believes require regrading and which roads do not require regrading. Without any explanation, the Court cannot conclude that there is substantial evidence to support FEMA's significantly lower calculation. At the least, FEMA needs to indicate where the 4,889 square yards of damaged roads are. That detail would show that the claims reviewers have some methodology to support their calculation. Evidence of an underlying methodology may surpass the substantial evidence hurdle, because the Lungstrum Erosion Claim Review Memo. would bear "markers of reliability." Biestek v. Berryhill, 587 U.S. at 108. Without any evidence showing that the reviewers have a reliable method of arriving at their lower calculation, however, the Court cannot conclude soundly that substantial evidence supports the lower calculation. Accordingly, the Court modifies FEMA's erosion award to include: (i) a ten-percent contingency fee award; and (ii) compensation to regrade approximately 54,436 square yards of road once. Dividing Lungstrum's expert's base calculation by three -- to account for only one regrading, instead of three -- equals $206,283.67 for one regrading. By adding the Lungstrum ESI Erosion Report's undisputed line items -- fifteen percent for additional maintenance, twenty percent for mobilization, and five percent for erosion control -- Lungstrum has an overall subtotal of $296,532.77. Adding a ten percent contingency fee -- $29,653.28 -- leaves Lungstrum with a grand total of $326,186.05. Accordingly, the Court modifies FEMA's erosion determination and enters a $326,186.05 award for Lungstrum.

For lost hunting revenue, FEMA awards Lungstrum $0.00, despite his $175,000.00 request. See Updated Lungstrum Letter of Determination at 2 (AR-Lungstrum-0000170); Lungstrum Proof of Loss Addition at 3 (AR-Lungstrum-000094). Lungstrum says that he planned

to start a hunting business that sells hunting trips on his property, and that he submitted to FEMA: (i) a declaration, which "detailed the amount of hunts he anticipated selling per season, and the amount of money that would be generated per year," from a "licensed outfitter" whom Lungstrum retained in anticipation of setting up the business; and (ii) "documentation demonstrating his filing for an LLC" for the hunting business.  May 5, 2025, Tr. at 165:11-166:6 (citing Declaration of Jason Beagle in Support of Claimant Gregory Lungstrum's Loss of Revenue Claim Re: Pecos Wilderness Ranch as a Result of the Hermit's Peak/Calf Canyon Fire at 1 (executed October 7, 2023)(AR-Lungstrum-000760)("Beagle Decl.")).  Lungstrum says that his lost-hunting-revenue request reflects "the idea that because the land has been burnt and destroyed by subsequent flooding, they do not expect the habitat to return . . . sufficient[ly] to attract the wildlife back for continued hunting."  May 5, 2025, Tr. at 166:1-6 (Berkstresser).   FEMA says that substantial evidence supports its categorical denial of Lungstrum's request, because: (i) his losses are speculative, given that Lungstrum admits that he had not sold any hunting trips and that "'the set-up of the hunting business was in progress at the time of the fire,'"  May 5, 2025, Tr. at 169:13-170:12 (Sydow)(quoting Email from Krystle Berkstresser to Hermit's Peak/Calf Canyon Claims Office re: Lungstrum - 6359 at 1 (dated March 18, 2024)(AR-Lungstrum-000166)("Berkstresser Email"); (ii) FEMA reviewed Lungstrum's submitted documents and found that "'there is no support for business interruption,'" May 5, 2025, Tr. at 170:12-19 (Sydow)(quoting Letter from Hermit's Peak/Calf Canyon Claims Office to Hermit's Peak/Calf Canyon Claims Office re: Escalation Request re: Claim No. 6359 - Gregory Lungstrum at 1 (dated July 27, 2024)(AR-Lungstrum-000639)("Hunting Revenue Denial Explanation Email"); and (iii) there is record evidence that wildlife populations have rebounded well, "which undermines the claim that it's not possible to conduct hunts after the fire," May 5, 2025, Tr. at 171:2-11 (Sydow)(citing Untitled

Screenshots at 1-2 (undated)(AR-Lungstrum-000047-48)("Wildlife Rebound Information Blurbs").

Considering the evidence before the Administrator, the Court concludes that substantial evidence supports FEMA's categorical denial of Lungstrum's hunting revenue losses. Lungstrum had plans to start a business; he did not have an active business. See Berkstresser Email at 1 (AR-Lungstrum-000166). FEMA evaluates Lungstrum's submission and concludes that his losses are speculative. See Hunting Revenue Denial Explanation Email at 1 (AR-Lungstrum-000639). There is record evidence that the wildlife impact is less than Lungstrum says it is. See Wildlife Rebound Information Blurbs at 1-2 (AR-Lungstrum-000047-48). The Beagle Decl.'s prediction that Lungstrum may have made money selling hunts is speculative, because the Beagle Decl. does not explain how Beagle arrives at his predictions or why Lungstrum's land is allegedly well-situated for selling hunts. See Beagle Decl. at 1 (AR-Lungstrum-000760). Although there is a "possibility of drawing two inconsistent conclusions from the evidence," the Court may not "displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Zoltanski v. F.A.A., 372 F.3d at 1200. FEMA's evidence is "such relevant evidence as a reasonable mind might accept as adequate to support" its conclusion that Lungstrum's request is too speculative. Lax v. Astrue, 489 F.3d at 1084. Applying the substantial-evidence standard, the Court thus upholds FEMA denial of Lungstrum's lost-hunting-revenue request. In sum, the Court enters: (i) $300,000.00 in noneconomic nuisance damages; (ii) $1,035,608.83 in reforestation damages; (iii) $326,186.05 for road-regrading and erosion damages; and (iv) $0.00 in lost hunting revenue, for a grand total of $1,661,794.88.

## I.    THE COURT MODIFIES FEMA'S FINAL DECISION FOR MAESTAS AND ENTERS $86,490.24 IN TOTAL COMPENSATION.

The Court modifies FEMA's final decision for Maestas and enters $86,490.24 in total compensation, which includes $35,000.00 in noneconomic nuisance damages.  The parties agree that FEMA's final economic damages offer is $51,490.34 and that Maestas challenges only FEMA's denial of her $35,000.00 noneconomic nuisance damages request.  See May 5, 2025, Tr. at 180:2-182:3 (Ritchey, Court, Starita); Letter from Angela Gladwell to Juanita Maestas re: FINAL LETTER OF DETERMINATION at 1 (dated January 18, 2024)(AR-Maestas-00101)("Maestas Letter of Determination")(awarding Joslin $0.00 in noneconomic damages); Proof of Loss at 2-3 (dated September 2, 2023)(AR-Maestas-000069-70)("Maestas Proof of Loss")(requesting $35,000.00 in noneconomic damages and directing the claims reviewer to "[r]efer to narrative in the Notice of Loss"); Notice of Loss at 4 (dated June 6, 2023)(AR-Maestas-000034)("Maestas Notice of Loss").  Maestas tells FEMA that she is a widow and that her husband "purchased her dream home in 1992 when they got married."  Maestas Notice of Loss at 4 (AR-Maestas-000034).  Maestas tells FEMA that her home is a "peaceful and safe sanctuary," which "hold[s] many happy memories of time with her husband and son."  Maestas Notice of Loss at 4 (AR-Maestas-000034).  Maestas tells FEMA that, when she evacuated, she saw "heavy black smoke in the air," and she "was worried about the unknown future of her home."  Maestas Notice of Loss at 4 (AR-Maestas-000034).  Maestas tells FEMA that, because she cannot "drive far away on her own due to her age," her son picked her up and drove her to safety 300 hundred miles away, and she stayed with her granddaughter for a month.  Maestas Notice of Loss at 4 (AR-Maestas-000034).  Maestas tells FEMA that the fire did not damage her home significantly, and she was able to return home after a month with her granddaughter.  See Maestas Notice of Loss at 4 (AR-Maestas-000034).  Maestas tells FEMA that, because she lives alone, "she worries about her safety

and if another fire will occur." Maestas Notice of Loss at 4 (AR-Maestas-000034). FEMA awards Maestas $0.00 in noneconomic damages. See Maestas Letter of Determination at 1 (AR-Maestas-00101).

In the Maestas Letter of Determination, FEMA explains why the agency denies Maestas' noneconomic damages request: "The claimed damages are not eligible under the Hermit's Peak/Calf Canyon Fire Assistance Act and implementing regulations." Maestas Letter of Determination at 1 (AR-Maestas-00101). Substantial evidence does not support FEMA's initial categorical denial, because FEMA's rationale is legal, and, as discussed, an incorrect legal argument is not substantial evidence. See supra, at 74. Thus, the Court concludes that neither the law nor substantial evidence supports the $0.00 noneconomic damages figure in the Maestas Letter of Determination, which is the "final decision" under review here. Hermit's Peak Act § 104(i)(1).

At the hearing, FEMA argues that Maestas' situation is similar to Gallegos' and Marquez' situations, and, accordingly, FEMA should compensate Maestas similarly, i.e., between $9,000.00 and $12,000.00. See May 5, 2025, Tr. at 185:12-186:9 (Ritchey). The Court also disagrees with this argument. Given Maestas' age and the fact that she is a widow, her evacuation experience and continued concerns about her safety hit harder. She experienced not insignificant discomfort, inconvenience, and annoyance when she had to evacuate, and travel far away to stay with her granddaughter. She continues to experience not insignificant discomfort, inconvenience, and annoyance by worrying about her safety in a home that was once a place of peace and solitude. Accordingly, the Court also concludes that neither the law nor substantial evidence supports FEMA's suggested amount at the hearing, and that Maestas' $35,000.00 request is reasonable. The Court orders FEMA to pay Maestas $86,490.24 in total damages for her disputed claim here, which includes $35,000.00 in noneconomic nuisance damages.

**J.     THE COURT MODIFIES FEMA'S FINAL DECISION FOR C. SEAVERNS AND ENTERS $1,203,921.32 IN TOTAL COMPENSATION.**

The Court modifies FEMA's final decision for C. Seaverns and enters $1,203,921.32 in total compensation, which includes $250,000.00 in noneconomic nuisance damages. In addition to contesting FEMA's denial of her $250,000.00 noneconomic nuisance damages request, C. Seaverns challenges FEMA's partial denial of her $1,417,395.08 road-regrading and erosion-control damages request, for which FEMA awards $120,770.77. See May 5, 2025, Tr. at 189:1-190:14 (Berkstresser, Court, Yang); May 6, 2025, Tr. at 23:22-24:15; Letter from Hermit's Peak/Calf Canyon Claims Office to Seaverns Family Living Trust re: Final Letter of Determination for Claim No.00006103 at 2 (dated December 5, 2024)(AR-SeavernsLT-001047)("Seaverns Letter of Determination")(awarding Seaverns: (i) $0.00 in noneconomic damages; and (ii) $120,770.77 for erosion, despite her $1,417,395.08 request); Proof of Loss at 3 (dated October 17, 2023)(AR-SeavernsLT-001037)("Seaverns Proof of Loss")(requesting: $250,000.00 in noneconomic damages and directing the claims reviewer to "[r]efer to narrative included in Notice of Loss"); Notice of Loss at 5 (dated June 5, 2023)(AR-SeavernsLT-000061)("Seaverns Notice of Loss"). On the noneconomic damages issue, C. Seaverns tells FEMA that she and her husband, Joseph, purchased the property in 1987 and then purchased two adjacent lots. See Seaverns Notice of Loss at 5 (AR-SeavernsLT-000061). C. Seaverns tells FEMA that she and J. Seaverns "spent summers and occasionally fall there as a family." Seaverns Notice of Loss at 5 (AR-SeavernsLT-000061). C. Seaverns tells FEMA that they "lost their vacation home and all personal belongings in the fire," including recently inherited antiques from C. Seaverns' mother, "irreplaceable sentimental gifts from their children," and J. Seaverns' "collection of mounts, rugs, and skins." Seaverns Notice of Loss at 5 (AR-SeavernsLT-000061). C. Seaverns tells FEMA that flooding destroyed the gravel road leading to the property and now they have to walk up a hill to access the

property.  Seaverns Notice of Loss at 5 (AR-SeavernsLT-000061).  C. Seaverns concludes: "The fire and flooding has robbed Claimants of their vacation paradise."  Seaverns Notice of Loss at 5 (AR-SeavernsLT-000061).  FEMA awards C. Seaverns $0.00 in noneconomic damages.  See Seaverns Letter of Determination at 2 (AR-SeavernsLT-001047).

FEMA denies C. Seaverns' noneconomic damages request, because, according to FEMA, those damages "are not eligible under the Hermit's Peak/Calf Canyon Fire Assistance Act and implementing regulations."  Seaverns Letter of Determination at 2 (AR-SeavernsLT-001047). FEMA also argues that C. Seaverns, on a living trust's behalf, cannot get noneconomic damages in this action, because: (i) "a trust as a non-living, non-corporal entity cannot suffer annoyance itself, nor discomfort"; and (ii) the trust is not an occupant of the damaged land.  May 6, 2025, Tr. at 24:23-25:9 (Yang).  The Court disagrees with all three legal arguments.  As the Court has held, the Hermit's Peak Act provides compensation for noneconomic damages.  See supra, at 9-10.  On the second argument, FEMA mischaracterizes C. Seaverns' claim.  Seaverns does not allege that her trust suffers noneconomic damages.  Seaverns alleges that she and her husband suffer noneconomic damages, and she files a Hermit's Peak Act claim on behalf of her trust, because the trust owns the damaged property and "combine[s] the whole household."  May 6, 2025, Tr. at 29:13-23 (Gallegos).  C. Seaverns represents that the trust is a grantor trust.  See May 6, 2025, Tr. at 29:13-23 (Gallegos).  A grantor trust is a trust "in which the settlor retains control over the trust property or its income to such an extent that the settlor is taxed on the trust's income."  Grantor Trust, Black's Law Dictionary at 1826 (12th ed. 2024).  FEMA introduces no legal authority to support its contention that a grantor trust may not receive noneconomic damages on behalf of its owners.  Moreover, New Mexico law suggests otherwise.  See McNeill v. Burlington Res. Oil & Gas Co., 2008-NMSC-022, ¶ 37, 143 N.M. 740, 749, 182 P.3d 121, 130 (holding that a trust may

sue for nuisance damages to a property in which the trust has ownership interest). Because the Seaverns Living Trust owns the damaged property, the Seaverns Living Trust may file suit in federal court seeking § 104(i) review of FEMA's claim determinations for that property, including the noneconomic damages which C. Seaverns and J. Seaverns suffer. Regarding FEMA's third argument -- that the trust is not an occupant -- the Court reiterates that occupancy does not require physical presence at all times. See supra, at 93-94. Instead, an occupant is someone who has possessory rights in a property. See supra, at 93-94. FEMA does not dispute that the Seaverns Living Trust, C. Seaverns, and J. Seaverns have possessory rights in the damaged property. Thus, Seaverns may receive noneconomic damages as an occupant. Because FEMA's three incorrect legal arguments are not substantial evidence, see supra, at 74, the Court concludes that neither the law nor substantial evidence supports the $0.00 noneconomic damages figure in the Seaverns Letter of Determination, which is the "final decision" under review here. Hermit's Peak Act § 104(i)(1).

The Court also concludes that C. Seaverns' $250,000.00 noneconomic damages request is reasonable, because C. Seaverns and J. Seaverns suffer significant discomfort, inconvenience, and annoyance when the fire destroys their long-time vacation home. It is highly discomforting, inconvenient, and annoying to lose irreplaceable sentimental items, including prized antiques, gifts from children, mounts, rugs, and skins. The Seaverns family used the home as a vacation home for almost forty years before the Hermit's Peak/Calf Canyon Fire. It is significantly discomforting, inconvenient, and annoying for them to lose a home with so many family memories. It is also discomforting, inconvenient, and annoying for them to have to walk up a hill to access the property. Accordingly, the Court modifies FEMA's final decision and enters a $250,000.00 noneconomic damages award.

For erosion damages, FEMA awards C. Seaverns $120,770.77, despite her $1,417,395.08 request.  See Seaverns Letter of Determination at 2 (AR-SeavernsLT-001047).  C. Seaverns argues that substantial evidence does not support FEMA's low calculation, because C. Seaverns' expert report is more reliable than FEMA's review memorandum, and FEMA's review memorandum lacks: (i) "any kind of particularized expert assessment" of how damaged the roads are and how many regradings are required; and (ii) "mapping or documentation showing how" the agency reached its conclusions.  May 5, 2025, Tr. at 190:19-192:16 (Berkstresser).  FEMA argues that its erosion review memorandum constitutes substantial evidence.  See May 5, 2025, Tr. at 198:5-17 (Yang).

FEMA's erosion review memorandum lists seven line items, which correspond to Seaverns' expert report: Item 1(a), Item 1(b), Item 2, Item 3, Item 4(a), Item 4(b), and Item 4(c). See SME Review Memo for Repairs/Risk/Reduction/Erosion Control at 1-2 (dated October 24, 2024)(AR-SeavernsLT-001070-71)("Seaverns Erosion Claim Review Memo."); Cost Estimates for Candace L. Seaverns Property Repairs at 2 (date October 24, 2023)(AR-SeavernsLT-000619)("Seaverns ESI Erosion Report").  Regarding Item 1(a), FEMA argues that substantial evidence supports its calculation, because its claims reviewers evaluated the Seaverns ESI Erosion Report and photographs, and concludes that only 853 cubic yards of soil are needed to fill the damaged roads, as opposed to Seaverns' expert's higher 4,030 cubic yards estimate.  See May 5, 2025, Tr. at 199:15-204:22 (Yang, Court, Sydow).  FEMA's Seaverns Erosion Claim Review Memo. identifies only one photograph to support its lower calculation.  See Seaverns Erosion Claim Review Memo. at 2 (AR-SeavernsLT-001071).  Moreover, FEMA's Seaverns Erosion Claim Review Memo. does not explain from where the lower calculation comes or what is wrong with Seaverns' higher calculation.  See Seaverns Erosion Claim Review Memo. at 2 (AR-

SeavernsLT-001071).   Because the Seaverns Erosion Claim Review Memo. lacks important information about FEMA's methodology for arriving at its lower number, the Court concludes that substantial evidence does not support that lower number.   Accordingly, the Court modifies FEMA's final decision regarding Item 1(a) and enters a $128,029.00 award, which matches Seaverns' calculation.

Item 1(b) has a similar problem.   FEMA provides a lower cost estimate, because FEMA proposes using a filling method that is cheaper than Seaverns' proposed method.   See Seaverns Erosion Claim Review Memo. at 2 (AR-SeavernsLT-001071).   FEMA's Seaverns Erosion Claim Review Memo. does not explain, however, why FEMA chooses the cheaper method or whether that cheaper method will work.   See Seaverns Erosion Claim Review Memo. at 2 (AR-SeavernsLT-001071).   Because the Seaverns Erosion Claim Review Memo. lacks important information about FEMA's rationale behind choosing a cheaper method, the Court concludes that substantial evidence does not support FEMA's lower estimate.   Accordingly, the Court modifies FEMA's final decision regarding Item 1(b) and enters a $119,547.00 award, which matches Seaverns' calculation.

Item 2 is similar to Lungstrum's situation.   See supra, at 111-13.   FEMA provides a lower regrading calculation, because FEMA asserts: (i) there is not as much damaged road as Seaverns' expert report says there is; and (ii) the road only needs to be regraded three times instead of five times.   See Seaverns Erosion Claim Review Memo. at 2 (AR-SeavernsLT-001071).   Applying consistent analysis to Seaverns' situation, the Court concludes that: (i) substantial evidence does not support FEMA's lower estimate for the quantity of damaged roads; and (ii) substantial evidence supports FEMA's determination that fewer regradings are needed.   See supra, at 112-13. Accordingly, the Court modifies FEMA's final decision regarding Item 2 and enters a $12,837.00

award.  For Item 3, both parties agree that the road needs to be regraded twice, but the parties disagree on how much road needs to be regraded.  <u>See</u> Seaverns Erosion Claim Review Memo. at 2 (AR-SeavernsLT-001071).  Applying consistent analysis, the Court concludes that substantial evidence does not support FEMA's lower quantity estimate.  <u>See</u> <u>supra</u>, at 112-13.  Accordingly, the Court modifies FEMA's final decision regarding Item 3 and enters a $48,684.00 award, which matches Seaverns' expert report.

Item 4 is about removing boulders and large debris from the property.  <u>See</u> Seaverns Erosion Claim Review Memo. at 2 (AR-SeavernsLT-001071).  For Item 4(a), FEMA provides a lower cost estimate, because FEMA asserts that only 356 square yards of debris needs to be removed, whereas Seaverns pegs the figure at 2,420 cubic yards.  <u>See</u> Seaverns Erosion Claim Review Memo. at 2 (AR-SeavernsLT-001071).  Again, Seaverns has introduced evidence substantiating her higher amount.  <u>See</u> Seaverns ESI Erosion Report at 7 (AR-SeavernsLT-000624)(identify where the debris is located); <u>id.</u> at 19-35 (AR-SeavernsLT-000636-52)(providing photographs of the debris).  To clear the substantial evidence burden, FEMA needs to provide some methodology that "a reasonable mind might accept as adequate to support" its lower amount.  <u>Lax v. Astrue</u>, 489 F.3d at 1084.  FEMA has not provided any methodology beyond asserting that the agency looked at Seaverns' photographs and topographic maps.  <u>See</u> Seaverns Erosion Claim Review Memo. at 2-3 (AR-SeavernsLT-001071-72).  FEMA does not explain what is wrong with Seaverns' number or identify from where the 356 cubic yards figure comes.  Accordingly, the Court modifies FEMA's final decision regarding Item 4(a) and enters a $409,464 award, which matches Seaverns' expert report.

On Item 4(b), the Court applies the same analysis and concludes that substantial evidence does not support FEMA's lower calculation for hauling costs: FEMA does not explain how it

comes to its lower figure or what is wrong with Seaverns' higher figure. See Seaverns Erosion Claim Review Memo. at 2-3 (AR-SeavernsLT-001071-72). Accordingly, the Court modifies FEMA's final decision regarding Item 4(b) and enters a $35,527.00 award, which matches Seaverns' expert report. On Item 4(c), the Court concludes that substantial evidence support FEMA's denial of tipping fees for specialized debris removal. See Seaverns Erosion Claim Review Memo. at 2-3 (AR-SeavernsLT-001071-72). FEMA says that the agency looked at all the photographs, and concludes that "the debris is mostly rocks, boulders, or vegetation not requiring special handling at the waste facility." Seaverns Erosion Claim Review Memo. at 3 (AR-SeavernsLT-001072). That statement is substantial evidence, because it describes FEMA's methodology and explains why Seaverns' tipping fee request is unwarranted. The explanation is evidence that "a reasonable mind might accept as adequate to support" FEMA's denial of the tipping fee. Lax v. Astrue, 489 F.3d at 1084. Accordingly, the Court upholds FEMA's final decision regarding Item 4(c) and enters a $0.00 tipping fee award.

The last disputed line item is the contingency fee. See Seaverns Erosion Claim Review Memo. at 3 (AR-SeavernsLT-001072). FEMA denies the contingency fee request, because, according to FEMA, those fees are "not required for earthwork repairs." Seaverns Erosion Claim Review Memo. at 3 (AR-SeavernsLT-001072). FEMA does not provide any rationale for this conclusion. See Seaverns Erosion Claim Review Memo. at 3 (AR-SeavernsLT-001072). The Court has concluded that ten-percent contingency fees are compensable under the Hermit's Peak Act. See supra, at 71-76. Accordingly, the Court modifies FEMA's final decision regarding the contingency fee and orders FEMA to pay Seaverns a ten-percent contingency fee for her erosion costs.

Adding up: (i) $128,029.00 for Item 1(a); (ii) $119,547.00 for Item 1(b); (iii) $12,837.00 for Item 2; (iv) $48,684.00 for Item 3; (v) $409,464.00 for item 4(a); and (vi) $35,527.00 for Item 4(b), the base cost of Seaverns' road regrading and erosion damage repairs is $754,088.00.  By adding the Seaverns ESI Erosion Report's undisputed line items -- ten percent for mobilization and five percent for erosion control -- Seaverns has an overall subtotal of $867,201.20.  Adding a ten percent contingency fee -- $86,720.12 -- leaves Seaverns with a grand total of $953,921.32. Accordingly, the Court modifies FEMA's erosion determination and enters a $953,921.32 award for Seaverns.  Adding Seaverns' $250,000.00 noneconomic damages to the $953,921.32 erosion award, the Court orders FEMA to pay Seaverns $1,203,921,32 in total damages for her disputed claim here.

### K.    THE COURT MODIFIES FEMA'S FINAL DECISION FOR OGOREK AND ENTERS $353,986.11 IN TOTAL COMPENSATION.

The Court modifies FEMA's final decision for Ogorek and enters $353,986.11 in total compensation, which includes $270,000.00 in noneconomic nuisance damages.  The parties agree that FEMA's final economic damages offer is $83,936.11 and that Ogorek challenges only FEMA's denial of his $300,000.00 noneconomic nuisance damages request.  See May 6, 2025, Tr. at 31:13-32:23 (Court, Berkstresser, Sydow); Letter from Angela Gladwell to Richard Ogorek re: FINAL LETTER OF DETERMINATION at 2 (dated January 25, 2024)(AR-Ogorek-000200)("Ogorek Letter of Determination")(awarding Ogorek $0.00 in noneconomic damages); Proof of Loss at 2-3 (dated November 9, 2023)(AR-Ogorek-000008-9)("Ogorek Proof of Loss")(requesting $300,000.00 in noneconomic damages and directing the claims reviewer to "[r]efer to narrative in the Notice of Loss"); Notice of Loss at 4 (dated March 24, 2023)(AR-Ogorek-000216)("Ogorek Notice of Loss").  Ogorek tells FEMA that he "loved this property due to its remote location and its amazing view of Hermit's peak [sic]."  Ogorek Notice of Loss at 4

(AR-Ogorek-000216).  Ogorek tells FEMA that he and his girlfriend evacuated twice.  See Ogorek

Notice of Loss at 4 (AR-Ogorek-000216).  Ogorek tells FEMA that, during the first evacuation,

they packed up and left their home in fifteen minutes and, as they left, they saw "massive flames

on the hillside."  Ogorek Notice of Loss at 4 (AR-Ogorek-000216).  Ogorek tells FEMA that he

and his girlfriend then stayed at a friend's house for a few days, but left, because they "did not

want to be a burden."  Ogorek Notice of Loss at 4 (AR-Ogorek-000216).  Ogorek tells FEMA that

he and his girlfriend then stayed at his other property, "but the living conditions were horrible."

Ogorek Notice of Loss at 4 (AR-Ogorek-000216).  Ogorek tells FEMA that he and his girlfriend

then returned to the original property for approximately one week, before evacuating again as "the

fire came barreling right toward their property and when they had embers landing on there [sic]

front lawn they left right away."  Ogorek Notice of Loss at 4 (AR-Ogorek-000216).  Ogorek tells

FEMA that he and his girlfriend "have been having a hard time getting back into their normal

groove," and that Ogorek's girlfriend "has been really struggling [] since the fire."  Ogorek Notice

of Loss at 4 (AR-Ogorek-000216).  Ogorek tells FEMA that his girlfriend's struggle "has also put

more of a burden on him because one of them have [sic] to remain strong."  Ogorek Notice of Loss

at 4 (AR-Ogorek-000216).  FEMA awards Ogorek $0.00 in noneconomic damages.  See Ogorek

Letter of Determination at 2 (AR-Ogorek-000201).

        In the Ogorek Letter of Determination, FEMA explains why the agency denies Ogorek's

noneconomic damages request: "The claimed damages are not eligible under the Hermit's

Peak/Calf Canyon Fire Assistance Act and implementing regulations."  Substantial evidence does

not support FEMA's initial categorical denial, because FEMA's rationale is legal, and, as

discussed, an incorrect legal argument is not substantial evidence.  See supra, at 74.  Thus, the

Court concludes that neither the law nor substantial evidence supports the $0.00 noneconomic

damages figure in the Ogorek Letter of Determination, which is the "final decision" under review here. Hermit's Peak Act § 104(i)(1).

At the hearing, FEMA argues that Ogorek's situation is similar to other Plaintiffs "who had short-term evacuations from their home," and, accordingly, the Court should compensate Ogorek similarly, i.e., between $9,000.00 and $24,000.00. May 6, 2025, Tr. at 37:18-24 (Sydow). The Court disagrees with FEMA. Ogorek experiences significantly more discomfort, inconvenience, and annoyance than Gallegos, Kemp, and Marquez do. He and his girlfriend evacuate twice, and the second evacuation is a close call. Being in close proximity with a raging wildfire is significantly discomforting, inconvenient, and annoying. It also discomforting, inconvenient, and annoying for Ogorek to have a hard time returning to his pre-fire routines and to bear the burden of supporting his struggling girlfriend. Accordingly, the Court also concludes that neither the law nor substantial evidence supports FEMA's suggested amount at the hearing. At the same time, Ogorek's $300,000.00 ask is a little rich. The Court concludes that $270,000.00 more accurately reflects Ogorek's discomfort, inconvenience, and annoyance stemming from his harrowing evacuation and its lingering impacts. The Court orders FEMA to pay Ogorek $353,986.11 in total damages for his disputed claim here, which includes $270,000.00 in noneconomic nuisance damages.

L. **THE COURT MODIFIES FEMA'S FINAL DECISION FOR HERRERA-ROMERO AND ENTERS $266,460.24 IN TOTAL COMPENSATION.**

The Court modifies FEMA's final decision for Herrera-Romero and enters $266,460.24 in total compensation, which includes $180,000.00 in noneconomic nuisance damages. The parties agree that FEMA's final economic damages offer is $58,773.11 and that Herrera-Romero challenges only FEMA's denial of her $200,000.00 noneconomic nuisance damages request. See May 6, 2025, Tr. at 41:8-43:12 (Court, Berkstresser, Go); Letter from Angela Gladwell to Juanita

Herrera-Romero re: FINAL LETTER OF DETERMINATION at 1 (dated February 3, 2024)(AR-Herrera-Romero-000044)("Herrera-Romero Letter of Determination")(awarding Herrera-Romero $0.00 in noneconomic damages); Proof of Loss at 2-3 (dated October 27, 2023)(AR-Herrera-Romero-000060-61)("Herrera-Romero Proof of Loss")(requesting $200,000.00 in noneconomic damages and directing the claims reviewer to "[r]efer to narrative in the Notice of Loss"); Notice of Loss at 4 (dated March 20, 2023)(AR-Herrera-Romero-000205)("Herrera-Romero Notice of Loss"). Herrera-Romero tells FEMA that "the fire was right behind the house" and that, because she and her husband "had 10 minutes to evacuate," she left behind her diabetes medication, which made her extended displacement "awful." Herrera-Romero Notice of Loss (AR-Herrera-Romero-000205). Herrera-Romero tells FEMA that she and her husband "were fearful to come back thinking they would completely lose their home." Herrera-Romero Notice of Loss (AR-Herrera-Romero-000205). Herrera-Romero tells FEMA that they left behind their animals, including a miniature pet pig who passed away because of smoke inhalation. See Herrera-Romero Notice of Loss (AR-Herrera-Romero-000205). Herrera-Romero tells FEMA that she was later diagnosed with bronchitis from smoke inhalation, that she came down with stress-induced shingles, and that she currently uses an inhaler several times a day. See Herrera-Romero Notice of Loss (AR-Herrera-Romero-000205). Herrera-Romero tells FEMA that, since the fire, she cannot regulate her sugar levels. See Herrera-Romero Notice of Loss (AR-Herrera-Romero-000205). FEMA awards Herrera-Romero $0.00 in noneconomic damages. See Herrera-Romero Letter of Determination at 1 (AR-Herrera-Romero-000044).

The Herrera-Romero Letter of Determination does not say why FEMA denies Herrera-Romero's noneconomic damages request. At the hearing, FEMA does not offer an explanation or defend the $0.00 figure. No evidence is not substantial evidence. The Court recognizes, however,

that FEMA denies Herrera-Romero's noneconomic damages request for the same reason it denies the others: FEMA has maintained consistently and continues to argue that the Hermit's Peak Act does not provide compensation for noneconomic damages.  As stated, an incorrect legal argument is not substantial evidence.  See supra, at 74.  Thus, the Court concludes that neither the law nor substantial evidence supports the $0.00 noneconomic damages figure in the Herrera-Romero Letter of Determination, which is the "final decision" under review here.  Hermit's Peak Act § 104(i)(1).

At the hearing, FEMA argues that Herrera-Romero's situation is similar to other Plaintiffs "who had short-term evacuations from their home," and, accordingly, FEMA should compensate Herrera-Romero proportionally, given that she incurred lower economic damages than the other evacuated Plaintiffs did.  See May 6, 2025, Tr. at 43:25-46:5 (Go).  FEMA also notes that Herrera-Romero does not submit evidence regarding her medical conditions.  See May 6, 2025, Tr. at 44:9-21 (Go).  Although the Court acknowledges that there is no record evidence about Herrera-Romero's medical conditions, the Court disagrees with FEMA's argument.  Herrera-Romero experiences significant discomfort, inconvenience, and annoyance when she rushes out of her home and leaves her animals behind.  It is significantly discomforting, inconvenient and annoying for Herrera-Romero to flee from her home in close proximity to the largest wildfire in New Mexico's history and pack up her belongings in ten minutes.  It is also discomforting and annoying for Herrera-Romero to lose her miniature pet pig to the fire.  Accordingly, the Court concludes that neither the law nor substantial evidence supports FEMA's suggested amount at the hearing.  At the same time, Herrera-Romero's $200,000.00 ask is a little high.  The Court concludes that $180,000.00 more accurately reflects Herrera-Romero's discomfort, inconvenience, and

annoyance. The Court orders FEMA to pay Herrera-Romero $266,460.24 in total damages for her disputed claim here, which includes $180,000.00 in noneconomic nuisance damages.

**IT IS ORDERED** that: (i) the Court may evaluate the Plaintiffs' judicial review requests, because, although the Plaintiffs filed the Complaint more than 60 days after getting a judicially reviewable decision, each Plaintiff's 60-day filing deadline has been tolled equitably, their 60-day clocks start ticking when FEMA issues their respective Letters of Determination, and the Plaintiffs file the Complaint within 60 days of each Letter of Determination; (ii) the Court limits its judicial review to materials presented to FEMA before FEMA rendered a judicially reviewable decision, because the Hermit's Peak Act provides that a claimant may seek judicial review of FEMA's "final decision," and a district court "shall" review that final decision "on the record made before the Administrator," Hermit's Peak Act § 104(i)(1)-(2); (iii) the Court will limit its judicial review to materials presented to FEMA before FEMA issued the decisions which the Court is reviewing -- which, in the Plaintiffs' cases, are the Letters of Determination -- because the Hermit's Peak Act provides that a district court "shall" review a challenged decision "on the record made before the Administrator," Hermit's Peak Act § 104(i)(1)-(2); and (iv) FEMA shall pay: (a) $11,118.58 to Plaintiff Anthony Gallegos, which includes $9,000.00 in noneconomic nuisance damages; (b) $206,991.36 to Olen C. Priddy, which includes $150,000.00 in noneconomic nuisance damages; (c) $314,198.68 to Plaintiff Sheila Cavitt-Olguin, which includes $215,000.00 in noneconomic nuisance damages; (d) $31,146.35 to Plaintiff Tyler Kemp, which includes $24,000.00 in noneconomic nuisance damages; (e) $269,782.43 to Plaintiff Deborah Leyba, which includes $100,000.00 in noneconomic nuisance damages and $169,782.43 in reforestation damages; (f) $15,112.35 to Plaintiff Rose Anna Marquez, which includes $12,000.00 in noneconomic nuisance damages; (g) $330,000.00 in noneconomic nuisance damages to Plaintiff

Daniel Joslin; (h) $1,661,794.88 to Plaintiff Gregory Lungstrum, which includes $300,000.00 in noneconomic nuisance damages, $1,035,608.83 in reforestation damages, and $326,186.05 in road regrading and erosion damages; (i) $86,490.24 to Plaintiff Juanita Maestas, which includes $35,000.00 in noneconomic nuisance damages; (j) $1,203,921.32 to Plaintiff Candace Seaverns, which includes $250,000.00 in noneconomic nuisance damages, and $953,921.32 in road regrading and erosion damages; (k) $353,986.11 to Plaintiff Richard Ogorek, which includes $270,000.00 in noneconomic nuisance damages; and (l) $266,460.24 to Plaintiff Juanita Herrera-Romero, which includes $180.000.00 in noneconomic nuisance damages.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Brian S. Colon
Alexander F. Flores
Jacob Payne
Singleton Schreiber
Albuquerque, New Mexico

-- and --

Gerald Singleton
Benjamin Siminou
Jonna D. Lothyan
Krystle D. Berkstresser
Paul Starita
Alicia Zimmerman
Singleton Schreiber
San Diego, California

   *Attorneys for the Plaintiff*

Ryan Ellison
  United States Attorney
Nicholas Sydow
Carrie Yang
Rafael Go
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

    *Attorneys for the Defendants*